IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JONATHAN I. GEHRICH, ROBERT LUND,
COREY GOLDSTEIN, PAUL STEMPLE and
CARRIE COUSER, individually and on behalf
of all others similarly situated,

                    Plaintiffs,

   v.

CHASE BANK USA, N.A., and JPMORGAN
CHASE BANK, N.A.,

                    Defendants.

NO. 1:12-CV-5510

Honorable Gary Feinerman

## **PLAINTIFFS' RESPONSE TO OBJECTIONS TO CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

**Page No.**

I. INTRODUCTION ...................................................................................................... 1

II. THE CLASS HAS RESPONDED POSITIVELY TO THE SETTLEMENT ................. 1

III. THE OBJECTIONS TO CLASS RELIEF LACK MERIT ............................................ 3

    A.    The $34 Million Settlement Is an Excellent Result for the Class ......................... 3

    B.    Basing Settlement Class Members' Awards on the Number of Calls
    Received Was Not Feasible .................................................................................... 8

    C.    The Settlement Fairly Allocates the Fund Among the Settlement Class
    Members ................................................................................................................... 9

    D.    The Release Is Narrowly Tailored and Fair ........................................................ 11

    E.    The Dedicated and Residual *Cy Pres* Distributions Are Appropriate ............... 13

        1.    Dedicated *Cy Pres* Distribution .............................................................. 14

        2.    The Residual *Cy Pres* Distribution ........................................................ 17

    F.    The Notice and Claims Procedures Satisfied Due Process ................................. 20

    G.    The Remaining Objections Should Be Overruled ............................................... 22

IV. OBJECTIONS TO THE ATTORNEYS' FEES SHOULD BE OVERRULED ............ 23

    A.    Awarding Counsel 33.33% of the Fund Is Fair and Reasonable ........................ 24

    B.    A Lodestar Crosscheck Is Not Warranted ........................................................... 26

    C.    Class Counsel's Requested Fee Complies with *Redman* and *Pearson* ............... 28

    D.    The Presence of a Clear Sailing Clause Does Not Warrant a Fee
    Reduction ............................................................................................................... 28

V. CONCLUSION ......................................................................................................... 29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adams v. AllianceOne Receivables Mgmt., Inc.*,
    No. 3:08-cv-00248-JAH-WVG (S.D. Cal. Sept. 28, 2012) ............................................... 7

*Aliano v. Joe Caputo & Sons-Algonquin, Inc.*,
    No. 09 C 910, 2011 WL 1706061 (N.D. Ill. May 5, 2011) ............................................... 6

*Americana Art China, Co. v. Foxfire Printing & Packaging, Inc.*,
    743 F.3d 243 (7th Cir. 2014) ......................................................................................... 24

*AT&T Mobility LLC v. Concepcion*,
    --- U.S. ---, 131 S.Ct. 1740 (2011) ................................................................................. 5

*Balschmiter v. TD Auto Fin., LLC*,
    303 F.R.D. 508 (E.D. Wis. 2014) ................................................................................... 5

*Birchmeier v. Caribbean Cruise Line, Inc.*,
    302 F.R.D. 240 (N.D. Ill. 2014) ...................................................................................... 5

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ....................................................................................................... 24

*CE Design, Ltd. v. Exterior Sys., Inc.*,
    Case No. 1:07-cv-00066 (N.D. Ill. Dec. 6, 2007) ......................................................... 26

*Cummings v. Sallie Mae*,
    Case No. 12 C-9984 (N.D. Ill. May 30, 2014) .............................................................. 25

*Desai v. ADT Sec. Servs., Inc.*,
    Case No. 1:11-cv-01925 (N.D. Ill. Feb. 14, 2013) ........................................................ 7

*Desai v. ADT Sec. Servs., Inc.*,
    Case No. 1:11-cv-01925 (N.D. Ill. June 21, 2013) ...................................................... 25

*Eubank v. Pella Corp.*,
    753 F.3d 718 (7th Cir. 2014) .................................................................................... 4, 29

*Garret, et al. v. Sharps Compliance, Inc.*,
    Case No. 1:10-cv-04030 (N.D. Ill. Feb. 23, 2012) ........................................................ 7

*Gaskill v. Gordon*,
  942 F. Supp. 382 (N.D. Ill. 1996) ................................................................. 24

*Gonzalez v. Citigroup Inc.*,
  No. Civ. S-11-0795 LKK/GGH, 2011 WL 5884250 (E.D. Cal. Nov. 23, 2011) ............ 7

*Gonzalez v. J.C. Penney Co., Inc.*,
  No. 2:11-cv-00794-KJM-EFB (E.D. Cal. Sept. 21, 2011) ............................... 7

*Gonzalez v. JP Morgan Chase*,
  No. 11-cv-00796-GEB-EFB (E.D. Cal. Nov. 16, 2011) .................................. 7

*Gusman v. Comcast Corp.*,
  298 F.R.D. 592 (S.D. Cal. 2014) .................................................... 5

*Harper v. Credit Control Servs.*,
  863 F. Supp. 2d 125 (D. Mass. 2012) ................................................ 6

*Hughes v. Kore of Indiana Enter., Inc.*,
  731 F.3d 672 (7th Cir. 2013) .................................................. 13-17

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
  270 F.R.D. 330 (N.D. Ill. 2010) .................................................... 4

*In re: Baby Prods. Antitrust Litig.*,
  708 F.3d 163 (3d Cir. 2012) .................................................. 15-18

*In re Bank of Am. Corp. Sec. Litig.*,
  775 F.3d 1060 (8th Cir. 2015) ........................................... 15, 18, 27

*In re Capital One TCPA Litig.*,
  --- F.Supp.3d ---, MDL No. 2416, 2015 WL 605203 (N.D. Ill. Feb. 12, 2015) ....... 24, 25

*In re Cathode Ray Tube Antitrust Litig.*,
  281 F.R.D. 531 (N.D. Cal. 2012) ................................................... 10

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir.2001) .......................................................... 9

*In re Charles Schwab Corp. Sec. Litig.*,
  No. C 08-01510, 2011 WL 633308 (N.D. Cal. Feb. 11, 2011) ...................... 25

*In Re Cmty. Bank of N. Virginia*,
  622 F.3d 275 (3d Cir. 2010) ....................................................... 12

*In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*,
280 F.R.D. 364 (N.D. Ill. 2011) ............................................................... 24

*In re Lawnmower Engine Horsepower Marketing & Sales Prac. Litig.*,
No. 08-md-01999 (E.D. Wis.) ................................................................... 11

*In re Lupron Marketing and Sales Prac. Litig.*,
677 F.3d 21 (1st Cir. 2012) ....................................................................... 18

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ....................................................................... 9

*In re Pre-Filled Propane Tank Marketing & Sales Prac. Litig.*,
No. 09-md-02086 (W.D. Mo. Nov. 20, 2012) ........................................... 11

*In re Southwest Airlines Voucher Litig.*,
No. 11 C 8176, 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013) ....................... 2

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. 07-md-1827 (N.D. Cal.) ....................................................................... 11

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
724 F. Supp. 160 (S.D.N.Y. 1989) ............................................................. 24

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) ................................................................... 1, 4

*Jamison v. First Credit Servs.*,
290 F.R.D. 92 (N.D. Ill. 2013) ..................................................................... 5

*Klier v. Elf Atochem N. Am.*,
658 F.3d 468 (5th Cir. 2011) ............................................................... 15, 19

*Mace v. Van Ru Credit Corp.*,
109 F.3d 338 (7th Cir. 1997) ..................................................................... 16

*Martin v. Dun & Bradstreet, Inc. et al.*,
Case No. 1:12-cv-00215 (N.D. Ill. Jan. 16, 2014) ..................................... 25

*Matter of Cont'l Ill. Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992) ..................................................................... 24

*Mirfasihi v. Fleet Mortg. Corp.*,
356 F.3d 781 (7th Cir. 2004) ................................................... 13, 14, 17, 21

*Molski v. Gleich*,
    318 F.3d 937 (9th Cir. 2003) ...................................................................... 12

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ....................................................... 4, 23, 25, 28

*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th Cir. 2014) ....................................................... 4, 23, 25, 28

*Reynolds v. Beneficial National Bank*,
    288 F.3d 277 (7th Cir. 2002) ............................................................... 11, 12

*Saf-T-Gard Int'l v. Vanguard Energy Servs.*,
    Case No. 12 C 3671, 2012 WL 6106714 (N.D. Ill. Dec. 6, 2012) ................................... 5

*Salina v. NCO Fin. Sys., Inc.*,
    No. 10-7496 (E.D. Pa. June 25, 2012) .............................................................. 7

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ..................................................... 2, 9, 10

*Steinfeld v. Discover Fin. Servs.*,
    No. C 12-01118 (N.D. Cal. Mar. 10, 2014) ................................................... 7, 27

*Sutton v. Bernard*,
    504 F.3d 688 (7th Cir. 2007) ...................................................................... 24

*Warnick v. Dish Network Corp.*,
    No. 11-cv-00615-MSK-CBS (D. Colo. May 20, 2011) ............................................... 7

*Wilkins v. HSBC*,
    No. 14 C 190 (N.D. Ill. Nov. 17, 2014) .......................................................... 28

## OTHER AUTHORITIES

Am. Law Inst., Principles of Law of Aggregate Litig. § 3.07 (2010) ......................................... 14

Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
    7 J. Empirical L. Stud. 811 (2010) ................................................................. 26

# I. INTRODUCTION

Plaintiffs and Class Counsel have achieved substantial relief for Settlement Class Members in the form of a settlement that requires Defendants Chase Bank USA, N.A. ("Chase USA") and JPMorgan Chase Bank, N.A. ("JPMC Bank") (together "Defendants" or "Chase") to pay $34,000,000 into a non-reversionary settlement fund.  The settlement is the product of disputed litigation, hotly-contested settlement negotiations, and a thorough evaluation of Plaintiffs' claims and the risks of continued litigation.  Notice of the settlement has been sent and the claims, exclusion, and objection deadlines have passed.  In total, 349,206 Settlement Class Members timely submitted claims for a cash payment.  By contrast, only 225 exclusion requests were submitted (23 of which were untimely and 97 of which were potentially invalid), and only 18 Settlement Class Members objected to the settlement.[1]  The positive reaction of the Class is evidence that the settlement is fair, reasonable, and adequate.

