# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JONATHAN I. GEHRICH, ROBERT LUND, COREY GOLDSTEIN, PAUL STEMPLE, and CARRIE COUSER, individually and on behalf of all others similarly situated, Plaintiffs, v. CHASE USA, N.A., and JPMORGAN CHASE BANK, N.A., Defendants. | No. 1:12-CV-5510 (N.D. Ill.) Hon. Gary Feinerman |

### REPONSE OF DAVID SCHLAGEL TO SUPPLEMENTAL BRIEF IN SUPPORT OF CLASS COUNSEL'S MOTION FOR AN AWARD OF FEES

Class member David Schlagel hereby responds to the Supplemental Brief in Support of Class Counsel's Motion for an Award of Fees and Approval of Service Awards filed on November 5, 2015. The lodestar number disclosed in that Brief confirms everything that Objector Schlagel has maintained about this case and Class Counsel's supra-competitive request for fees. In his Objection, Mr. Schlagel asserted that under no circumstances could Class Counsel's lodestar in this case be larger than class counsel's lodestar in the Capital One TCPA case in which Professor Henderson filed his report (Document 143-2), which was $2.2 million. Indeed, Class Counsel's lodestar in this case is significantly lower than that, at $1.286 million.

**I.  Class Counsel's Low Lodestar Figure Demonstrates the Accuracy of Professor Henderson's Declaration.**

Objector Schlagel suggested that, based upon Professor Henderson's determination of the market rate for fees in Capital One, the market rate in this smaller case should be in the neighborhood of 10%, or approximately $2.85 million of the

settlement net of cy pres and expenses. Doc 143. A $2.85 million fee in this case would represent a more than adequate 2.21 lodestar multiplier, a return on investment that is well above the market rate according to Professor Henderson.

Despite the fact that a percentage fee vastly lower than 33% would give Class Counsel an extremely healthy rate of return on their investment of time in this case, Class Counsel persist in their claim that only a fee of $9.5 million, or *a 740% increase in their lodestar*, would adequately compensate them for the risk of this case! Suffice it to say that there are very few cases in which a 740% markup of lodestar is necessary to attract competent counsel, and this case is most certainly not one of them. There are no fewer than 8 separate firms laying claim to a piece of the fees here. Had those firms competed over price, rather than colluding to maximize fees, it is likely that at least some of them would have submitted bids closer to 10% than 33%, in order to land the lead counsel position.

Class Counsel fundamentally misunderstand what the market rate means. The market is not established by blindly mimicking what past courts have awarded in other cases involving different statutes. Past percentage awards do not establish the market. The methodology whereby courts rotely award the same percentage in case after case is the benchmark method, followed by the Ninth Circuit and a few others. A market rate, in contrast, by definition varies from case to case, and by subject area. As demonstrated by Professor Henderson, in TCPA cases like this one, the risk of not recouping one's lodestar is very low, and the investment of time in each case is relatively small, such that a rational firm would be willing to take on a TCPA case for an average return on investment, or lodestar multiplier, of 1.57. Doc 143-2 at p. 3.

Because the amount of TCPA settlements varies based on factors wholly unrelated to the amount of work devoted to the case by class counsel, such as the number of qualifying class members -- something that is often known only by the defendant before a case is filed -- it is clear that one cannot state the market rate as a percentage that must be applied in every case, irrespective of class counsel's investment of time in the case.

Instead, the market rate for this case may be, and in fact is, vastly different from the market rate in a securities or antitrust case. In an efficient market, where the market price delivers a marginal return that exceeds marginal cost, new competitors will enter the market until the market price falls to equilibrium, where marginal return equals marginal cost. We know the marginal cost of this action was $1.286 million. Certainly, there are law firms out there willing to take on this case for less than an $8.2 million bonus over and above lodestar. In a consumer case like this one, the reason why the negotiated rates do not fall to the market price is that consumers, like the Lead Plaintiffs here, are mere figureheads who are recruited and manipulated by class counsel to agree to the maximum fee class counsel believe a court will award. *See In re Synthroid Marketing Litig.*, 201 F. Supp. 2d 861, 868 (N.D. Ill. 2002)("lawyers have an incentive to list as the named plaintiffs those who agree to the highest contingent attorneys fees"). There is no active negotiation of a market price, and no way for the consumers to obtain the information necessary for them to determine what that price is. *See id.* at 875-876.

Under no circumstances would the Seventh Circuit permit a fee of 740% of the lodestar. *See Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) (calling a multiplier of 2 an appropriate "ceiling" for lodestar multipliers).

**II.  None of the Reasons Given by Class Counsel in Support of a 33% Fee Justify That Award.**

The Seventh Circuit held in *Synthroid* that while this Circuit follows the market rate method, the market rate may consist of a specific multiple of class counsel's lodestar calculated at negotiated rates. The market rate can be "a percentage of recovery [or] a lodestar hourly rate and a multiplier for risk-bearing. (The greater the risk of loss, the greater the incentive compensation required.)" *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001). A lodestar-multiplier fee agreement would be particularly appropriate in TCPA cases, where the likely amount of recovery cannot be accurately forecast at the outset of a case, given the asymmetrical access to information possessed by the parties.