Class Counsel appreciate the important role that objectors can play in the class settlement approval process.  That said, none of the objections lodged here, many of which were filed by well-known "professional" objectors, should be allowed to deprive the Settlement Class Members of the benefits they are entitled to receive under the settlement.  For these reasons and those that follow, Plaintiffs respectfully request that the objections be overruled and the settlement approved as fair, reasonable, and adequate.

## II. THE CLASS HAS RESPONDED POSITIVELY TO THE SETTLEMENT

The class members' reaction to a proposed settlement is a factor in determining whether the settlement is fair, adequate, and reasonable.  *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996).  Courts often infer that a settlement is fair, adequate, and reasonable when few class members object to it.  *See, e.g., Isby*, 75 F.3d at 1200 (affirming final approval of settlement

---

[1] Some of the objections are invalid.  For example, three of these objections were submitted after the February 9, 2015 objection deadline and four objections were not filed with the Court. (Dowd Decl. ¶ 40.)  Plaintiffs respectfully request these objections be overruled on this basis.

where 13% of the class submitted written objections); *In re Southwest Airlines Voucher Litig.*, No. 11 C 8176, 2013 WL 4510197, at * (N.D. Ill. Aug. 26, 2013) (finding that the "low level of opposition" amounting to 0.01% of the class "supports the reasonableness of the settlement") (citing *In re Mexico Money Transfer Litig.*, 164 F.Supp.2d 1002, 1021 (N.D.Ill.2000)); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 584 (N.D. Ill. 2011) (approving settlement where 342 class members excluded themselves and 15 class members objected) (citing *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (holding that the fact that more than "99.9% of class members have neither opted out nor filed objections is strong circumstantial evidence in favor of the settlement"), *aff'd*, 267 F.3d 743 (7th Cir. 2001)).

Chase estimates the Collection Call Subclass consists of 18,370,250 individuals and the Alert Call Subclass consists of 13,927,106 individuals.[2]  However, throughout the litigation and confirmatory discovery, Chase adamantly maintained that contact information did not exist for a large portion of the proposed Settlement Class.  Chase initially provided 15,942,691 records containing names and addresses to claims administrator, Garden City Group ("GCG").  GCG sent email notices to 11,404,065 of those Settlement Class members for whom Chase had provided email addresses.  (Dowd Decl. ¶¶ 10–11.)  GCG also mailed notice to Settlement Class members for whom GCG had a mailing address but no email or whose email was returned undeliverable and could not be resent.  To reach Settlement Class members who could not be notified directly, GCG supplemented the direct email and mail program with publication notice, publishing a summary of the settlement in two issues of *People*, one issue of *Better Homes and Gardens* and two issues of *Sports Illustrated*.  (*Id.* ¶¶ 17–18.)

Before the final approval hearing, the parties realized that GCG had not been provided names and contact information for what they understood were approximately 7.1 million persons in the Settlement Class.  Chase investigated the issue and subsequently provided GCG with a list

---

[2] Chase informed Plaintiffs that it made a de-duplication error when it originally calculated the size of the Collection Call Subclass.  Thus, Chase revised its estimate of the size of the Collection Call Subclass from 19,859,245 to 18,370,250.  (Dkt. No. 186-2 ¶ 5.)

of names and contact information for 7,103,530 Settlement Class members. (Dkt. No. 188 ¶ 18.) GCG eliminated duplicate names and addresses and determined that 4,990,596 Settlement Class members inadvertently were not provided direct notice by U.S. Mail or E-mail as set forth in the Settlement Agreement and the Court's Preliminary Approval Order (Dkt. No. 117). The parties agreed that the final approval hearing should be continued so that GCG could send notice to these Settlement Class members and provide them with an opportunity to object to, or exclude themselves from, the settlement. (Dkt. No. 176.) In total, approximately 19,969,177 Settlement Class members were sent direct notice that was not returned to GCG. (*Id.* ¶¶ 16, 26.)

In addition, at Class Counsel's insistence, the parties agreed that a supplemental "reminder" notice should be sent to Settlement Class Members who originally received notice but, for whatever reason, did not submit a claim. (*Id.*) The Court entered an order approving the parties' proposal. (Dkt. No. 178.) GCG sent a total of 4,886,327 reminder notices. (Dowd Decl. ¶ 43.)

The claims period has now closed. Settlement Class Members have submitted a total of 349,206 timely claims. (Dowd Decl. ¶ 47.) Only 18 members of the Settlement Class objected to the settlement (*Id.* ¶ 40) and only 225 requested to opt out. (*See* Dowd Decl. ¶¶ 37–39.) The notice program's total cost is $5,152,929.51. (*Id.* ¶ 28.)

### III. THE OBJECTIONS TO CLASS RELIEF LACK MERIT

#### A. The $34 Million Settlement Is an Excellent Result for the Class

The monetary relief in this settlement is not "hypothetical" or "speculative," or based on any attempt to monetize coupon redemption rates or other in-kind relief. It is a true common fund, comprised of $34,000,000 that will be distributed to pay (1) Settlement Class Member claims; (2) a dedicated *cy pres* distribution of $1,000,000; (3) settlement administration expenses of $5,152,929.51; (4) court-approved incentive awards to the five named Plaintiffs in the amount of $1,500 each; and (5) court-approved attorneys' fees and costs. Class Counsel seek $9,507,603 in fees and costs, which amounts to 34% of the settlement fund after subtracting the dedicated *cy*

*pres* and administration expenses.[3]  Assuming the Court approves Class Counsel's requested fee and the incentive awards, $18,331,967.49 would remain to distribute among the claimants.  Each Settlement Class Member who files a timely claim will receive approximately $19.40, $58.20, or $77.60 depending on whether they received calls regarding a Chase bank account, credit card, both, or were not Chase customers and received "wrong-party" calls. (Dowd Decl. ¶ 50.)

Without addressing the substantial risks involved in the litigation and potential years of delay, some objectors complain that more money should have been obtained.  (*See* Dkt. Nos. 121, 145, 152, 155, 162; *see also* Dowd Decl. ¶ 40, Ex. K (Yost, Russo).)  But "the essence of settlement is compromise" and "courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs."  *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (St. Eve, J.) (quoting *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) and *Isby*, 75 F.3d at 1200) (internal quotations omitted); *Fifth Third Bank*, 805 F. Supp. 2d at 584 (noting "simply because the proposed settlement amounts to a fraction of potential recovery does not render the proposed settlement inadequate and unfair") (quotations and citation omitted).

Plaintiffs acknowledge the Seventh Circuit has "remarked the incentive of class counsel, in complicity with defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judges approve a settlement involving a meager recovery for the class but generous compensation for the lawyers."  *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (quoting *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014) and *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011) and citing *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014)).  This is not the case here.  Although the plain terms of the TCPA allow for statutory damages of $500 – $1,500 per call, attempting to obtain anything approaching that amount for all Settlement Class Members through litigation would entail significant risk and delay.

---

[3] Due to an increase in GCG's expenses, this percentage is slightly larger than what Class Counsel requested in their fee petition.

First, Plaintiffs faced the very real risk that they would not be able to identify the class. Defendants challenged Plaintiffs efforts during discovery to obtain information necessary to understand the size and scope of the class. At the time this case was stayed pending mediation, Plaintiff Gehrich had moved to compel such information and the parties had fully briefed the issue. As Plaintiffs pointed out in their fee petition (Dkt. No. 186-1), TCPA plaintiffs sometimes lose such motions and are unable to proceed on a class basis as a result. *See, e.g., Gusman v. Comcast Corp.*, 298 F.R.D. 592, 596–97 (S.D. Cal. 2014) (denying motion to compel production of the defendant's call data). During confirmatory discovery, Chase confirmed that records did not exist for a large portion of the potential class. (Terrell Decl. ¶¶ 2–3.) Even if data existed and Plaintiffs succeeded in compelling it to be produced, Plaintiffs would have been required to expend substantial time and money working with an expert to analyze the data that they received.

Second, Chase maintains that JPMC Bank account holders signed arbitration agreements that purported to waive the account holders' right to bring a class action lawsuit. The United States Supreme Court has held that such agreements are enforceable. *AT&T Mobility LLC v. Concepcion*, --- U.S. ---, 131 S.Ct. 1740, 1748–49 (2011). Chase very likely would have moved to dismiss this portion of the class and compel arbitration had the case not settled.