What TCPA plaintiffs do know, however, is what Professor Henderson has disclosed in his Report: (1) TCPA class actions involve relatively small investments of time, and (2) TCPA cases carry relatively low risk of non-recovery (64% of these cases settle). This means that TCPA plaintiffs could negotiate a market rate fee equal to class counsel's lodestar (calculated at reasonable negotiated rates) enhanced by a multiplier of 1.57 or slightly higher. This rate would be guaranteed to provide class counsel with a positive rate of return on their investment in the case, while avoiding the windfall that would result from the negotiation of an arbitrary percentage amount before anyone knows how much the case is likely to settle or verdict for.

Class Counsel invested relatively little time in the prosecution of this case. *Cf. Sutton v. Bernard*, 504 F.3d 688, 691 (7th Cir. 2007)(class counsel's lodestar in securities class action was $5.69 million). All of Class Counsel's arguments in favor of a 33% fee and a 740% enhancement of their lodestar are belied by the low amount of their lodestar. For example, Class Counsel contend that "litigating TCPA cases like this one requires persistent diligence throughout the entire course of litigation." Supp. Brief at p.14. While Objector Schlagel is unaware of any kind of case in which class counsel can afford to coast on autopilot, suffice it to say that in this case, Class Counsel was able to supply all the necessary diligence in the 2300 hours claimed. A 10% fee would compensate Class Counsel at more than twice their hourly rate for every hour worked. Why is the supposed need for heightened diligence not fully captured in the lodestar amount, which presumably reflects that diligence?

Likewise, Class Counsel's claim that it faced the "unique" defense of the arbitration clause is absurd. Arbitration clauses are routinely included in all kinds of consumer contracts these days. In fact, an arbitration clause defense is the rule, not the exception, in TCPA and other class actions. In any event, Class Counsel was able to fully investigate and brief the arbitration clause issue in the 2300 hours claimed in their affidavits. Without this unique defense, presumably, their collective lodestar would be even lower, and they would receive a correspondingly lower fee. Again, the 10% fee urged by Objector Schlagel compensates Class Counsel for every hour expended, whether on the arbitration clause issue, the consent defense, or class member identification, at twice their hourly rates. The Seventh Circuit market rate requires nothing more.

With regard to risk, this case was settled a little more than a year after it was filed. While it took a year to hammer out the Settlement Agreement, this does not mean that any substantial risk of non-payment remained after a settlement in principle was agreed to in the fall of 2013. Therefore, unlike those cases in which the market rate may be as high as 33%, in this case the market rate is much lower because of the fact that these cases are routine, and that the defendant agreed to participate in mediation of this case within nine months of filing, and settled it within sixteen months of filing.

### III. The District Court Must Reject The Settlement Due to The Inadequacy Of the Lead Plaintiffs.

The Lead Plaintiffs must be found inadequate for agreeing to pay fees of 40% and 50%, respectively, in a class action expected to generate a $30 to $100 million recovery, and by failing to negotiate a competitive market rate fee with their counsel. This demonstrates complete ignorance of their fiduciary duty to the class, the fact that this is a class action rather than an individual one, and the market rates in class action litigation as demonstrated by fees awarded in cases of this size and the Henderson Report. *See Eubank v. Pella*, 753 F.3d 718, 723 (7th Cir. 2014)(rejecting settlement because named plaintiff was inadequate). The adequacy inquiry made of lead plaintiffs should include the lead plaintiffs' discharge of their duty to negotiate an *ex ante* competitive market rate fee agreement with their counsel. Where the lead plaintiffs fail to do that, and instead demonstrate that they are willing pawns of class counsel seeking to obtain a windfall attorneys' fee, the Court should refuse to find the adequacy prong for class certification satisfied.

Even now, after they have learned that their counsel expended no more than $1.286 million on this case, the Lead Plaintiffs have failed to require their counsel to

lower their fee request, or to oppose that request, instead allowing them to continue to seek a 740% enhancement of their actual time.[1] A 740% enhancement of lodestar is not the market rate anywhere in this country in any area of law, let alone in a routine TCPA case in the Seventh Circuit that adheres to the market rate methodology of fee calculation.

## CONCLUSION

For the foregoing reasons, this Court should DENY the motion to certify the settlement class and to approve the settlement; if the Court does approve the settlement, it should award a fee to Class Counsel of no more than 10% of the net Settlement Fund, which is 2.2 times their claimed lodestar.

Respectfully submitted,
David Schlagel,
By his attorney,


*/s/ John J Pentz*
John J. Pentz
19 Widow Rites Lane
Sudbury, MA 01776
Phone: (978) 261-5725
jjpentz3@gmail.com

---

[1] It is not clear that Class Counsel have informed their clients that their lodestar in this case is so much lower than their requested fees. If not, then Class Counsel should be found inadequate for failing to communicate with their clients. Either way, this Court must find the adequacy prong of FRCP 23 unsatisfied here.

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that the foregoing document was filed via the ECF filing system of the USDC for the ND IL on November 16, 2015, and that as a result electronic notice of the filing was served upon all attorneys of record.

                                              */s/ John J. Pentz*
                                              John J. Pentz