Third, Plaintiffs faced challenges at class certification. Courts are divided as to whether consent issues predominate over common questions in TCPA cases, depending on the circumstances of the case. *Compare Jamison v. First Credit Servs.*, 290 F.R.D. 92, 107 (N.D. Ill. 2013) (finding issues of consent to predominate in TCPA action) and *Balschmiter v. TD Auto Fin., LLC*, 303 F.R.D. 508, 527–28 (E.D. Wis. 2014) (same); *with Saf-T-Gard Int'l v. Vanguard Energy Servs.*, Case No. 12 C 3671, 2012 WL 6106714 (N.D. Ill. Dec. 6, 2012) (certifying a class in a TCPA action and finding no evidence supported the view that issues of consent would be individualized) and *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 253 (N.D. Ill. 2014) (same).

Fourth, even if Plaintiffs survived a motion to compel arbitration and class certification, at trial Plaintiffs would have to rebut Chase's consent defense. Chase has maintained that many potential "collection call" members provided their cell phone numbers either on credit applications or through subsequent dealings with Chase. According to Chase, class members also provided their cell phone numbers when they signed up online to receive "alerts" regarding their Chase accounts. Rebutting this defense could have proven very difficult and, regardless of the outcome, the losing party almost certainly would have appealed thereby delaying class recovery even longer.

Fifth, and perhaps most importantly, Plaintiffs faced challenges even if they prevailed at trial. Some courts view awards of aggregate, statutory damages with skepticism and either refuse to certify a class or reduce such awards on due process grounds. *See, e.g., Aliano v. Joe Caputo & Sons-Algonquin, Inc.*, No. 09 C 910, 2011 WL 1706061, at *13 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case — between $100 and $1,000 per violation — would not violate Defendant's due process rights …. Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature."). Even if the Court permitted such an award, Plaintiffs could have had difficulty collecting any judgment since Chase faced exposure of between $17 and $50 billion assuming that each class member only received a single call (33,786,351 class members x $500 = $16,893,175,500; 33,786,351 class members x $1,500 = $50,679,526,500).

The objectors either ignore these risks and, in the case of objectors Dawn Weaver and Susan House, their omission is without excuse. Weaver and House's counsel, Joseph Darrell Palmer has brought several of his own unsuccessful TCPA actions. Each of these actions was dismissed or compelled to arbitration, thereby providing no monetary relief for Mr. Palmer's clients or the classes they purported to represent. *See, e.g., Harper v. Credit Control Servs.*, 863 F. Supp. 2d 125, 127 (D. Mass. 2012) ("Because it would not be reasonable for a jury to

conclude from the record that CCS placed calls to Harper's cell phone in violation of the TCPA, defendant's motion for summary judgment will be allowed."); *Gonzalez v. Citigroup Inc.*, No. Civ. S-11-0795 LKK/GGH, 2011 WL 5884250, at *8 (E.D. Cal. Nov. 23, 2011) (compelling claims to arbitration); *Gonzalez v. J.C. Penney Co., Inc.*, No. 2:11-cv-00794-KJM-EFB, Dkt. No. 18 (E.D. Cal. Sept. 21, 2011) (dismiss all claims with prejudice and imposing sanctions on plaintiff for failure to comply with a prior court order); *Salina v. NCO Fin. Sys., Inc.*, No. 10-7496, Dkt. No. 44 (E.D. Pa. June 25, 2012) (voluntarily dismissing class action case without having obtained a recovery for the class); *Warnick v. Dish Network Corp.*, No. 11-cv-00615-MSK-CBS, Dkt. No. 14 (D. Colo. May 20, 2011) (same); *Gonzalez v. JP Morgan Chase*, No. 11-cv-00796-GEB-EFB, Dkt. No. 30 (E.D. Cal. Nov. 16, 2011) (same).

Objector David Schlagel erroneously asserts that these risks did not remain after the parties agreed to mediate. (*See* Dkt. No. 192.) To the contrary, these very risks informed the settlement discussions and the eventual settlement agreement.

Here, 349,206 Settlement Class Members have submitted timely claims. Each Settlement Class Members stands to receive $19.40, $58.20, or $77.60. These awards are well in line with awards approved in other TCPA settlements. *See, e.g., Steinfeld v. Discover Fin. Servs.*, No. C 12-01118, Dkt. No. 96 at ¶ 6 (N.D. Cal. Mar. 10, 2014) (claimants received $46.98 each); *Adams v. AllianceOne Receivables Mgmt., Inc.*, No. 3:08-cv-00248-JAH-WVG, Dkt. No. 137 (S.D. Cal. Sept. 28, 2012) (claimants received $40 each); *Desai v. ADT Sec. Servs., Inc.,* Case No. 1:11-cv-01925 (Dkt. No. 229) (N.D. Ill. Feb. 14, 2013) (estimating claimants would receive between $50 and $100); *Garret, et al. v. Sharps Compliance, Inc.*, Case No. 1:10-cv-04030 (Dkt. No. 65) (N.D. Ill. Feb. 23, 2012) (claimants received between $27.42 and $28.51).[4]

---

[4] Contrary to the assertions of objectors Steve Purgahn and Maritza Cabrera (Dkt. Nos. 153, 190), Class Counsel did not make "misleading and contradictory" statements regarding the amount they estimated Settlement Class Members would recover in this action. Class Counsel initially estimated that Settlement Class Members would receive $20-$40 per claim. This was a conservative estimate based on their experience in other actions. In their fee petition, Class Counsel revised these estimates informing Settlement Class Members that if the Settlement Agreement were approved that day claimants would be receive $22.39, $67.17 or $89.56.

The objectors' assertions that this settlement is unreasonable because Plaintiffs could have obtained more money lack merit. Moreover, to the extent any Settlement Class member decided that the payment was insufficient he or she could simply have opted out and pursued an individual case.[5]

**B.      Basing Settlement Class Members' Awards on the Number of Calls Received Was Not Feasible**

Some objectors maintain that Settlement Class Members should be able to make a claim for each call received. (Dkt. Nos. 145, 152.) But data regarding the number of calls that each Settlement Class Member received was not available in this case. (Terrell Decl. ¶¶ 2–3.) Determining the number of calls made to each individual Settlement Class Member and then determining whether, when, and in what manner those individuals may have provided Defendants with consent to make such calls would not only be difficult but extremely costly, so much so that the process would consume a significant portion of the recovery simply on that administrative function. *Id.*

Moreover, the calls at issue in this case were either debt collection calls or automatic "alert" calls. Because Defendants' practices with respect to such calls were standardized, it is very unlikely that some Settlement Class Members had an average call volume that differed materially from other Settlement Class Members. To the extent any Settlement Class member did receive a large number of calls, they were free to exclude themselves from the settlement and

---

Because Class Counsel filed their fee petition before the deadline to submit claims, Class Counsel acknowledged that these numbers likely likely would be reduced since more individuals were likely to submit claims before the deadline. (Dkt. No. 186-1, n. 5.)  The estimates set forth here may increase because potentially invalid claims are included in the calculations.

[5] Objectors House and Weaver object that the settlement provides "little in the way of injunctive relief." (*See* Dkt. No. 155 at 4.)  Of course, courts do not require settlements to include injunctive relief and the Seventh Circuit's recent concerns involved class counsel placing too high a value on prospective changes for purposes of requesting a higher fee.  Here, Chase agreed to clarify the ways in which Settlement Class Members can opt out from receiving texts in the class notice.  Class Counsel does not place a "value" on the injunctive relief for purposes of calculating the class benefit.  Thus, House and Weaver's objections should be overruled.

pursue individual litigation.  The parties therefore concluded that allocating such relief regardless of the number each Settlement Class Member may have received is reasonable, fair, and efficient.

## C.     The Settlement Fairly Allocates the Fund Among the Settlement Class Members

Some objectors assert that the settlement structure is unfair and confusing because some Settlement Class Members receive a higher cash payment than other Settlement Class Members. (*See* Dkt. Nos. 142, 152, 153.)  These objections should be overruled.  "[W]hen real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed."  *Schulte*, 805 F. Supp. 2d at 589 (quoting *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y.1997) (internal quotations and citations omitted)); *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461–63 (9th Cir. 2000) (approving settlement despite the fact that "a large portion of the class" was left "without recovery" under settlement distribution because they "could never get" damages); *In re Cendant Corp. Litig.*, 264 F.3d 201, 248–49 (3d Cir.2001) (approving allocation plan that provided different payments to different class members).

Here, the Settlement Agreement allocates varying amounts to Settlement Class Members because some Settlement Class Members have stronger claims than others or are subject to unique defenses.  For example, for "Collection Call Subclass" members, Chase has asserted that JPMC Bank account holders agreed to submit disputes to arbitration and waived their right to bring a class action against JPMC Bank.  Chase USA credit card holders are not subject to the same defense.  Therefore, the Settlement Agreement provides for a larger cash payment for Chase USA credit card holders than it does for JPMC Bank account holders.[6]

---

[6] Objector Cindy Bray wrongly asserts that Chase "card holders" are not afforded relief under the settlement.  (*See* Dkt. No. 142.)  Card holders who received collection calls or wrong-party texts are entitled to submit a claim.  In fact, card holders are not subject to an arbitration provision and thus their claims receive more weight than Settlement Class members who received unlawful calls and texts regarding their bank account.

As for "Alert Call Subclass" members, Chase produced information in discovery showing that Chase customers must affirmatively sign up to receive "Automatic Alerts" on their cellular telephones and thus provide "consent" to receive the alerts. The settlement appropriately does not allocate any monetary payment to these individuals because they specifically requested to receive the calls on their cell phones.[7] Nicholas O. Gunden underscores the propriety of allocating no monetary damages to this segment of the Class, describing the alerts he received from Chase as a "feature" rather than a nuisance. (*See* Dkt. No. 118 (Gunden Objection) (lauding the text message alerts feature and objecting "customers should have to demonstrate how they were harmed by this technological innovative feature in order to belong to the class").)[8]

Objector Kristina Lopez's challenges to the adequacy of the class representatives due to alleged conflicts of interest miss the mark.[9] The class representatives properly considered the important differences among Settlement Class members to craft a settlement allocation plan that fairly distributes the settlement relief to the Settlement Class members based on the strength of the Settlement Class members' claims. As the court in *Schulte* put it, "[w]hat would be arbitrary, unreasonable, and unfair would be to distribute" the majority of the settlement fund to the class members with the weakest claims." *Schulte*, 805 F. Supp. 2d at 590. The court concluded that the allocation method provided for under the settlement was fair, reasonable, and adequately precisely because it was "tailored to the facts of th[e] case." *Id.*

---

[7] Individuals who received alerts intended to be sent to another person ("Wrong Party Alerts") receive a monetary payment under the settlement.

[8] Objector Oliver also indicates he welcomed the "alerts." (Dowd Decl., Ex. K.)

[9] Objector Lopez's counsel, Christopher Bandas, is another attorney who routinely objects to settlements. Indeed, one court found that Mr. Bandas files objections not "to effectuate changes to settlements, but … for his own personal financial gain; he has been excoriated by Courts for this conduct." *In re Cathode Ray Tube Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012).

**D.     The Release Is Narrowly Tailored and Fair**

Objector Steve Purgahn[10] objects that the settlement is not fair, reasonable or adequate because Settlement Class Members are forced to release claims against the defendant that were never pursued by Class Counsel without consideration.  (*See* Dkt. No. 153.)[11]  Mr. Purgahn is wrong for two reasons.  First, the settlement does not "force" anyone to release claims.  To the contrary, each and every person had an opportunity to opt out of the settlement and pursue their claims individually.  Second, the settlement includes a $1,000,000 dedicated *cy pres* distribution to the Consumer Federation of America on behalf of the "right party" Alert Call Subclass members and in consideration for a release of their claims.  Such an allocation is appropriate in light of the weakness of the Alert Call claims on the merits.

Objector Purgahn wrongly relies on *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 282–84 (7th Cir. 2002).  At the time of the settlement in *Reynolds* (the "*Reynolds* Settlement") several class actions were pending against the defendants, including a class action in Texas.  *Reynolds*, 288 F.3d at 283.  The *Reynolds* Settlement valued the Texas claims at zero.  *Id.* at 284.  In approving the *Reynolds* Settlement, the district court also (in error) enjoined the lawyers for the Texas class from notifying the members of that class of the status of the Texas litigation to

---

[10]  Objector Purgahn's counsel, Jonathan Fortman, Steve Miller, and John Kress also have a lengthy history of objecting to settlements, appealing settlement approval when their objections are overruled, and then voluntarily dismissing the appeals without having gained anything beneficial for the class.  *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827, Dkt. Nos. 7807 & 9096 (N.D. Cal.) (Fortman, Miller, and Kress appealed the court's order overruling their objection, which they voluntarily dismissed over a year later without having obtained anything for the class); *In re Pre-Filled Propane Tank Marketing & Sales Prac. Litig.*, No. 09-md-02086, Dkt. No. 311 (W.D. Mo. Nov. 20, 2012) (Miller and Fortman filed notices of appeal of a final approval order overruling their objections, which they later agreed to voluntarily dismiss without having gained any benefit for the class); *In re Lawnmower Engine Horsepower Marketing & Sales Prac. Litig.*, No. 08-md-01999, Dkt. Nos. 481 & 486 (E.D. Wis.) (Fortman, Kress, and Miller filed notices of appeal on September 14, 2010, which they voluntarily dismissed in February 2011 without having gained any benefit for the class).

[11] Francis Vincent Russo, whose objection was apparently not filed with the court, objects that the settlement does not cover Chase's predatory lending practices.  (Dowd Decl., Ex. K.)  Such claims are not covered by the release.  Therefore, Objector Russo seeks relief against Chase outside of the class settlement.

assist them in deciding whether to opt out of the settlement and continue to litigate in the Texas courts. *Id.* Here, by contrast, the parties agreed to a robust notice program that provided Settlement Class Members with the opportunity to opt out if they chose to do so.[12]

Moreover, in *Reynolds*, evidence existed that the defendants conducted a "reverse auction" in which they chose to negotiate with the least effective class lawyers "in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Id.* at 282 (citing cases). At the time of the *Reynolds* Settlement the settling lawyers were in the early stages of litigation while the Texas case was certified, set for trial, and appeared to have a viable theory of liability and damages. *Id.* at 283. Here, Class Counsel, who are highly experienced attorneys, are aware of no other TCPA class cases pending against Chase that would have prompted a "reverse auction" type of scenario.

*In Re Community Bank of Northern Virginia*, 622 F.3d 275, 285 (3d Cir. 2010) also is inapposite. In *Community Bank*, the settlement purported to release claims that had not been brought in the litigation (*see id.* at 282) and the objectors convincingly argued that class members would have been entitled to substantially more in damages had class counsel pursued those claims. No evidence exists that Settlement Class Members would receive more compensation under any other legal theory. Indeed, it is highly likely they would not since these theories likely would require proof of actual damages rather than the statutory damages authorized under the TCPA.

Furthermore, in making his argument, Objector Purgahn misleadingly uses ellipses to omit key language from the release. (*See* Dkt. No. 153 at 6 (characterizing the settlement as releasing "any claim … under or for violation of federal or state debt collection practices act….").) The omitted language limits the release to all claims "*that arise out of* the use by Chase USA and/or JPMC Bank or by other Chase affiliates acting for or on their behalf, of an

---

[12] For similar reasons, *Molski v. Gleich*, 318 F.3d 937, 942 (9th Cir. 2003) is distinguishable. That case involved a mandatory class brought pursuant to Fed. R. Civ. P. 23(b)(2). Unlike this case, class members were not afforded an opportunity to opt out and pursue individual claims.

'automatic telephone dialing system' and/or an 'artificial or prerecorded voice' to make 'calls' to a cellular telephone (to the fullest extent that those terms are used, defined or interpreted by the Telephone Consumer Protection Act, 47 U.S.C. § 227, relevant regulatory or administrative promulgations and case law, and which the Parties agree includes voice and text messages) by or on behalf of the Released Parties…." (Dkt. 107-2 at 20 (emphasis added).) [13]  It is simply untrue that class members are releasing any claims other than those arising from the allegedly unlawful calls described in Plaintiffs' Second Amended Complaint.

Objector Purgahn's conclusion that class members are "receiving little, if anything in exchange for giving up their legal rights to bring suit against Defendants for any claim" (Dkt. No. 153 at 6–7) is false and should be rejected.  Settlement Class Members receive substantial relief under the settlement, are emphatically not giving up their rights to bring suit against Defendants "for any claim," and, to the extent the settlement requires them to release claims, may opt out and pursue their claims individually.

### E.       The Dedicated and Residual *Cy Pres* Distributions Are Appropriate

"'[C]y pres' is the name of a doctrine of trust law that allows the funds in a charitable trust, if they can no longer be devoted to the purpose for which the trust was created, to be diverted to a related purpose; and so when the polio vaccine was developed the March of Dimes Foundation was permitted to redirect its resources from combating polio to combating other childhood diseases."  *Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013). In the class action context, "the reason for appealing to cy pres is to prevent the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds of the settlement … to the class."  *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004).

Courts generally have approved *cy pres* distributions in two circumstances.  "First, many courts allow a settlement that directs funds to a third party when funds are left over after all

---

[13] Page numbers cited to herein refer to the page number designated by the ECF filing system.

individual claims have been satisfied…. Second, some courts allow a settlement to require a payment only to a third party, that is, to provide no recovery at all directly to class members." Am. Law Inst. ("ALI"), Principles of Law of Aggregate Litig. § 3.07, comment a (2010).

The proposed settlement here includes both types of distributions, the "Dedicated *Cy Pres* Distribution" paid to the Consumer Federation of America on behalf of Alert Call Subclass Members and a "Residual *Cy Pres* Distribution" in which any amount remaining in the Settlement Fund after paying all claims, settlement administration costs, and any court-awarded attorneys' fees or service awards will be distributed either: (1) in a second distribution to eligible Settlement Class Members who submitted a claim and whose initial payment was cashed; or (2) if there are not enough funds to justify a second distribution, to the Electronic Frontier Foundation.

Objectors Murphy, Bray, Doyley, and Purgahn object to both of the proposed settlement's *cy pres* components. (*See* Dkt. Nos. 122, 142, 150, and 153.) For the following reasons, their objections should be overruled.

1.  Dedicated *Cy Pres* Distribution

Although courts generally favor direct distribution of settlement proceeds to individual class members, *cy pres* distributions are appropriate where either individual class members cannot be identified through reasonable effort or individual distributions are not economically viable. *See* ALI, Principles of Law of Aggregate Litig. § 3.07(a) (2010); *see also Hughes*, 731 F.3d at 675 (observing that "the amount of damages that each class member can expect to recover is probably too small even to warrant the bother, slight as it may be, of submitting a proof of claim in the class action proceeding"). A *cy pres* distribution dedicated to a class of people is justified "if careful scrutiny indicate[s] that the class had no realistic prospect of sufficient success to enable an actual distribution the class members." *Mirfasihi*, 356 F.3d at 785–86.

Here, Chase has agreed to pay $1,000,000 for the benefit of Alert Call Subclass members to whom Chase placed calls or send texts because these Alert Call Subclass members specifically requested to receive such calls or texts on their cellular telephones. To activate the "alert" feature, Chase customers would go online to establish a "delivery profile" where the customer would choose which alerts he or she wished to receive from a list of available alerts for each account and then choose how he or she wanted the alert delivered. After the Chase customer provided his or her cellular telephone through the website, Chase would send a confirmation message to the number provided asking the customer to confirm that the telephone number actually belonged to the person who had requested the alerts. According to Chase, this process provides a rock-solid consent defense to Plaintiffs' TCPA claims and thus this class has little to no chance or prospect of success sufficient to justify the administrative cost of distributing individual payments. As a compromise, Chase agreed to pay $1,000,000 to the Consumer Federation of America in exchange for a release from these Settlement Class Members.[14]

Objector Tamiqueca Doyley maintains that "unclaimed class action settlement funds must be distributed to class members who submit a claim form until those class members are made whole." (Dkt. No. 150 at 3.) Objector Doyley is wrong. All three of the out-of-circuit cases on which Objector Doyley relies involve *cy pres* payments of residual, unclaimed settlement funds. *See In re Bank of Am. Corp. Sec. Litig.*, 775 F.3d 1060, 1063–65 (8th Cir. 2015) (holding district court abused its discretion in ordering a *cy pres* distribution of unclaimed funds after a first distribution to individual settlement class members already had been made); *In re: Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2012) (vacating approval of *cy pres* distribution where excessive funds remained after claimants received distribution under terms of settlement and it appeared very little of settlement fund went directly to the class); *Klier v. Elf*

---

[14] By contrast, Alert Call Subclass Members who did not sign up for this program and thus to whom Chase did not intend to place such calls or texts (Wrong-Party Alert Call Subclass" members) are entitled to a cash payment under the settlement. Settlement Agreement (Dkt. No. 107-2) § III.G.1.

*Atochem N. Am.*, 658 F.3d 468, 473 (5th Cir. 2011) (holding settlement agreement did not authorize the district court to make a charitable gift of unused funds and that the district court erred when it rejected the settlement administrator's request that the funds be allocated to other class members). None of these cases involved a dedicated *cy pres* distribution. Moreover, in *Baby Products* the Third Circuit specifically rejected Objector Doyley's premise here. *See In re Baby Prods. Antitrust Litig.*, 708 F.3d at 176 (agreeing that *cy pres* is appropriate where individual distributions would overcompensate claimant class members but specifically noting that they "do not limit cy pres distributions to instances where all claimants have received 100% of their estimated damages").[15]

Objector Purgahn's challenges to the Dedicated *Cy Pres* Distribution also should be rejected. Contrary to Objector Purgahn's assertions, the Seventh Circuit did not hold in *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 345 (7th Cir. 1997) that *cy pres* "should only be utilized or considered [in cases] 'in which it is difficult or impossible to identify the persons to whom damages should be assigned or distributed.'" (Dkt. No. 153 at 3 (emphasis added).) Instead, the Seventh Circuit noted that "[c]y pres recovery 'is used where the individuals injured are not likely to come forward and prove their claims or cannot be given notice of the case.'" *Id.* (quoting *Simer v. Rios*, 661 F.2d 655, 675 (7th Cir. 1981)). The Seventh Circuit went on to state that "[c]y pres recovery is thus ideal for circumstances in which it is difficult or impossible to identify the persons to whom damages should be assigned or distributed." *Id.* The Seventh Circuit did not hold that *cy pres* should <u>only</u> be used in cases where it is impossible to identify the class. Notably absent from Objector Purgahn's memorandum is any reference to the recent Seventh Circuit decision in *Hughes* where the Seventh Circuit explains that *cy pres* may be used where an actual distribution is not possible because the class has not realistic prospect of

---

[15] Objector Doyley's assertion that the *cy pres* doctrine is limited to "situations involving unclaimed settlement funds after distribution to ascertainable class members" is directly contrary to her own authority (*see In re Baby Prods.*, 708 F.3d at 171–72 (acknowledging *cy pres* distributions sometimes approved where there is only a payment to a third party and no recovery at all directly to class members) and Seventh Circuit authority. *See Hughes*, 731 F.3d at 675.

sufficient success.  *See Hughes*, 731 F.3d at 675.  Of course, *Hughes* describes the law of *this* circuit having to do with *cy pres*.

Mr. Purgahn wrongly objects that the Consumer Federation of America ("CFA") does not provide a benefit specific enough to the class members in this case.  (Dkt. No. 153 at 3 (citing *Mirfasihi*, 356 F.3d at 784); *see also* Dkt. No. 142 (Bray Objection) (objecting "to a non-profit that has nothing to do with the case receiving $1 million").)  A *cy pres* recipient must have a mission that "coincide[s] with, or at least overlap[s], the interest of the class."  *Hughes*, 731 F.3d at 676.  *Hughes*, for example, involved alleged violations of the Electronic Funds Transfer Act, 15 U.S.C. § 1693b(d)(3).  *Id.* at 674.  Although it did not reach the issue, the Seventh Circuit suggested that a charity "concerned with consumer protection issues of the general character presented by the case" would suffice.  *See id.* at 676.

Plaintiffs allege that Chase placed unwanted and harassing autodialed and/or prerecorded calls to their and Settlement Class Members' cell phones, primarily in an attempt to collect debts. The CFA is a national research, advocacy, education, and service organization.  (Terrell Decl., Ex. A.)  The CFA has devoted substantial resources to educating consumers about their rights under the TCPA and with respect to debt collection generally.  (*Id.*)  The CFA has lobbied Congress to protect consumers against harassment from creditors and debt collection.  (*Id.*) Thus, the interest of the CFA overlaps with the interests of Settlement Class Members and is a proper *cy pres* recipient.[16]

2.    The Residual *Cy Pres* Distribution

Objectors Doyley, Purgahn, and Murphy also object to the settlement's Residual *Cy Pres* Distribution.  (Dkt. Nos. 122, 150, 153.)  These objections also are meritless.  For example,

---

[16] Mr. Murphy's unsupported assertion that every non-profit consumer advocacy organization in the country should receive funds from the settlement (Dkt. No. 122) is simply not feasible and should be rejected.  Likewise, Objector Bray wrongly accuses Class Counsel of having relatives who work for the CFA.  Neither Class Counsel nor their relations have any connection with either *cy pres* designee.  (Terrell Decl. ¶ 5.)  Objector Narkin's assertion in his untimely objection (Dkt. No. 158) that the *cy pres* may violate the Rule Against Perpetuities is unsupported and should be overruled.

Objector Doyley asserts that the settlement distributes "unclaimed funds" to third party Electronic Frontier Foundation ("EFF") before compensating the class. This is untrue. After deducting any court-awarded attorneys' fees, notice expenses, service awards, and the Dedicated *Cy Pres* Distribution, the Settlement Agreement requires all of the remaining settlement funds (the "Net Settlement Funds") to be distributed to Settlement Class Members on a pro rata basis. Some claims will be weighted more heavily than others. For example, claims of a credit card holder who received a collection call and a person who received a "wrong-party alert" will be given three times the weight of a bank account holder who received a collection call. But the Net Settlement Fund will be distributed in its entirety to the Settlement Class Members. There is no "cap" on the amount that each class member could receive under the settlement. For example, if only ten class members had filed claims, then the entire Net Settlement Fund would be divided between those ten class members with individual shares "weighted" according to the Award Unit procedure set forth in the Settlement Agreement. (*See* Dkt. No. 107-2 § III.G.1.)

This case is distinguishable from the cases that Objector Doyley cites in her brief. In those cases, the defendant made a certain amount of money available to satisfy claims but the funds were not fully distributed because each claim was capped at a certain amount and an insufficient number of class members submitted claims to exhaust the respective funds. *See, e.g., In re Lupron Marketing and Sales Prac. Litig.*, 677 F.3d 21, 25 (1st Cir. 2012) (involving settlement that allowed consumers to claim 30% of their total out-of-pocket payments or $100, whichever sum was greater). In each case, the courts noted that if feasible "unclaimed funds" should be distributed to class members first rather than to a third party. *See In re Bank of Am. Corp. Sec. Litig.*, 775 F.3d at 1064 (holding unclaimed funds should be distributed to the class "except where an additional distribution would provide a windfall to class members with liquidated damages claim that were 100 percent satisfied by the initial distribution"); *In re Lupron*, 677 F.3d at 32 (noting the ALI principles' policy that unclaimed funds be redistributed to ensure class members recover their full losses); *In re Baby Prods. Antitrust Litig.*, 708 F.3d at

173 (cautioning that direct distributions to the class are preferred to *cy pres* distributions but holding that a district court does not abuse its discretion by approving a class action settlement agreement that includes a *cy pres* component); *Klier*, 658 F.3d at 478–79 (holding that district court abused its discretion by not redistributing funds left unclaimed by one segment of the class to another segment of the class).

The only "unclaimed funds" that potentially could exist in this case are funds that remain due to claimants' failure to cash their checks.  (*See* Dkt. 107-2.)  Far from deviating from the principles set forth in the case law, the Settlement Agreement provides that such funds from uncashed checks first will be distributed to Settlement Class Members who filed a claim and cashed their checks in a "second distribution."  (*Id.* § III.H–I.)  If the amount remaining in the fund is insufficient to justify a second distribution, the funds then will first be used to pay any person who was eligible to participate in the settlement but for whatever reason did not do so. (*Id.*)  For example, a person who missed the claims deadline would be eligible to receive funds under this provision as would someone who opted out.  Objector Purgahn vehemently objects to this provision, characterizing it as "nothing but a reversionary clause with Class Counsel having an illusory ability to dictate how Defendants utilize those funds."  (Dkt. No. 153 at 13.)  Objector Purgahn cites no legal authority in support of his objection and fails to offer any explanation or factual analysis for his inflammatory comments because none exist.  The purpose of this provision is to ensure that any settlement fund residual is used to compensate victims of Chase's unlawful calls before it is donated to charity.  Moreover, it appears Objector Purgahn misunderstands the settlement.  A distribution pursuant to Section III.H.3 of the Settlement Agreement would occur only after those who timely submitted claims received their settlement checks.  If, after 120 days, a claimant had not cashed his or her check, and a second redistribution to claimants who cashed their checks had been made (or was small enough to be unfeasible), and settlement funds still remained – only then would a distribution be made to individuals who opted out or filed otherwise ineligible claims.  (*See* Dkt. 107-2 § III.H.3.)

Objector Purgahn's objection to Section III.H.3 highlights the reasonableness of the Residual *Cy Pres* Distribution. If any funds remain 365 days after the settlement's effective date (and thus after Settlement Class Members have had an opportunity to cash their checks, after a second distribution has been made, and after other individuals who could have filed a claim have received a distribution), only then would any remaining funds be distributed to EFF. *Id.* Because any residual by definition would only be distributed to EFF if it would not be feasible to make a second distribution to the class, there is no chance that the EFF will receive a "massive payday" as Objector Purgahn suggests. (*See* Dkt. No. 153 at 4.) This procedure conforms to the ALI Principles and case law set forth above.

Objectors Purgahn and Murphy further object that the EFF is not a proper recipient of any *cy pres* award. These objections also should be overruled. EFF's mission is, in part, to protect consumers from invasions of privacy resulting from the use of new technologies such as cellular telephones. See https://www.eff.org/issues. This mission coincides with the purpose of the TCPA and thus overlaps with the interests that Plaintiffs seek to protect in this case. Objector Purgahn's assertions to the contrary are meritless. Objector Murphy's assertion that EFF's annual report indicates frivolous expenditures should likewise be rejected. As Objector Murphy points out, EFF's primary expenditure is on the salaries of its attorneys and staff members, who devote their time to researching, advocating, and litigating on behalf of consumers. Such expenses are hardly frivolous.

## F.    The Notice and Claims Procedures Satisfied Due Process

The claims administrator provided direct notice to 19,969,177 Settlement Class members. (Dowd Decl. ¶¶ 16, 26.) Combined with the publication and internet notice programs, approximately 78.65% of Settlement Class members received notice. (*Id.* ¶ 51.) The direct and publication notices provided Settlement Class members with the following information: (1) the name of the case and a general description of the claim; (2) a description of the Settlement Class; (3) the total amount of the Settlement Fund; (4) the estimated amount of individual Settlement

Class Member payments; (5) the requested attorneys' fees; (6) Settlement Class Members' rights to submit a claim, to opt out of the settlement, or to do nothing, and the consequences of exercising such rights; (7) the deadlines for taking such actions; (8) the final approval hearing date; and (9) where to get more information, including the URL for the settlement website and the number for the toll-free settlement hotline.  (Dkt. No. 107-2, Ex. C.)

Objector Weaver wrongly asserts that the notice program "did not involve direct notice to Chase customers."  (Dkt. No. 155 at 8.)  Direct mail and email notice reached 19,969,177 Settlement Class members.  (Dowd Decl. ¶¶ 16, 26.)  Quoting the Seventh Circuit's decision in *Mirfasihi*, Weaver also maintains that "electronic notice should be part of class action administration."  (*See* Dkt. No. 155 at 9 (quoting *Mirfasihi*, 356 F.3d at 786).)  Here, the parties with the assistance of the claims administrator considered many different publication notice options, including web-based options.  Based on research regarding the demographics of the Settlement Class members, the claims administrator recommended an efficient, cost-effective notice program that included print publications rather than websites and banner advertisements.  (Dowd Decl. ¶ 27.)  The notice satisfies due process.  (*Id.* ¶ 51.)

Objector Weaver argues that the settlement website URL should have included the word "Chase" to "enable class members to easily find it when doing an internet search," (Dkt. No. 155 at 5), but as noted above, all forms of notice provided Settlement Class members with the URL.  Moreover, the settlement website is the second result rendered by a simple Google search for "Chase settlement."  (Dowd Decl. ¶ 30.)  The settlement website is the first result that appears following a Google search for "Chase TCPA settlement."  (*Id.*)  There is no basis to believe Settlement Class members had trouble locating the website.

Objector Weaver erroneously asserts that "the deadlines for responding to class notice are not sufficiently clear" because they are not set forth in the box summarizing the options provided on page 2 of the notice.  (Dkt. No. 155 at 9.)  The deadlines are plainly provided in the options box on the settlement website, in bold on the email notice, and on the postcard notice.  In

addition, the deadline to submit a claim is prominently displayed in all capital letters on the claim form.  (*See* Dkt. No. 107-2, Exs. A, C.)  Further, no requirement exists to display the deadlines in the box on the long-form notice that provides detailed information regarding the settlement.  Indeed, the Federal Judicial Center's form notices, which are widely considered to reflect the standard for adequate class action notices, do not display the deadlines in this manner.

Objector Weaver acknowledges that the Settlement Website includes links to download the Settlement Agreement, the Preliminary Approval Order, and the Motion for Attorneys' fees but maintains that the website should have included a link to the operative complaint.  (Dkt. No. 155 at 10.)  Weaver provides no explanation as to how the complaint was necessary for Settlement Class members to effectively evaluate the settlement because none exists.  Weaver further asserts that the website should have included the final approval motion, but that motion has not been written and was filed for the first time today.  It will be uploaded to the settlement website within twenty-four hours.[17]

Finally, Objector Murphy's assertion that the claim process is unfair because Settlement Class members are only entitled to enter one phone number into the settlement website is meritless.  On the written claim form, which Settlement Class Members received in the mail or which could have been downloaded and printed from the settlement website, Settlement Class Members are asked to provide various identifying information for verification purposes, including their names, addresses, telephone numbers, and the cellular telephone number on which they received the Collection Call or Wrong-Party Alert.  Settlement Class Members were not required to provide this information, which was used for verification purposes only.

## G.  The Remaining Objections Should Be Overruled

The remaining objections are without merit.  Objector Bray objects to being subject to "binding arbitration" (Dkt. No. 142) but fails to acknowledge that the U.S. Supreme Court has held that such agreements are generally enforceable.  Objector Purgahn maintains that the

---

[17] The Second Amended Complaint also has been uploaded to the website.

dismissal of Plaintiff Willis's claim "raises an appearance of impropriety" (Dkt. No. 153) but fails to explain why. Plaintiff Willis decided — as his right — to settle his individual claims and not seek appointment as a class representative. (Terrell Decl. ¶ 6.) Plaintiff Willis's decision only underscores the fact that each and every Settlement Class member had a right to opt out of the settlement and pursue their individual claims. Objector Narkin, who filed his objection after the deadline (Dkt. No. 158), objects that Class Counsel has not provided enough information regarding the procedural history of the case and has not published a copy of the protective order. But Objector Narkin fails to explain what further information he needs to assess the reasonableness of the settlement. Finally, Objectors Grunden and Cabrera question the proportionality between the requested attorney fee and the class relief. As discussed above, the class relief is fair, adequate, and reasonable. And, as addressed in the following, the attorneys' fees are likewise reasonable and should be approved.

## IV.  OBJECTIONS TO THE ATTORNEYS' FEES SHOULD BE OVERRULED

The Settlement Agreement provides that Class Counsel may request that the Court award them $11,000,000 in attorneys' fees and costs, which amounts to 33.33% of the Settlement Fund after the Dedicated *Cy Pres* Distribution is subtracted and 37% of the Settlement Fund if both the Dedicated *Cy Pres* Distribution and notice expenses are deducted. After Class Counsel negotiated the Settlement Agreement, the Seventh Circuit issued two decisions determining that attorneys' fees should be calculated after excluding notice and claims administration costs from the settlement fund. *See Redman*, 768 F.3d at 630; *Pearson*, 772 F.3d at 781. In light of *Redman* and *Pearson*, Class Counsel respectfully reduce their fee request to $9,507,603, which amounts to 34% of the net settlement fund after deducting the Dedicated *Cy Pres* Distribution and notice expenses totaling 5,152,929.51. Class Counsel's request subsumes all litigation costs.

As set forth below, Plaintiffs' revised requested fee is reasonable. Moreover, none of the objections counsel against awarding such a fee in this case.

**A.    Awarding Counsel 34% of the Fund Is Fair and Reasonable**

The Seventh Circuit and other federal courts recognize that when counsel's efforts result in the creation of a common fund that benefits plaintiffs and unnamed class members, counsel have a right to be compensated from that fund for their successful efforts in creating it.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("lawyer who recovers a common fund … is entitled to a reasonable attorneys' fee from the fund as a whole"); *Sutton v. Bernard*, 504 F.3d 688, 691 (7th Cir. 2007) ("the attorneys for the class petition the court for compensation from the settlement or common fund created for the class's benefit").

In common fund cases, unlike fee-shifting cases, courts have discretion to use one of two methods to determine whether the request is reasonable:  (1) percentage of the fund; or (2) lodestar plus a risk multiplier.  *See, e.g., Americana Art China, Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014).  However, "the approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred upon the class." *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 364, 379 (N.D. Ill. 2011); *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 170 (S.D.N.Y. 1989); *see also In re Capital One TCPA Litig.*, --- F.Supp.3d ---, MDL No. 2416, 2015 WL 605203, at *10 (N.D. Ill. Feb. 12, 2015) (percentage of the fund method "more likely to yield an accurate approximation of the market rate")*; Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992) (noting it is easier to establish market based contingency fee percentages than to "hassle over every item or category of hours and expense and what multiple to fix and so forth"); *Gaskill v. Gordon*, 942 F. Supp. 382, 386 (N.D. Ill. 1996) (percentage of fund method "provides a more effective way of determining whether the hours expended were reasonable."), *aff'd*, 160 F.3d 361 (7th Cir. 1998).

The Seventh Circuit recently suggested that in consumer cases, which often have low claims rates, the "presumption" should be that "attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and

their counsel." *Pearson*, 772 F.3d at 782. After subtracting the Dedicated *Cy Pres* Distribution, and administration expenses, Class Counsel seek 34% of the $27,847,071 remaining in the Settlement Fund. Therefore, the requested fee is presumptively reasonable under *Pearson*. Class Counsel's requested fee also reflects percentages awarded in both TCPA and non-TCPA cases. (*See* Dkt. No. 186-1 at 18–20 (collecting cases).)

Objector David Schlagel argues that Class Counsel should receive 10% of the common fund. (Dkt. No. 143 at 3, Ex. 2; Dkt. No. 192 at 1–2.)[18] Objector Schlagel relies on an "expert report" from Todd Henderson that an objector submitted in *In re Capital One TCPA Litigation*, *supra*. Objector Schlagel neglects to inform the Court that Judge Holderman declined to rely on Professor Henderson's analysis, finding that it did not accurately approximate the market rate had a fee been negotiated ex ante. *See Capital One*, 2015 WL 2015 at *18–19. By contrast, Class Counsel's fee request is in line with fees awarded in other similar cases, reflects the fee agreements negotiated between Plaintiffs and Class Counsel, and takes into account the risks associated with the case, the amount and quality of work performed, and the stakes involved. (*See* Dkt. No. 186-1 at 18–24.)

Objector Sam Cannata also objects to the amount of Class Counsel's requested fee, asserting that 33.33% "far exceeds recent Seventh Circuit decisions in similar matters." (Dkt. No.145 at 2.) Objector Cannata is wrong. Courts in this circuit routinely award such a percentage. *See Martin v. Dun & Bradstreet, Inc. et al.*, Case No. 1:12-cv-00215 (N.D. Ill. Jan. 16, 2014) (Martin, J.) (Dkt. No. 63) (awarding one-third of defendants' total payout for fees); *Cummings v. Sallie Mae*, Case No. 12 C-9984 (N.D. Ill. May 30, 2014) (Gottschall, J.) (Dkt. No. 91) (awarding one-third of the common fund for fees); *Desai v. ADT Sec. Servs., Inc.*, Case No.

---

[18] Schlagel's counsel, John J. Pentz, has been routinely criticized for his conduct in class action settlement proceedings. Although Mr. Pentz purports to object to class action settlements on ideological or political grounds, at least one court noted that class counsel argued "Pentz has been shameless in his quest to extort settlement fees from parties to meritorious class settlements." *In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510, 2011 WL 633308, at *2 (N.D. Cal. Feb. 11, 2011) (overruling Mr. Pentz's objection). In light of his history, Schlagel's objection should be given little consideration.

1:11-cv-01925 (N.D. Ill. June 21, 2013) (Bucklo, J.) (Dkt. No. 243) (fees equal to one-third of the settlement fund); Dkt. No. 140-9 (fees equal to one-third of the settlement fund plus expenses); Dkt. No. 140-10 (fees equal to one-third of settlement plus expenses); Dkt. No. 140-11 (fees and expenses equal to 33% of the settlement fund); Dkt. No. 140-12 (fees equal to one-third of settlement plus expenses); Dkt. No. 140-13 (fees and expenses equal to 33% of the fund); *Holtzman v. CCH*, Case No. 1:07-cv-07033 (N.D. Ill. Sept. 30, 2009) (Nordberg, J.) (Dkt. No. 33) (same); *CE Design, Ltd. v. Exterior Sys., Inc.*, Case No. 1:07-cv-00066 (N.D. Ill. Dec. 6, 2007) (Darrah, J.) (Dkt. No. 39) (same).

Objector Schlagel challenges the Class Representatives' adequacy because they entered into contingency fee agreements with their counsel that required them to pay 40% to 50% of any recovery in attorneys' fees. (Dkt. No. 192.) Schlagel's objection is baseless. Class Counsel do not seek 40–50% of the Settlement Fund. Instead, they seek a reasonable 34% of the fund after the Dedicated Cy Pres Distribution and administration expenses are subtracted.

Relying on a 2010 empirical study from Professor Brian Fitzpatrick, Objectors Weaver and House argue that the mean percentage nationwide in settlements over $30 million is 22.3%. (Dkt. No. 155 at 8.) But Professor Fitzpatrick's study analyzed cases in which notice and administration expenses were included in the total settlement fund and thus the mean percentage was calculated with those expenses included. *See* Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 836 (2010). Further, Professor Fitzpatrick found the mean fee award achieved in Seventh Circuit class action settlements was 27.4% and the median 29%. *Id.* Here, Class Counsel request 28.8% of the Settlement Fund less the Dedicated Cy Pres Distribution, which is nearly identical to this Circuit's mean and median fee award. *Id.*

## B. A Lodestar Crosscheck Is Not Warranted

Some objectors wrongly argue that the court should consider Class Counsel's lodestar when assessing a reasonable fee. (*See* Dkt. Nos. 122, 143, 145, 152-3, 153, 155, 192.) District

courts in the Seventh Circuit have discretion to choose either the lodestar or a percentage approach to calculating fees. *Florin*, 34 F.3d at 566 ("It bears reiterating here that we do not believe that the lodestar approach is so flawed that it should be abandoned …. We therefore restate the law of this circuit that in common fund cases, the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court.")[19] In common fund cases "there are advantages to utilizing the percentage method" because of its "relative simplicity of administration." *Id.* Regardless of the method, the district court "must approximate the market rate that would have prevailed had the parties negotiated the rate at the outset of the representation." *Silverman*, 739 F.3d at 975.

A few of the objectors point to the attorney fee order in *Rose v. Bank of Am. Corp.*, No. 11-cv-02390, Dkt. No. 108 (N.D. Cal. Aug. 29, 2014), in which Judge Davila reduced the requested fee of 25% of the fund (which is the Ninth Circuit benchmark) to less than 7.5% of the fund after applying a lodestar analysis. Respectfully, Class Counsel submit that this order represents a radical departure from the typical fee awarded in the Ninth Circuit (or anywhere else) for TCPA class action cases, even for cases litigated contemporaneously with *Rose* in the same district. *See, e.g., Steinfeld v. Discovery Fin. Servs.*, No. C 12-01118, 2014 WL 1309352 (N.D. Cal. Mar. 31, 2014) (awarding the requested 25% of the fund). The order was also premised on several errors of fact, including: (1) the amount of pro rata payments class members would receive; (2) the different types of calls at issue and the different entities sued in each of the separate TCPA cases that were covered by the settlement; (3) the years-long separate efforts of counsel in litigating each separate case up until they ultimately coordinated their efforts in seeking a settlement; (4) the risks involved; and (5) the numbers of hours worked and the types

---

[19] Objectors Weaver and House assert that *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 909 (S.D. Ill. 2012) "supports the ongoing importance of conducting a lodestar crosscheck" (Dkt. No. 155 at 13) but that case says nothing about the relative "importance" of such a crosscheck. It simply found the fee justified under either the lodestar or percentage method.

of work performed by class counsel. Objectors provide no reasoned basis that would justify following that out-of-jurisdiction order based on (erroneous) facts specific to that case.

Objectors Weaver and House also wrongly rely on Judge Holderman's order in *Wilkins v. HSBC*, No. 14 C 190, (Dkt. No. 89) (N.D. Ill. Nov. 17, 2014) in which the court requested that counsel provide lodestar information. In *HSBC*, the court ultimately declined to conduct a lodestar crosscheck. *Wilkins*, 2015 WL 890566 at *10 (N.D. Ill. Feb. 27, 2015).

**C.     Class Counsel's Requested Fee Complies with *Redman* and *Pearson***

The Seventh Circuit has instructed district courts that the "ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman v. RadioShack*, 768 F.3d 622, 630 (7th Cir. 2014). The Seventh Circuit found that administration and notice costs are not benefits to the class and thus not part of "what the class members received." *Id.*

In light of *Redman*, Class Counsel request an award of 34% of $27,847,071, which is the amount of the Settlement Fund after deducting the Dedicated *Cy Pres* Distribution and administration costs. This amount subsumes the out-of-pocket costs Class Counsel have paid to prosecute this litigation. As set forth in Class Counsel's fee petition, this amount is presumptively reasonable and in line with other settlements in this circuit and elsewhere.

**D.     The Presence of a Clear Sailing Clause Does Not Warrant a Fee Reduction**

Objectors Purgahn and Schlagel assert that Class Counsel's requested fee is objectionable because Chase agreed not to contest Class Counsel's it so long as it did not exceed 33.33% of the Settlement Fund after deducting the Dedicated Cy Pres Distribution. (Dkt. Nos. 153, 192.) But the Seventh Circuit explained in *Redman* that such "clear sailing" clauses "should be subjected to intense critical scrutiny" when they are included as a provision in a non-cash award settlement. *Redman*, 768 F.3d at 637. The Seventh Circuit's concern is not implicated here because Chase is providing a real cash non-reversionary fund for the Settlement Class. Because any dollar that does not go to the class would go to the defendant in the case of a reversionary settlement, a clear

sailing clause could give rise to collusion between the defendant and class counsel at the expense of the class.

Here, the amount of the Settlement Fund is certain and is non-reversionary, and thus the concerns with clear sailing clauses do not apply. *See Eubank v. Pella Corp.*, 753 F.3d 718, 723 (7th Cir. 2014) (questioning settlement provision permitting settlement funds not allocated to attorneys' fees to revert to defendant). Objections regarding any "clear sailing" provision should be overruled.

## V. CONCLUSION

None of the objections to the settlement warrant rejecting this class action settlement. Plaintiffs and Class Counsel respectfully submit that the settlement is an excellent outcome for a class that faced numerous risks had the case proceeded to class certification and trial. The settlement is well within the parameters for settlement approval in the Seventh Circuit and should be approved.

RESPECTFULLY SUBMITTED AND DATED this 8th day of October, 2015.

TERRELL MARSHALL DAUDT & WILLIE PLLC


By:   /s/ Beth E. Terrell, *Admitted Pro Hac Vice*
Beth E. Terrell, *Admitted Pro Hac Vice*
Email: bterrell@tmdwlaw.com
Michael D. Daudt, *Admitted Pro Hac Vice*
Email:  mdaudt@tmdwlaw.com
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
Telephone:  (206) 816-6603
Facsimile:  (206) 350-3528

Alexander H. Burke
Email:  aburke@burkelawllc.com
BURKE LAW OFFICES, LLC
155 North Michigan Avenue, Suite 9020
Chicago, Illinois  60601
Telephone:  (312) 729-5288
Facsimile:  (312) 729-5289

Syed Ali Saeed, *Admitted Pro Hac Vice*
Email:  ali@sllawfirm.com
SAEED & LITTLE, LLP
1433 North Meridian Street, Suite 202
Indianapolis, Indiana  46202
Telephone:  (317) 614-5741
Facsimile:  (888) 422-3151

Gayle M Blatt, *Admitted Pro Hac Vice*
Email: gmb@cglaw.com
CASEY, GERRY, SCHENK, FRANCAVILLA,
  BLATT & PENFIELD LLP
110 Laurel Street
San Diego, California  92101-1406
Telephone:  (619) 238-1811
Facsimile:  (619) 544-9232

Mark D. Ankcorn
Email: mark@ankcorn.com
ANKCORN LAW FIRM, PC
11622 El Camino Real, Suite 100
San Diego, California  92130
Telephone:  (619) 870-0600
Facsimile:  (619) 684-3541

Joshua B Swigart, *Admitted Pro Hac Vice*
Email: josh@westcoastlitigation.com
HYDE AND SWIGART
411 Camino Del Rio South, Suite 301
San Diego, California  92108-3551
Telephone:  (619) 233-7770
Facsimile:  (619) 297-1022

Matthew M. Loker
Email: ml@kazlg.com
KAZEROUNI LAW GROUP APC
2700 North Main Street Suite 1000
Santa Ana, California  92705
Telephone:  (800) 400-6808
Facsimile:  (800) 520-5523

Seyed Abbas Kazerounian, *Admitted Pro Hac Vice*
Email: ak@kazlg.com
KAZEROUNI LAW GROUP APC
245 Fischer Avenue, Suite D1

Costa Mesa, California  92626
Telephone:  (800) 400-6808
Facsimile:  (800) 520-5523

Todd M Friedman
Email: tfriedman@attorneysforconsumers.com
LAW OFFICES OF TODD M. FRIEDMAN PC
369 South Doheny Drive, Suite 415
Beverly Hills, California  90211
Telephone:  (877) 206-4741
Facsimile:  (866) 623-0228

*Attorneys for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I, Beth E. Terrell, hereby certify:

1.      On October 8, 2015, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to the following:

Kenneth Michael Kliebard
Email: kkliebard@morganlewis.com
Tedd Macrae Warden
Email: twarden@morganlewis.com
MORGAN LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, Illinois  60601-5094
Telephone:  (312) 324-1774
Facsimile:  (312) 324-1001

Julia B. Strickland
Email: jstrickland@stroock.com
Lisa M. Simonetti
Email: lsimonetti@stroock.com
Arjun P. Rao
Email: arao@stroock.com
Julieta Stepanyan
Email:  jstepanyan@stroock.com
STROOCK & STROOCK & LAVAN LLP
2029 Century Park East Suite 1600
Los Angeles, California 90067-3086
Telephone:  (310) 556-5800
Facsimile:  (310) 556-5959

*Attorneys for Defendants*

Christopher Perez-Gurri, *Admitted Pro Hac Vice*
Email:  chris@gpglawfirm.com
Alan G. Geffin, *Admitted Pro Hac Vice*
Email:  alan@gpglawfirm.com
GPG LAW
101 NE 3rd Avenue, Suite 1110
Ft. Lauderdale, Florida  33301
Telephone:  (954) 533-5530
Facsimile:  (954) 374-6588

*Attorneys for Objector Tamiqueca Doyley*

Norman T. Finkel, #6183246
Email:  norm.finkel@sfnr.com
Daniel E. Beederman, #3121545
Email:  daniel.beederman@sfnr.com
William R. Klein, #6185715
Email:  bill.klein@sfnr.com
SCHOENBERG, FINKEL, NEWMAN & ROSENBERG, LLC
222 S. Riverside Plaza, Suite 2100
Chicago, Illinois  60606
Telephone:  (312) 648-2300
Facsimile:  (312) 648-1212

*Attorneys for Objector Tamiqueca Doyley*

Daniel M. Samson, *Admitted Pro Hac Vice*
Email:  dan@samsonappellatelaw.com
SAMSON APPELLATE LAW
201 S. Biscayne Boulevard, Suite 2700
Miami, Florida  33131
Telephone: (305) 341-3055
Facsimile:  (305) 379-3428

*Attorneys for Objector Tamiqueca Doyley*

C. Jeffrey Thut, #6188219
Email:  jeff@roachjohnstonthut.com
ROACH, JOLMSTON & THUT
516 N. Milwaukee Avenue
Libertyville, Illinois  60048
Telephone:  (847) 549-0600
Facsimile:  (847) 549-0312

*Attorneys for Objector Kristina Lopez*

Jonathan E. Fortman
Email:  jef@fortmanlaw.com
LAW OFFICE OF JONATHAN E. FORTMAN, LLC
250 St. Catherine Street
Florissant, Missouri 63031
Telephone:  (314) 522-2312
Facsimile:  (314) 524-1519

*Attorneys for Objector Steve Purgahn*

Steve A. Miller
Email: sampc01@gmail.com
STEVE A. MILLER, PC
1625 Larimer Street, No. 2905
Denver, Colorado 80202
Telephone: (303) 892-9933
Facsimile: (303) 892-8925

*Attorneys for Objector Steve Purgahn*

John C. Kress
Email: jckress@thekresslawfirm.com
THE KRESS LAW FIRM, LLC
4247 S. Grand Blvd
St. Louis, Missouri 63111
Telephone: (314) 631-3883
Facsimile: (314) 332-1534

*Attorneys for Objector Steve Purgahn*

Joseph Darrell Palmer
Email: darrell.palmer@palmerlegalteam.com
LAW OFFICES OF DARRELL PALMER PC
2244 Faraday Avenue, Suite 121
Carlsbad, California 92008
Telephone: (858) 215-4064
Facsimile: (866) 583-8115

*Attorneys for Objectors Dawn Weaver and Susan House*

2.      I further certify that on October 8, 2015, I mailed by United States Postal Service

the foregoing to the following non CM/ECF participants:

David Schlagel
c/o John J. Pentz
19 Widow Rites Lane
Sudbury, Massachusetts 01776

*Attorneys for Objector David Schlagel*

Michael Narkin
███████████████

Eugene, Oregon 97405

*Objector, Appearing Pro Se*

Sam P. Cannata

██████████████

Cleveland, Ohio  44022

*Objector, Appearing Pro Se*

Cindy Bray

████████████████

Springfield, Missouri  68504-3336

*Objector, Appearing Pro Se*

Nicholas Owen Gunden
ORVANDI PROPERTY OR LLC

█████████████████

Walnut, California  91789

*Objector, Appearing Pro Se*

David H. Pierce
DAVID H. PIERCE & ASSOCIATES, PC

██████████████████████

Sherman Oaks, California  91403-3501

*Objector, Appearing Pro Se*

Ken Murphy

██████████████

Denver, Colorado 80210

*Objector, Appearing Pro Se*

Maritza Cabrera

█████████████

Miami, Florida  33114-5395

*Objector, Appearing Pro Se*

David D. Dishman

███████████

Swampscott, Massachusetts  01907

*Objector, Appearing Pro Se*

DATED this 8th day of October, 2015.

TERRELL MARSHALL DAUDT & WILLIE PLLC

By:   /s/ Beth E. Terrell, *Admitted Pro Hac Vice*
Beth E. Terrell, *Admitted Pro Hac Vice*
Email:  bterrell@tmdwlaw.com
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869

*Attorneys for Plaintiffs*