```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3
      JONATHAN J. GEHRICH, ROBERT      )
 4    LUND, COREY GOLDSTEIN, PAUL      )
      STEMPLE, and CARRIE COUSER,      )
 5    individually and on behalf       )
      of all others similarly          )
 6    situated,                        )
                                        )
 7                      Plaintiffs,    )
                                        )
 8    -vs-                             )  Case No. 12 C 5510
                                        )
 9    CHASE BANK USA, N.A., and        )
      JPMORGAN CHASE BANK, N.A.,       )  Chicago, Illinois
10                                      )  October 22, 2015
                        Defendants.    )  10:00 a.m.
11

12                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE GARY FEINERMAN
13

14    APPEARANCES:

15    For the Plaintiffs:      TERRELL MARSHALL LAW GROUP, PLLC
                               BY:  MS. BETH ELLEN TERRELL
16                             936 North 34th Street
                               Suite 300
17                             Seattle, Washington  98103
                               (206) 816-6603
18
                               ANKCORN LAW FIRM, PC
19                             BY:  MR. MARK D. ANKCORN
                               11622 El Camino Real
20                             Suite 100
                               San Diego, California  92130
21                             (619) 870-0600
      Court Reporter:
22
                      CHARLES R. ZANDI, CSR, RPR, FCRR
23                         Official Court Reporter
                       United States District Court
24              219 South Dearborn Street, Suite 2128
                        Chicago, Illinois  60604
25                   Telephone:  (312) 435-5387
               email:  Charles_zandi@ilnd.uscourts.gov
```

1  APPEARANCES:   (Continued)

2  For the Plaintiffs:      LAW OFFICES OF TODD M. FRIEDMAN, P.C.
                            BY:   MR. TODD M. FRIEDMAN
3                           324 South Beverly Drive
                            Suite 725
4                           Beverly Hills, California  90212
                            (877) 206-4741
5

6                           BURKE LAW OFFICES, LLC
                            BY:   MR. ALEXANDER H. BURKE
7                           155 North Michigan Avenue
                            Suite 9020
8                           Chicago, Illinois  60601
                            (312) 729-5288
9

10 For the Defendants:      STROOCK & STROOCK & LAVAN, LLP
                            BY:   MS. JULIA B. STRICKLAND
11                                MR. ARJUN P. RAO
                            2029 Century Park East
12                          Suite 1600
                            Los Angeles, California  90067-3086
13                          (310) 556-5800

14                          MORGAN LEWIS & BOCKIUS, LLP
                            BY:   MR. KENNETH M. KLIEBARD
15                          77 West Wacker Drive
                            Chicago, Illinois  60601-5094
16                          (312) 324-1000

17 For Objector             GPG LAW
   Tamiqueca Doyley:        BY:   MR. ALAN G. GEFFIN
18                                MR. DANIEL SAMPSON
                            101 N.E. Third Avenue
19                          Suite 1110
                            Fort Lauderdale, Florida  33301
20                          (954) 533-5530

21

22

23

24

25

1    (Proceedings heard in open court:)

2         THE CLERK:  12 C 5510, Gehrich versus Chase Bank.

3         THE COURT:  So, who do we have?

4         MS. TERRELL:  Good morning, your Honor.  Beth Terrell

5    on behalf of plaintiffs and the class.

6         MR. BURKE:  Alex Burke for plaintiffs and the class.

7         MR. ANKCORN:  Mark Ankcorn as well for plaintiffs and

8    the class.

9         MR. FRIEDMAN:  And Todd Friedman for plaintiffs and

10   the class, your Honor.

11        MS. STRICKLAND:  Good morning, your Honor.  Julia

12   Strickland from Stroock & Stroock & Lavan on behalf of Chase

13   and the Chase defendants.

14        MR. RAO:  Good morning, your Honor.  Arjun Rao also

15   on behalf of Chase defendants.

16        MR. KLIEBARD:  Good morning, your Honor.  Kenneth

17   Kliebard of Morgan Lewis also on behalf of Chase.

18        MR. GEFFIN:  Good morning, your Honor.  Alan Geffin

19   of GPG Law on behalf of the objector, Tamiqueca Doyley.

20        THE COURT:  Which objector?

21        MR. GEFFIN:  Doyley, your Honor, D, apostrophe,

22   O-Y-L-E-Y.

23        THE COURT:  Okay.  And your name is?

24        MR. GEFFIN:  Geffin, G-E-F-F, like Frank, I-N, like

25   November.  Good morning, Judge.

1          THE COURT:  Good morning.

2          MR. SAMPSON:  Good morning, your Honor.  Daniel

3    Sampson on behalf of the objector Tamiqueca Doyley as well.

4          THE COURT:  Okay.  And your last name?

5          MR. SAMPSON:  Sampson.  Thank you, your Honor.

6          THE COURT:  Do we have any other parties here who --

7    or any other, I guess, non-parties, parties, whatever, who are

8    here to object?

9          MR. BURKE:  No, Judge.  I've searched the floor as

10   well.  I have not found anybody.

11         THE COURT:  Because I think that the lawyers for

12   Schlagel indicated that they might be here.  And Mr. Dishman,

13   who is representing himself, indicated that he might be here.

14   And the lawyers representing Steve Purgahn, the objector,

15   indicated that they would be here.  Is there anybody here in

16   the courtroom on behalf of those objectors?

17         Nobody's responded.  I know I-55 is backed up right

18   now, and it's possible that they might have flown in to Midway

19   this morning.  Has anybody heard -- has anybody gotten an

20   e-mail or a text from any of these folks?

21         MS. TERRELL:  No.

22         MR. ANKCORN:  No, your Honor.

23         MS. STRICKLAND:  No, your Honor, and I checked my

24   e-mail as recently as about five minutes ago.

25         THE COURT:  All right.  Then we'll just proceed,

1    then.

2            So, the plaintiffs had the last word in responding to

3    the objections.  So, why don't I let the lawyers for Objector

4    Doyley, that's D-O-Y-L-E-Y, make whatever presentation you

5    would like to make.  The floor is yours.  You can address

6    whatever it is you'd like to address.

7            MR. GEFFIN:  Thank you, your Honor.  And at the risk

8    of repetition, my name is Allen Geffin, your Honor.  We

9    represent Objector Doyley.

10           Let me start, if I may, with a bit of a candid

11   remark.  Over coffee this morning, I mentioned to co-counsel

12   that our position this morning may not be a particularly

13   popular one.  And as I sit here in this courtroom amongst this

14   bevy of lawyers before the bench, I fear that I may be

15   correct.

16           Of course, this is a significant matter involving

17   350-odd thousand claimants.  Plaintiffs' counsel on behalf of

18   the class and defendants' counsel on behalf of the defendants

19   have apparently worked tirelessly to bring about a resolution

20   of the matter.  We understand that.  We appreciate that.  And

21   it is not without some measure of discomfort that we come

22   before the Court objecting to the settlement agreement.

23           To be clear, our objection is limited to the *cy pres*

24   award, or I think the French pronounce it *cy pres*.  We don't

25   *per se* have an objection to the amount of the settlement, the

1   global settlement.  We don't *per se* have an objection to the

2   amount of attorney's fees sought by the class counsel.

3          What we object to, really, in two discrete

4   objections, are the *cy pres* awards as it relates to the

5   dedicated *cy pres* and the residual *cy pres*.

6          And curiously, we've scoured the law in the various

7   circuit courts of appeal.  Most of the decisions that address

8   the propriety of *cy pres* awards first go through a little bit

9   of an analytical approach to where the *cy pres* notion came

10  from in the first instance.  And it is now known that it came

11  from the notion of trust law.  It's relatively new, the

12  *cy pres* award, in the context of class action lawsuits.

13         As I'm sure the Court has had the benefit of reading

14  many of the opinions, including the recent opinion out of the

15  Seventh Circuit authored by Judge Posner, and I'm referring in

16  particular to *Pearson v*. *NBTY*, which is published at 772 F.3d

17  778.  There, Judge Posner, like many of the jurists from the

18  other circuit courts of appeal that we cite to in our brief,

19  traces the history of the *cy pres* award, and notes the

20  importance of the award and its purpose.

21         The purpose of the award is to -- is somewhat

22  conditional.  It is:  What do we do when there are, either, A,

23  funds remaining after a settlement agreement is entered into

24  and the claimants have been made whole, or, alternatively, B,

25  if it's simply infeasible to pay all of the claimants?

1       An example, for example, of infeasibility might be
2   where a claimant would receive 50 cents, but it would cost
3   perhaps a dollar to transmit the 50-cent payment to the
4   claimant.  In those certain limited contexts, the courts have
5   said that a *cy pres* award is indeed appropriate.

6       Let's focus on this case and what the *cy pres* award
7   first is intended to do and, in fact, does.  We now know that
8   particularly in this circuit, the Seventh Circuit, that a
9   settlement of a class action lawsuit creates vested property
10  rights in the claimants.  The settlement funds, which these
11  parties want this Court to approve today, are now the property
12  rights of the various claimants.  It's, to be colloquial, the
13  claimants' money.

14      What these folks have endeavored to do by cobbling
15  together their settlement agreement is create a, quote,
16  "dedicated," close quote, *cy pres* award.  And in so doing,
17  they propose to take a million dollars of the settlement fund
18  and ascribe that million dollars to members of the -- I
19  believe they call it the, quote, "alert class," close quote.

20      Unfortunately, that's improper because you can't take
21  that million-dollar dedicated fund until -- unless and until
22  the class members are first made whole.  And as we posit in
23  our --

24      THE COURT:  So, what's your objection to this million
25  dollars?  Is it that the alert subclass is getting any money

1   at all, in light of the fact that everybody agrees that they

2   have no conceivable claim; or is it that -- so, first, is it

3   that the million dollars should be going to the other

4   subclasses and zero should be allocated to the alert subclass,

5   or is your argument that if you're going to give a million

6   dollars to the alert subclass, they should get the money and

7   not the Consumer Federation of America?

8               MS. TERRELL:  The former, not the latter.

9               THE COURT:  Okay.

10              MS. TERRELL:  The very notion of the *cy pres* is first

11  and foremost to distribute funds for their, quote, "next best

12  use."  But you can only do that if the, quote, "very best use"

13  of the funds has been exhausted.  The very best use of the

14  funds is payment to the claimants.  And by taking a million

15  dollars, as we perhaps uncharitably describe in our moving

16  paper, by diverting a million dollars, you, in fact, divest

17  those claimants of one of their property rights, their right

18  to receive pro rata that million-dollar fund.

19              So, in effect, it's the former proposition

20  articulated by the Court.  You can't, as a matter of law --

21  and this is precisely what Judge Posner speaks to in the

22  *Pearson* opinion.  You can't as a matter of law simply say,

23  "Well, we'll take their property rights, a million dollars,

24  and we'll give it to some charity."  It's simply impermissible

25  under federal law.

1   THE COURT:  Just one thing, and then I have to
2   mention, in case you end up upstairs -- and I'm doing this as
3   a favor to out-of-town counsel.  If you're upstairs, you
4   never, ever refer to an opinion as Judge So-and-So's opinion.
5   It's always the opinion of the Seventh Circuit.
6   MR. GEFFIN:  I appreciate that.
7   THE COURT:  I just saved you about five minutes of
8   grief if you ever end up upstairs.
9   MR. GEFFIN:  Well, and for the 30 seconds of grief
10  that I'm currently --
11  THE COURT:  It wasn't grief.  It was just a friendly
12  suggestion.
13  MR. GEFFIN:  I appreciate that.  I will accept that
14  suggestion in the manner in which it was intended.  Thank you,
15  your Honor.
16  Let me endeavor not to make that mistake again.  The
17  Seventh Circuit in its *Pearson* decision was very clear about
18  the *cy pres* award and how in *Pearson* it was improper.  The
19  rationale of the Seventh Circuit in *Pearson* frankly is
20  applicable here and should be the rationale of this Court.  I
21  say that respectfully.
22  As much as everybody in this room except for the
23  objector wants this matter resolved, and as benevolent as the
24  defendants may appear to be by suggesting that a million
25  dollars ought to go to some charity, it simply cannot be done.

1    It is impermissible.

2              And that's as to the dedicated *cy pres* provision of

3    the settlement agreement.  But there's yet another problem

4    with the settlement agreement as it relates to the *cy pres*

5    program, and that's with respect to the residual *cy pres*.

6              THE COURT:  Now, the residual is just if the people

7    in the first -- the people in the first round who don't cash

8    their checks, so what should we do with that?  And what the

9    plaintiffs and the defendant is saying -- are saying is that,

10   "For the folks who don't cash their checks, we'll put that

11   money in a bucket; and if we can distribute it, fine.  And if

12   it's too little to distribute, in other words, if it's going

13   to cost 50 cents to mail everybody a check for 37 cents, then

14   we'll give it to the Electronic Frontier Foundation."

15             So, what exactly is wrong with that picture?

16             MR. GEFFIN:  It's the facts that are the foundation

17   to the picture that are -- is problematic.

18             In order for you to even have the potentiality of a

19   residual *cy pres* award, the parties have stipulated to a cap

20   on the number of claims that may be made by members of the

21   class.  For example, there is one claim that may be made if, I

22   believe, you had a telephone call or a text message related to

23   a bank account and one claim as it relates to a charge card.

24             That artificial cap has been deemed improper and

25   unenforceable by the various circuit courts of appeal because

1  in capping the recovery, the parties have *ipso facto* ensured

2  that no claimant, or at least no claimant who received more

3  than, for example, two calls, will ever be made whole because

4  those claimants have the right, the property right --

5  THE COURT:  I don't follow where you're going.

6  Because my understanding is that the first set of checks go

7  out.  X number of people don't cash the checks.  That money

8  goes into a bucket.  And if it's feasible to do so, that money

9  then gets distributed to the people in the first round, so

10  there's a supplemental payment to those people.

11  And then if those -- whatever checks don't get cashed

12  in that round -- whenever there's uncashed checks in whatever

13  round it is where it would cost more to distribute it than it

14  would be to just give it -- than -- it would cost more to

15  distribute it than the pool of money, in that situation, it

16  goes to a *cy pres*.

17  So, I don't -- I don't follow where you're going.

18  MR. GEFFIN:  Let me see if I can -- if I can perhaps

19  state this with a little more clarity.  There's really two

20  problems with the residual *cy pres* award.  Let's start with

21  the -- what I characterize as the fundamental problem.

22  The fundamental problem is the notion of a cap, the

23  fact that no claimant, no claimant regardless of the number of

24  calls or text messages that that claimant may have received,

25  may file more than two claims.  And if we stop the analysis

1  right there, Judge, which would be appropriate if that was the
2  only issue, that in and of itself is improper.

3          THE COURT:  Okay.  I don't understand how that
4  objection -- I understand the objection.  I don't understand
5  what it has to do with the residual *cy pres*.  It seems to be
6  an orthogonal issue.  You seem to be saying, look, in adding
7  up the number of points that -- or whatever, credits or
8  whatever the metric is, people ought to be able to have the
9  number of points based on the number of calls that they
10  received.

11          MR. GEFFIN:  Yes.

12          THE COURT:  That has -- why are you using the
13  residual *cy pres* issue as a vehicle for presenting that
14  objection?

15          MR. GEFFIN:  Because the notion of a *cy pres* is to
16  pay some next best use, some other beneficiary.  But if the
17  credits, to use the Court's expression, are insufficient to
18  make a party whole, then there can't be a *cy pres*.  First and
19  foremost, the claimants must be made whole.

20          So, if the Court accepts my proposition just for
21  argument's sake and an individual claimant would be entitled
22  to more credits, then that claimant would be entitled to
23  payment from the, quote, residual *cy pres* award.  That's where
24  the money ought to come from.

25          It's not -- unless and until every claimant is made

1    whole, then you start even looking at the issue of a *cy pres*

2    award.  And what I'm suggesting to the Court is by capping it,

3    that's tantamount to an acknowledgment, "We're not going to

4    make these people whole."

5               Am I any clearer?  And if not, I apologize.

6               THE COURT:  It may be me.

7               MR. GEFFIN:  It may be me.

8               THE COURT:  But I'm just not -- it seems like you're

9    mixing apples and oranges.  Like, the only situation -- my

10   understanding of the residual *cy pres* -- and if my

11   understanding is wrong, you'll tell me.  My understanding of

12   the residual *cy pres* is if there ever comes a time where the

13   amount of money left to be distributed is less than the cost

14   of distributing that money, then that money goes to a *cy pres*

15   for the residual.

16              MR. GEFFIN:  And therein lies the second half of the

17   problem with the residual *cy pres*.  What I was trying to

18   explain to the Court is even before you address the second

19   half of the problem is the fundamental problem of the cap,

20   which ought not be there.

21              May I defer to co-counsel?  And perhaps he'll do a

22   better job than I in --

23              MR. SAMPSON:  May I take a shot, your Honor --

24              THE COURT:  Sure.

25              MR. SAMPSON:  -- at clearing this up?  And perhaps I

1   won't be able to, but I'd like to try.

2        Imagine there are only 10 claimants and each of them
3   received four calls.  That would be statutory damages of
4   $2,000 apiece.  The settlement agreement says they may only
5   make claims for two calls, which would be statutory damages of
6   a thousand dollars apiece.

7        So, now there's -- there's about $20 million
8   available to fund the payments to these 10 claimants.  They
9   will all get $2,000.  There will now be all this other money
10  left over to go to *cy pres*, but it's only left over to go to
11  *cy pres* because the settlement agreement has said that the
12  claimants may only make claims about two calls instead of the
13  four that they actually received.

14        So, instead of making them whole and giving them
15  their damages, which there is money available to give them
16  their full measure of damages for all four calls, the
17  settlement agreement says, "No, you may only receive for two
18  calls, and the rest of the money goes to the residuary
19  *cy pres*."

20        So, your Honor, if your explanation of the settlement
21  agreement was correct and that everyone would receive their
22  full measure of damages prior to residuals going to *cy pres*,
23  then of course there would be no problem.  That's exactly what
24  a residuary *cy pres* program is for.  But because Chase doesn't
25  seem to have records of how many calls were made to the

1     claimants, they've said, "Okay.  We're only paying for two
2     calls, one credit card, one bank account, doesn't matter how
3     many.  And if you received more calls, well, you can just opt
4     out of the settlement."
5            But that's not what Rule 23 assumes for opt-outs.
6     Opt-outs are for people who want to make their individual
7     claims.  This is not, "Oh, we're just going to cap how much
8     money you can receive under the settlement agreement."
9            If it was full pro rata, in other words, every
10    claimant come forward with your phone records and show how
11    many times Chase called you, and then everyone will receive
12    their pro rata distribution until it's infeasible to give you
13    more, and the amount that's uncashed checks or infeasible goes
14    to *cy pres*, we would have no valid objection to the residuary.
15    The problem is when you combine a cap on the number of claims
16    the claimants can make with a residual *cy pres* that you get to
17    the problem that we are describing.
18            I hope I've cleared it up a little.
19            THE COURT:  I'm so sorry.  And again, it may be me.
20            MR. GEFFIN:  Thank heavens.
21            THE COURT:  It may be me, but we don't have a
22    situation, though, where there's $20 million to fund
23    10 claimants and there's a cap.  The cap is not going to
24    result in there being this huge pot of money that's going to
25    go to a *cy pres*.

1      That's one way in which -- like, there's a huge pot

2  of money.  Each claimant has a cap.  There aren't enough

3  claimants to use up the money, so let's give the $19,980,000

4  to the Consumer whatever, the Consumer Federation of America.

5      The money is going to get used up, and it's going to

6  continue to get used up until we reach -- we reach the point

7  in the law of diminishing returns where it's going to cost

8  more to distribute the rest of the money than there is money

9  to distribute.

10      MR. SAMPSON:  If I --

11      THE COURT:  And I don't see -- so, your cap

12  hypothetical doesn't work or is not this case.  It is -- it

13  may be the *Pearson* case.  It may be the *Pella* case.  It may be

14  the *Redman* case, but it's not this case.

15      MR. SAMPSON:  I mean, I would agree that should -- if

16  there were enough claimants making two claims, the 390,000

17  claimants making two claims to exhaust the fund, that the

18  residuary *cy pres* portion of Miss Doyley 's objection would be

19  moot.

20      THE COURT:  Isn't that what we have?

21      MR. SAMPSON:  Well, I don't see either Chase or the

22  plaintiffs making that argument.  They don't seem to suggest

23  that the fund is going to be exhausted.  If they come up and

24  say yes and with the calculations that the fund would be

25  exhausted, then we would rest on our objection to the

1    dedicated *cy pres* award.

2           Certainly, under the circumstances that your Honor is

3    suggesting, then absolutely, the residuary portion of our

4    *cy pres* objection has become moot, if the 390,000-some

5    claimants will exhaust the fund or substantially exhaust the

6    fund.

7           THE COURT:  Okay.  All right.  Thanks.

8           MR. SAMPSON:  Thank you, your Honor.

9           MR. GEFFIN:  Judge, may I leave one last --

10          THE COURT:  Sure.

11          MR. GEFFIN:  -- and hopefully lasting thought on the

12   Court's mind?

13          As it relates to the dedicated *cy pres* award, I've

14   made some hay on the *Pearson* decision.  I'd like the Court to

15   likewise be mindful of the cases in the other circuit courts

16   of appeal, including the *Klier* opinion in the Fifth Circuit

17   Court of appeal, because really *Klier* is the first case upon

18   which the successor cases follow.

19          And *Klier*, like *Pearson*, goes through a fairly

20   in-depth analysis, including even a definition of *cy pres* in

21   the first instance, of what a *cy pres* award is, when there

22   ought to be a *cy pres* award, and more critically, when there

23   ought not be a *cy pres* award.

24          And it's clear in reading *Klier* -- in fact, with the

25   Court's permission, I'll quote from one of the critical

1  paragraphs. "Because the settlement funds are the property of
2  the class, a *cy pres* distribution to a third party of
3  unclaimed settlement funds is permissible only when it is not
4  feasible to make further distributions to class members. The
5  option arises only if it is not possible to put those funds to
6  their very best use benefiting the class members directly."

7  And therein lies the problem with the dedicated
8  *cy pres*. Had these parties gotten together and said
9  effectively, "We're not going to have a dedicated *cy pres*.
10  We'll have a residual *cy pres*. Let's take all the settlement
11  funds and use them for their very best use," then it's
12  arguable we might not be here at all; but that's not what
13  these parties have done.

14  What apparently Chase has opted to do is try to buy
15  some peace, and said, "We'll tell you what we'll do. We'll
16  take a million dollars and ascribe it to some" -- whoever it
17  is -- "regardless of what claimants ultimately recover."
18  That's not the very best use of the settlement funds. The
19  very best use of the settlement funds is to pay the claimants
20  in an effort to make them whole. And by taking a million
21  dollars and moving it out of that fund, you completely
22  undermine the notion of a *cy pres* distribution in the first
23  instance.

24  And the Fifth Circuit, the Eight Circuit, I believe
25  the Third Circuit, and now the Seventh Circuit have all said

1    that that is inappropriate.

2              THE COURT:  Okay.

3              MR. GEFFIN:  And it's for that reason that

4    Tamiqueca Doyley objects to the *cy pres* portion of the

5    settlement agreement.

6              THE COURT:  Okay.  Thank you.

7              MR. GEFFIN:  You're welcome.  Thank you for your

8    time, your Honor.

9              THE COURT:  So, let's just focus on the *cy pres*

10   issues, and I don't know who wants to address it.  And I can

11   imagine a lawyer being in a situation where the judge has made

12   a misapprehension or can't understand something and that

13   misunderstanding is to the lawyer's benefit.  And there's a

14   temptation to say, "Yeah, Judge, you're right, you're right,"

15   when in the back of your mind, you know that the judge is

16   completely missing the point.  I'm going to ask that you

17   resist that temptation and tell me, am I missing anything on

18   the residual *cy pres*?

19             MS. TERRELL:  No.  Let's start there, and although we

20   didn't confer, the way the settlement is set up, the fund is

21   exhausted.  And so as I understand it, to a large extent, that

22   disposes of their objections to the residual *cy pres*.

23             And, in fact, we bent over backwards to make sure

24   that we were adhering to all of the newer requirements with

25   regard to *cy pres*, which is to do a second distribution --

1  well first of all, only uncashed checks, right?  We do a
2  second distribution, get the money out to as many folks as we
3  can, and this pot of money that will go eventually to the
4  Electronic Frontier Foundation starts with the uncashed
5  checks.

6        That's true in every class action settlement.  We
7  don't understand why people who file a claim and then get a
8  check don't cash them, but it happens more often than you
9  would imagine.  So, there's going to be a little pot of money.
10 And that uncashed check amount, then we're going to try and
11 distribute that again to the folks who made claims and
12 actually cashed their checks.  And then whatever is left
13 there, if there are opt-outs or other folks from the class who
14 could have made a claim, Chase has the ability to make
15 settlements with those folks.  And then out of that amount,
16 anything that is left goes to the Electronic Frontier
17 Foundation.

18       The whole goal was to spend almost every dollar
19 possible on people who are within the class, and that's what
20 this *cy pres* distribution does.  And so --

21       THE COURT:  That's the residual *cy pres*?

22       MS. TERRELL:  As to residuals, that's right.  That's
23 right.

24       THE COURT:  All right.  Does Chase have anything to
25 add?

1     MS. STRICKLAND:  No, your Honor.  I do have one
2   comment on the dedicated *cy pres* when we get there.
3     THE COURT:  Okay.  We're going to get to that in a
4   second.  Anything else on the residuals?
5     MS. STRICKLAND:  Nothing.  Plaintiffs have described
6   it absolutely accurately.
7     THE COURT:  Okay.  So, on the dedicated, both sides
8   seem to agree that the alert call subclass has no viable claim
9   because there's consent.  Why should we give a million dollars
10   to these people -- or why should we use these people as a
11   vehicle for the plaintiffs' lawyers to give a million dollars
12   to the Consumer Federation of America?
13     MS. TERRELL:  We spent a lot of time negotiating that
14   point, and we would have preferred, given that the alert
15   subclass -- or the alert folks don't have claims that in our
16   view are valuable at all, to have cut them out of the class.
17   It was a requirement of the overall settlement that those
18   folks release their claims.
19       So, the only way that I felt comfortable doing that
20   was to make sure that the amount that is there that's getting
21   distributed to people that have good claims, everybody who's
22   not in the alert subclass, that that money was enough.
23       So, the presupposition or the assumption of the
24   objectors is that the $33 million that we had to pay the
25   people who are in the other subclasses isn't enough; but, in

1   fact, all of the factors with regard to settlement of those
2   claims are satisfied in terms of it being a fair, adequate,
3   and reasonable settlement.

4           And the reason that it's so important to have set
5   aside money just for the alert subclass is so that those -- I
6   think it ends up being 13 million class members, it's a lot,
7   so that those folks's really claims that I think are worth
8   nothing don't dilute the claims of those who have very good
9   claims and are getting a very good dollar settlement out of
10  this -- out of this deal.

11          And so that's why, in order to have the folks get
12  $33 million set aside for real claims, we had to have an
13  amount that went to *cy pres* so that we could have a release,
14  we'd have consideration and release for those in the alert
15  subclass.  So, they're tied together.

16          THE COURT:  So, I used to think there was only one
17  problem with the dedicated *cy pres*.  Now there are two
18  problems with the dedicated *cy pres*.  The first problem is
19  these people shouldn't be getting any money at all.  Chase is
20  willing to pay $34 million.  Chase doesn't care how it's
21  allocated.  The $34 million should go -- or whatever portion
22  is for the class members should go to people who actually have
23  claims.  That's the first problem.

24          The second problem is if you're -- you're having them
25  release their claims and getting nothing in return, so I --

1   so, you're saying you didn't want to do it, but Chase wanted

2   you to do it, so let me turn it over to Chase and ask Chase to

3   address this alert subclass.

4           MS. STRICKLAND:  Thank you, your Honor.  Well, what I

5   stood up to say in the first instance was that the objector is

6   completely wrong in terms of how the settlement was

7   negotiated.  It was not negotiated as a $34 million settlement

8   with a million dollars to go to the dedicated *cy pres*.  It was

9   actually negotiated as a $33 million settlement with a million

10  dollars.  So, there's no taking away from anybody for that

11  million dollars.

12          THE COURT:  That is so unpersuasive.  Money is

13  fungible.  It doesn't -- I mean, you can say, "Well, it's 32

14  and 2 or 31 and 3, or 33,950,000, and 50,000."  It doesn't

15  matter to Chase.  Money's money.

16          MS. STRICKLAND:  But, your Honor, in terms of how it

17  was negotiated, I think it's an important point, because the

18  objectors' argument was that there was this vested right.

19  That vested right did not exist in this particular group

20  because there -- there was no money allocated.  The million

21  was not allocated ever to the class members other than the

22  alert subclass.

23          With respect to why we insisted on the release with

24  respect to that group and the consideration given to them,

25  it's actually twofold.  We insisted on it because there were a

1    number of class actions settled through this case.  Certain of
2    those class actions actually made claims based on alert calls,
3    and certain of the named plaintiffs actually received alerts,
4    which were included within the case.

5         So, we were not prepared to settle a case and leave
6    these claims hanging out there, which we agreed did not have
7    any significant value; but on the other hand, we were being
8    sued with respect to those claims, and we wanted a release for
9    them.  It's a very practical point, because they were in the
10   case based on the allegations.  So, we wanted to settle the
11   cases as they were filed.

12        And absent every one of those plaintiffs stating on
13   the record, "Those claims are worth zero and we don't have a
14   claim.  We'll dismiss those class claims with prejudice,"
15   which they can't do without a certified class, we wanted a
16   release of claims that had been asserted, very simple.

17        With respect to the consideration given, actually,
18   there's consideration in addition to the million dollars.  We
19   agreed as part of the settlement through the notice process to
20   give people instruction, class members, and you know, there
21   was wide notice, including publication notice and the like, as
22   to how to actually opt out of alerts.  We gave them very clear
23   instructions additional to what is already provided in the
24   ordinary course by Chase.

25        So, it was -- it's not injunctive relief, because

1    it's not an injunction, in quotes, but it is in the nature of
2    an injunctive decree.
3           THE COURT:  So, you've -- Chase has agreed to follow
4    the law as consideration?
5           MS. STRICKLAND:  I don't think that's actually -- the
6    law doesn't require us to give additional opt-out
7    instructions.  They already give opt-out instructions.  This
8    is something additional to what they would do in the ordinary
9    course.  Chase is already following the law, but this is
10   telling people again and again how to do it if this is an
11   issue for them.
12          THE COURT:  Okay.  Why a million dollars?
13          MS. STRICKLAND:  Because that was the negotiated
14   amount.  There's -- there's no --
15          THE COURT:  That's a tautological answer.  Why was a
16   million dollars the negotiated amount?
17          MS. STRICKLAND:  There's no magic to that number,
18   your Honor.  It could have been less.  It could have been
19   more.  I'm just being candid with the Court.
20          There are obviously a lot of people in that group.
21   We don't think any of them really have viable claims.  There
22   may be a small number where somehow there's a glitch or
23   something.  We don't think that's the case.  But it seemed
24   like a fair number in addition to what I referred to as sort
25   of the quote, unquote "injunctive" type relief.

1       THE COURT:  Why don't I just decertify the alert
2   subclass?
3       MS. STRICKLAND:  Because, your Honor, the claims by
4   those plaintiffs still exist, and we would like to get a
5   release of those claims unless we somehow get a dismissal with
6   prejudice of those claims.  I mean, if your Honor issues an
7   order saying that class could never be certified, I could
8   perhaps live with that, subject to consultation with our
9   client; but what we're not interested in doing is spending
10  33-plus-1 to buy peace and discovering that, in fact, we have
11  not bought peace with respect to a bunch of people who
12  actually filed lawsuits, even if they're baseless.
13      THE COURT:  Okay.  Do you have any thoughts -- well
14  first of all, I think there were a couple of folks who came in
15  after the case was called.  Is there anybody who's come in --
16  everybody's welcome to be here for whatever reason.  I just
17  want to make sure, is there anybody who's come in who's an
18  objector who hasn't yet made an appearance?
19      Okay.  Nobody's stepped up, so why don't you go ahead
20  and address that issue.
21      MS. TERRELL:  I think the only additional point I
22  want to make with regard to why a million dollars is that we
23  had to be convinced that $33 million was enough to adequately
24  settle the claims of the non-alert subclasses.  That was our
25  focus.  So, it needed to be enough to support a release on

1   behalf of the 13 million sub alert folks, the million dollars;
2   but our real focus was making sure that we had enough money in
3   the $33 million to take care of those who again had real
4   claims.
5           And it was -- it was a deal point, and to us, it
6   was -- we had to make sure that we took care of the folks who
7   could make claims against the $33 million.
8           THE COURT:  But Chase is willing -- to buy global
9   peace, Chase is willing to pay $34 million.  Why allocate
10  3 percent of that to people who you -- even you believe have
11  no claim?  Because in order to get the alert calls, you
12  necessarily had to -- alert calls that aren't mistaken alert
13  calls --
14          MS. TERRELL:  That's right.  That's right.
15          THE COURT:  -- you necessarily had to consent.  Why
16  shouldn't they just get just a much more nominal award?
17          MS. TERRELL:  Because of the shear number of people
18  in that alert subclass.  I mean, it was 13 million, a lot.
19          THE COURT:  But the value of what they have is zero,
20  so 13 million times zero is still zero.
21          MS. TERRELL:  I don't disagree.
22          MS. STRICKLAND:  But, your Honor, I need to say that
23  the value of their claim may be zero, but the cost to us of
24  dealing with their claims is not zero.
25          And if what your Honor is suggesting is that maybe

1  the number shouldn't be a million, it should be 500,000,

2  that's, you know, obviously something we would --

3        THE COURT:  That's still an order of magnitude too

4  high.

5        MS. STRICKLAND:  -- we would entertain.

6        Your Honor's correct in terms of it being fungible,

7  but a deal point was find a release because those cases are

8  expensive to defend.  There may be somewhere someone out there

9  in that population who maybe thinks they have a real claim.

10  Maybe there was a quirk.  Anything's possible, right?  But

11  since the named plaintiffs, some of them had alert calls and

12  were making claims, we were not prepared to settle without

13  that group covered.

14        THE COURT:  If I were to reallocate $950,000 or

15  $990,000 or $995,000 from the alert subclass to -- and I'm

16  going to ask Mr. Geffin and his colleague about this as well,

17  Mr. Sampson.

18        If I were to reallocate money from the alert subclass

19  to the other subclasses on the ground that if it were up to me

20  the alert subclass would get zero, but I understand that a

21  component of the settlement is that Chase buys peace with

22  respect to the alert subclass and there has to be, like,

23  something given to them, would that decision be vulnerable on

24  any factual or legal ground, vulnerable to challenge on any

25  factual or legal ground?

1          In other words, am I being unfair -- if I do that, am
2     I being unfair or violating the rights of people in the alert
3     subclass?

4          MS. TERRELL:  I don't believe so.  The notice that
5     went out told folks that they were going to get nothing for
6     those claims, and so that would still be true.  It would just
7     be the magnitude that is going towards the *cy pres*.

8          I'm not aware of any specific authority that requires
9     a threshold monetary amount for consideration to support a
10    release when you're talking about *cy pres*.

11          THE COURT:  Okay.  And again, just to be clear,
12    everybody agrees that this is the release of claims that have
13    no value, and all they have is a dead weight loss cost on
14    Chase for having to litigate it.

15          MS. STRICKLAND:  Well, your Honor, I agree that
16    that's correct.  What we don't know is whether there's some
17    few people in there where something odd happened in the Chase
18    system.

19          THE COURT:  What do you mean?

20          MS. STRICKLAND:  I mean, for example, just a computer
21    quirk or something like that.  We're not aware of that
22    happening, but in terms of reallocation, you know, obviously,
23    the problem with that, of course, is the Seventh Circuit.
24    And, you know, this is a little bit squishy.  And people can
25    look at whether 5,000 is appropriate or 50,000 is appropriate.

1  There's no set standard for looking at this issue.

2  You know, if the Court wants to reallocate, may I

3  suggest that the reallocation be not quite so aggressive as

4  your Honor suggested.

5  THE COURT:  Okay.  Let me ask Mr. Geffin or

6  Mr. Sampson or both whether they have any thoughts on the

7  issues that I've been discussing with plaintiffs' counsel and

8  Chase's counsel.

9  MR. GEFFIN:  Thank you for the opportunity, your

10 Honor.

11 MR. SAMPSON:  Thank you.

12 MR. GEFFIN:  With your permission and a little bit of

13 some perhaps hinted guidance, I'm going to table the issue on

14 the residual *cy pres* for the time being and focus my

15 commentary, and I'll invite Mr. Sampson to do the same, as to

16 the dedicated *cy pres* award.

17 I think first and foremost the Court has very aptly

18 hit the nail on the head as to the $34 million fund.  And it's

19 easy now for counsel for the class and Chase to come before

20 the Court and say, "Well, it was never 34.  It was always 33,

21 and we just threw a million dollars in to secure releases from

22 plaintiffs who have no claims in the first instance."

23 What's critical about the dedicated *cy pres* -- and

24 this is addressed by *Klier*.  There is a settlement fund.

25 THE COURT:  If you could move the microphone further

 1    towards you.

 2              MR. GEFFIN:  Can you hear me better, your Honor?

 3              THE COURT:  I'm more worried about the people in the

 4    gallery.

 5              MR. GEFFIN:  Understood.  There is a settlement fund.

 6    The negotiations that go on about that settlement fund are

 7    wholly irrelevant to this Court's analysis today.  What is

 8    relevant today is the amount in the fund, $34 million, of

 9    which $1 million will be utilized to, quote, "pay," close

10    quote --

11              THE COURT:  Okay.  You've already -- I wouldn't --

12    if I were you, I wouldn't focus on things that you've already

13    won because the only thing that can happen is things could get

14    worse for you.  I would focus on the question of the

15    reallocation.

16              MR. GEFFIN:  Judge, here's the candid response.  If

17    the Court --

18              THE COURT:  Have you been giving me uncandid

19    responses to my other questions?

20              MR. GEFFIN:  No, but I've been much more delicate.

21              THE COURT:  Because that's the negative implication

22    of your saying, "Here's the candid response."

23              MR. GEFFIN:  We don't have a problem with the

24    reallocation on the order of what the Court has suggested,

25    950,000 to go to class members and 50,000 to go, for example,

1　to the *cy pres*, or even 995 to the class members and 5,000 to

2　the *cy pres* beneficiary.

3　　　　　Of course, we would have to discuss it with our

4　client.  We would recommend certain things to our client that

5　are beyond the pale of this Court insofar as the privilege

6　goes, but I will advise the Court that a reallocation on the

7　order of what the Court has suggested is not offensive to the

8　objectors' counsel.

9　　　　　MR. SAMPSON:  Yeah.  I believe that there's a

10　provision in the settlement, although Chase hasn't brought it

11　up yet, that would permit Chase to essentially eject from the

12　settlement if the Court reallocates it in that manner.

13　　　　　That said, assuming that Chase doesn't do so, of

14　course, we represent the client, who has objected to this

15　provision, and the legal argument would be the same whether

16　it's $5,000 or a million dollars.  That said, presumably our

17　client would simply ask to be compensated for making the

18　objection.  It's not going to go to the Seventh Circuit

19　regarding a $5,000 allocation.  We would not -- we would not

20　suggest to her that that would be a good allocation of her

21　time and resources.

22　　　　　THE COURT:  Okay.  And what subclass is Ms. Doyley

23　in?

24　　　　　MR. SAMPSON:  The collection call, not the alert.

25　　　　　THE COURT:  Okay.  And is she a bank person or a

1  credit card person?

2       MR. SAMPSON:  I think she's both.

3       MR. GEFFIN:  I believe that's correct.

4       THE COURT:  Okay.  All right.

5       MR. SAMPSON:  That's in the court file, because we

6  filed her claim form with her objection.

7       THE COURT:  Okay.  All right.  Thanks.

8       MR. SAMPSON:  Thank you, your Honor.

9       MR. GEFFIN:  Thank you.

10      THE COURT:  So, anything else on the *cy pres* issues

11  from anybody?  No?

12      All right.  Let's -- and have any other objectors

13  appeared in the courtroom since we started a little after

14  10:00?  Nobody's appeared, so I guess it's incumbent on me to

15  address some of the other issues.  I'm not going to address

16  all of the issues that were presented in the objections.  I'm

17  going to address the issues that I think are of reasonable

18  concern.

19      So, let's first talk -- and this is -- I'm

20  comfortable with what happened, but I just want to get a full

21  explanation on the record as to what happened to the

22  7.1 million people.  And if you could just take me through the

23  timeline.  And again, I said this was okay.  The discussion of

24  it may not have been as complete as it should have been, so if

25  we could just get that on the record.

1          MS. TERRELL:  Yeah.  Let me get that in front of me.

2          So, initially, Chase transmitted about 8-1/2 million

3   consumer bank records to Garden City Group.  Just so your

4   Honor knows, as I promised I would, I took a deposition to

5   establish all of these facts, and that's what these facts are

6   pulled from.

7          Chase then discovered that it had only pulled data

8   for its consumer bank class members from its active database,

9   so Chase went back to its data warehouse and discovered

10  another 7.1 million records.  And when the claims

11  administrator de-duped those records, his number was somewhat

12  reduced.  And so we sent supplemental notice to those

13  additional class members.

14          So, it was as simple as they just didn't pull from

15  both databases.

16          THE COURT:  And what was the second database?

17          MS. TERRELL:  The data warehouse.

18          THE COURT:  And who was in that database?

19          MS. TERRELL:  As I understand it, it's a matter of

20  timing.  So, it was folks who were further back in time.

21          THE COURT:  I see.

22          MS. TERRELL:  That they just pulled it from their

23  active database, so people who had current accounts --

24          THE COURT:  So, these are people who no longer had

25  accounts at the time the 8.1 million were generated, but at

1    the time of the calls, they did have accounts?

2              MS. TERRELL:  That's my understanding.

3              THE COURT:  Okay.

4              MS. TERRELL:  That's correct.

5              THE COURT:  Is that right?

6              MS. STRICKLAND:  That is correct, your Honor.

7              THE COURT:  Okay.  And I know we've set back

8    everything by a couple of months, two or three months after

9    that happened, so --

10             MS. TERRELL:  And again, we propounded discovery, and

11   they did a full investigation and produced someone who

12   explained that investigation, walked through the data in quite

13   an amount of detail and explained what had happened, so --

14             THE COURT:  Okay.  All right.  I'd like to talk about

15   attorney fees.  And there are three issues I'd like to

16   address, and they're interrelated.

17             The first issue -- the first question is -- I'm just

18   going to lay them out.

19             The first question is:  What's the magic about

20   $9.507 million?  That was the amount requested in the

21   August 14th brief, where using the correct denominator, it was

22   33.3 percent.

23             Then in the October 8th brief, when the denominator

24   was reduced a little bit because the notice costs went up a

25   little bit, you kept the same $9.507 million attorney fee, and

1   then said it's now 34 percent.

2          So, the first question is:  Why between August and
3   October you didn't reduce the attorney fee amount to
4   33 percent of what the denominator at that point was.

5          The second issue has to do with the lodestar cross
6   check.  The objectors suggested that the Court ought to at
7   least look at the lodestar; and as you know, in the Seventh
8   Circuit's recent cases, the Seventh Circuit has said a court
9   can look at contingency fee, can look at lodestar, either one.
10  And if that's true, I think the Court can look at both.

11         And in response, the plaintiffs essentially said
12  lodestar doesn't matter and didn't say anything about what the
13  lodestar actually was.  And the only reasonable inference to
14  draw from that is it wouldn't be good for the plaintiffs if I
15  were to see what the lodestar was, because if it was a good
16  story, it would have been told.

17         And finally, some of the recent Seventh Circuit
18  decisions, *Silberman* in particular, *Silberman versus Motorola,*
19  739 F.3d 956; *Americana Art*, 743 F.3d 243; and then Judge
20  St. Eve addressed the matter in more detail in the *Craftwood*
21  *Lumber* case, 2015 Westlaw 1399367.

22         Why have a straight percentage of the recovery, of
23  the total recovery, why make it 34 percent or 33 percent for
24  the entire recovery, as opposed to having cascading
25  percentages as the Seventh Circuit suggested would be

appropriate in the *Silberman* case?

So, go ahead.

MS. TERRELL: I think I only heard two issues, so it's just two sub-issues under lodestar. Okay.

THE COURT: Well, the first one is -- even if I'm wrong on -- the first issue was why go from 33.3 percent to 34 percent, even assuming that the lodestar cross check and the cascading percentages issue goes away? And you can address those in any order you like.

MS. TERRELL: We'll just take it from the top. There's no magic number with the $9 million and change. What we did is once the full numbers were in and we had adjusted for the additional notice costs, we looked at what the percentage was and whether it fell within the range of reasonableness in the Seventh Circuit, and we decided that it did.

We're within the *Pearson* presumption, which is if it's a percentage of a true common fund, anything up to 50 percent is okay. So, we thought, "We're just going a little bit up to 34 percent, over a third," and so to us that seemed reasonable.

In addition, it's within the scope of our retainer agreements with our plaintiffs, which courts in this circuit have found to be relevant in terms of setting the expectations of the parties.

1        And it's also within the mean and median of

2   Professor Fitzpatrick's study, which was something that was

3   presented to Judge Holderman and is in the papers here, where

4   his mean is 27.4 percent and the median is 29 percent.

5        So, again, it's just consistent with the amount that

6   has been asked for.  And again, the percentages, 28.7 percent

7   of the fund, if you only exclude the *cy pres* -- so if you take

8   a percentage of the full $34 million -- or the full

9   $33 million, including the cost of notice and claims

10  administration, which is what -- which is the apples-to-apples

11  comparison with Professor Fitzpatrick's study, then again,

12  we're at 28.7 percent, so we're within that range.

13       So, from our perspective, even though the notice

14  costs had gone up -- and we -- obviously, we think it was

15  beneficial.  We had to send some additional notice.  We also

16  did a reminder campaign, which we thought was a good idea.  We

17  felt that the amount of fees that we were seeking was still

18  reasonable and should not be reduced for that amount.

19       THE COURT:  Didn't the Seventh Circuit look at

20  different studies that had lower percentages?

21       MS. TERRELL:  They did, but -- well, they've

22  definitely looked at and adopted Professor Fitzpatrick's

23  study.  The question is always whether the percentages when

24  being calculated include the notice and claims administration

25  costs or not.

1         And again, Judge Holderman, you know, he just did two
2    of these settlements in the last year, and he found -- you
3    know, he found percentages in that range to be reasonable.
4         I mean, courts in the Seventh Circuit routinely
5    approve fees of a third, just a straight third of the common
6    fund, especially when -- only when it's really a common fund.
7    This is an actual full amount of money that Chase is going to
8    pay with no reversion.
9         THE COURT:  Right.  But in common fund cases that --
10   where the common fund is in the mid eight figures?
11        MS. TERRELL:  Well, when we looked at those studies,
12   though, and when we briefed this extensive with Judge
13   Holderman, normally the jumbo cases, where they've done the
14   *Synthroid* sliding scale, it's substantially above $34 million.
15   I think it's usually starting at 45, 50 and above.
16        So, for example, in *Capital One*, it was a $75 million
17   fund, and there wasn't any doubt that the judge was well
18   within his discretion to treat that as a mega-fund and do some
19   sliding scale.
20        THE COURT:  So, why shouldn't we do the sliding scale
21   in this case?
22        MS. TERRELL:  I think there are a couple of reasons.
23   Number one, this is -- this is a -- it's below the mega-fund
24   threshold.  Number two, this case was very, very risky.  Not
25   only were there a substantial number of class members who were

1   bound by arbitration clauses, which would mean to a certain

2   extent their claims would be worth virtually nothing; but

3   there was also a very solid consent defense for many of the

4   other class members, and it would have been very hotly

5   litigated.

6           In addition, it would have been difficult to prove

7   the claims because of the data issues that we have discovered

8   along the way and have had to deal with.

9           And so, you know, the risk to the plaintiffs of

10  receiving nothing was very substantial, and plaintiffs took on

11  that risk as part of the contingent fee.

12          THE COURT:  But that's also true in the cases that

13  approve sliding scale.

14          MS. TERRELL:  That is also true.  That is true.

15          THE COURT:  So, why -- then that's not a reason why

16  we shouldn't do a sliding scale in this case.

17          MS. TERRELL:  You know, in the sliding scale cases,

18  though, there's typically some notion that the first chunk was

19  harder to get than the remaining chunk.  So, in other words,

20  the first $10 million or the first $20 million or the first

21  $30 million, there was something that was much more difficult

22  about getting that amount than the rest.

23          And again, it's usually when there's a lot more at

24  stake than $34 million.  In our view, when we looked at it, it

25  was going to -- I mean, there wasn't an obvious threshold,

1    well, $10 million is harder to get than $34 million.

2           Which is why, again, I think the Seventh Circuit, and

3    even Judge Holderman, they look at that when you're looking at

4    $50 million or more.  There's just a different calculus here.

5           We didn't see a natural break where it was going to

6    be easier -- there was going to be some sort of dispositive

7    motion so it was easier or harder to get that first 10 to

8    $15 million than the remaining amounts.  We just don't believe

9    the mega-fund applies here.

10          THE COURT:  What about the lodestar?  Why shouldn't I

11   just say, you know what, negotiated fees -- deference to

12   negotiated fees makes sense when you have sophisticated named

13   plaintiffs, like in a securities case.  It doesn't make sense

14   in a consumer case like this where the plaintiffs probably --

15   I'm not going to say they're unsophisticated, but they're not

16   as sophisticated as the plaintiffs in security cases.

17          So, why shouldn't I either base the fee on the

18   lodestar or at least look at the lodestar, look at the number

19   of hours that were put in; and if it turns out that the

20   $9.5 million fee would yield an hourly rate of $10,000 or

21   $5,000 or $3,000, that that's something I ought to consider?

22          MS. TERRELL:  Well, your Honor, obviously, it's

23   within your discretion to ask us to provide the lodestar and

24   do the lodestar cross check, and we'd be prepared to do that.

25          From our experience in these cases, number one, the

1    amount that we've asked for is the market rate, and that's

2    really what the Seventh Circuit, you know, asked the trial

3    courts to do.  And you're right that a negotiated --

4                THE COURT:  And why is it the market rate?

5                MS. TERRELL:  Well, it's the market rate based on a

6    lot of work and surveys that were conducted in the *HSBC* and

7    the *Capital One* cases, you know, where there actually was a

8    lot of discovery that was provided about the amounts that

9    counsel in this case and other cases had received in similar

10   TCPA class settlements.

11               And at the end of the day, after he had all of that

12   information about lodestar and wins and losses and where we

13   ended up, Judge Holderman ended up not applying a lodestar

14   cross check and finding that the percentages that were

15   requested there were reasonable and within the expectation of

16   the parties at the outset, or it was the market rate.

17               And this amount is well within that market rate.

18               THE COURT:  Okay.  Do you have the lodestar

19   information?

20               MS. TERRELL:  I don't have it with me.  We can

21   provide it, your Honor.

22               THE COURT:  Okay.  Do you have a ballpark estimate of

23   what it is?

24               MS. TERRELL:  No, I don't.  I apologize.

25               THE COURT:  All right.  Does Chase have anything to

1   say about the attorney fee issue?

2        MS. STRICKLAND:  Your Honor, we do not.

3        THE COURT:  And I know there's a clear sailing

4   provision, so you might be breaching the agreement if you say

5   anything in opposition.

6        MS. STRICKLAND:  I would always prefer not to breach

7   the agreement; but in any event, we don't have a view on the

8   attorney's fees.  We believe this is within the sound

9   discretion of the Court.

10       THE COURT:  Okay.  Could you give me your view as to

11   what the next step ought to be from the plaintiffs'

12   perspective if I decide that certain aspects of the proposed

13   settlement ought to be adjusted?

14       Do you believe that we need to start from scratch, or

15   do you believe that it would be -- in order to make a record,

16   or do you believe that it would be sufficient for the Court

17   just to make the adjustments, enter the order, and then we're

18   done with it?

19       MS. TERRELL:  Your Honor, I think the only impediment

20   to that is Chase does have the ability to blow the deal if

21   they're not happy with the allocation.  So, I would suggest

22   the next steps would be for your Honor to issue an order

23   setting forth your ideas about how to reallocate that amount,

24   and then we'll need to hear from Chase as to whether they're

25   going to go forward with the settlement on those terms.  And

1   if so, then I think we can just implement the settlement

2   that's already been noticed and approved, just with that

3   reallocation.

4          We would want to provide some additional information

5   to your Honor so that you would know what the average class

6   member is going to receive with the additional funds going to

7   the other class; but because the notice told those in --

8   number one, the folks who are entitled to a portion of the

9   $33 million, they'll be thrilled, right?  There's no prejudice

10  to them.  They're going to get more money.

11         The folks who were in the sub -- you know, the alert

12  subclass, they always knew they were going to get zero, so

13  long as it wasn't a wrong call alert, so there's no prejudice

14  to them that the *cy pres* award has gone down.

15         So, I don't believe we need to do another round of

16  notice or allow people to come in and object.  I believe we

17  can just proceed with that reallocation, again, so long as

18  Chase will agree to a settlement along those lines.

19         THE COURT:  Do you agree?

20         MS. STRICKLAND:  Your Honor, do I agree?  I guess to

21  what?  I agree with -- I agree with plaintiffs' counsel with

22  respect to not needing to do additional notice --

23         THE COURT:  Okay.

24         MS. STRICKLAND:  -- in the event that your Honor

25  reallocates the dedicated *cy pres* fund.  I agree that we don't

1  have to provide additional notice, which plaintiffs' counsel,
2  I don't think, addressed if your Honor adjusts their
3  attorney's fees down in some way because it would be for the
4  benefit of the class.  We don't have an opinion on whether
5  your Honor should do that or not do that, but I don't think it
6  would need to be re-noticed.

7          And the answer to everything else is it depends, but
8  we have not heard anything today that would suggest that
9  there's something else that your Honor is thinking of.

10         THE COURT:  And you had said earlier that you thought
11 that the reallocation of the *cy pres* that I was -- the numbers
12 that I was batting about were a little aggressive.  What do
13 you think would be appropriate, if you can say?

14         MS. STRICKLAND:  Your Honor, I don't really have --
15 to be candid, I really -- not to suggest I wasn't candid
16 before, to take a page from your Honor's book.

17         But in any event, I don't have a strong view, because
18 I think it's so inherently judgmental as to where this falls.
19 I mean, this is definitely a situation in which it's art, not
20 science.

21         Obviously, the more in the dedicated *cy pres* fund,
22 the more comfortable we are that we're delivering value.  I
23 don't think that that class is entitled to any monetary award,
24 which is made clear from the settlement; but obviously, you
25 know, the greater the number, the less risk of an objection

1  and the Seventh Circuit taking anything terribly seriously.

2  I will say, actually, I want to go back to one of the

3  comments before.  Again, that number was separately

4  negotiated.  I mean, it isn't a situation where 34 million

5  was allocated.  And objector's counsel seemed to take issue

6  with that.  The fact of the matter is it was separately

7  negotiated.

8  But in terms of how that number is reallocated, I

9  would defer to your Honor's most excellent judgment.

10  THE COURT:  Well, I dispute the premise of that last

11  sentence.  And I don't doubt what you're saying, which is that

12  it was separately negotiated.  But I think at this point, the

13  way I'm looking at it, at this point, I don't care how you got

14  to 34.  All I know is that Chase is at 34 for global peace.

15  Would I -- could somebody in the alert call

16  subclass -- and I'm going to ask Mr. Geffin and Mr. Sampson if

17  they would like to address any of these issues.

18  Would anybody -- if I were to reallocate a good

19  portion of the $1 million to the classes -- to the other

20  classes, could the alert -- could somebody in the alert call

21  subclass complain that their rights were violated because I

22  did not give them a chance to object to the reallocation?

23  MS. STRICKLAND:  So, the answer to that question is

24  someone can complain about just about anything.  The question,

25  of course, is whether the complaint is a legitimate complaint.

1          THE COURT:  Yes.

2          MS. STRICKLAND:  And I believe plaintiffs' counsel

3    addressed that, which is since that money was not actually

4    going out to the alert call subclass and they are getting the

5    benefit of this additional notice program or instruction

6    program, so as not to confuse it with class notice, I don't

7    think that there would be a legitimate basis for complaining

8    that additional notice was not sent out.

9          MS. TERRELL:  The only thing I would add is that

10   something you have in the record, your Honor, is actually

11   comments from class members commenting on how helpful the

12   alerts were.  So, I think it's just highly unlikely that we're

13   going to hear from a member of that class complaining that we

14   have reduced the amount going to a third party, because truly,

15   most of the comments about that portion of the settlement

16   were, "I like those alerts.  Those are helpful."

17         THE COURT:  So, maybe we should make them pay extra

18   money into the pot and distribute it to the people who got the

19   calls that they didn't want.

20         MS. STRICKLAND:  Your Honor, as I said, excellent

21   judgment.  And for the record, that was all in humor.

22         THE COURT:  Mine, too.

23         Okay.  So, Geffin and Sampson, do you have anything

24   to say about any of the things I just talked to plaintiffs'

25   counsel and Chase's counsel about?

1    MR. GEFFIN:  Just a small handful of thoughts, your
2  Honor.

3    With respect to your direct inquiry to Chase's
4  counsel, our observation is the whole notion of the settlement
5  fund and the notion of the *cy pres* is to use the money for the
6  very best use.  And by that I mean the more money that goes
7  from the *cy pres* to the claimants the better.  You take that
8  money, and you use it for the very best use.  The larger the
9  *cy pres*, then you're going to the next best use, and that's
10  exactly what the courts have asked us not to do.

11    THE COURT:  Okay.  How about the issue of re-notice?
12    MR. GEFFIN:  I think both class counsel and defense
13  counsel is correct.  The *cy pres* award, by definition, goes to
14  a third party, so I'd query even before they have an objection
15  whether anybody in the alert subclass even has standing to
16  bring such a claim.  It's not their money in the first place.
17  It's the third party's money that the Court is suggesting
18  reallocating a great deal of.

19    I think both lawyers are correct.  There is no
20  colorable objection that can be made by an alert subclass
21  claimant.  It wasn't his, her, or its funds in the first
22  instance.

23    THE COURT:  Well, it kind of was, but it wasn't going
24  to go to them because each of them would get 8 cents, and it's
25  just better to -- in a situation like that, better to give

1    it -- that's a situation where *cy pres* is appropriate,

2    assuming that these people had a claim to begin with, which we

3    all agree they don't.

4              Okay.  Anything else?

5              MR. GEFFIN:  Not from me, your Honor.

6              THE COURT:  Okay.  I'd like to -- I'd like to mull

7    over some of the matters that we -- we've spoken about.  I

8    know that we have some counsel who are in from out of town,

9    and it's conceivable that I could just give you an oral ruling

10   this afternoon, but I don't want to inconvenience anybody

11   who's in from out of town.

12             So, why don't we go off the record for a moment.

13     (Discussion held off the record.)

14             THE COURT:  All right.  Let me step back.  We've been

15   going for about an hour and 15 anyway.  Let me step back for a

16   few moments, and I'll come back out at 11:25, and then we'll

17   figure out -- I'll tell you where we're going to go from here.

18   Okay?

19     (Recess had.)

20             THE COURT:  Everybody can be seated.

21             So, I forgot to ask about Barry Willis.  What was the

22   story with him, the plaintiff who settled?

23             MR. FRIEDMAN:  Yes.  This is Todd Friedman.  Barry

24   Willis wanted -- ended up wanting to settle individually, so

25   he did.

1    THE COURT:  Okay.  Is there -- I mean, was -- when

2  did his decision to settle get made?

3    MR. FRIEDMAN:  At this point in time, seven or eight

4  months ago now.

5    THE COURT:  Okay.  And I don't know if you can share

6  this.  What -- did he just not want to continue as a class

7  rep?

8    MR. FRIEDMAN:  Your Honor, I don't want to give away

9  too much privileged information, but I think it was more about

10  what he would want to get at the end of the day.

11    THE COURT:  I see.  Okay.  Do you have any thoughts

12  on Mr. Willis?

13    MS. STRICKLAND:  None, your Honor.

14    THE COURT:  Okay.  All right.  I'm not going to be

15  able to give -- I'm not going to keep you around because I'm

16  not going to give you a ruling today.  Let me just give you my

17  tentative thoughts, and they're more than tentative, but

18  they're not final.

19    I think that the settlement -- with the exceptions

20  I'm about to mention, I think the settlement is fair and

21  reasonable.  The $34 million, I think, is sufficient.  I'm not

22  concerned about that.  I'm not concerned about how the

23  recovery is being allocated among the various subclasses, like

24  the different points given to the different people.  I think

25  that makes sense.

1          I'm not concerned that the class members are limited

2   to only one claim of each type, and here's why:  It's -- I'm

3   persuaded that it's more likely than not that all the class

4   members received the same number of calls, given Chase's

5   practices; and to get into the weeds as to, "Well, this person

6   had five calls and this person had eight calls," the game

7   would at that point no longer be worth the candle in terms of

8   the costs of making those determinations.  So, for that

9   reason, I'm not concerned about the limit on the number of

10  claims.

11         And because the fund is going to get exhausted, with

12  the exception of the residual *cy pres* -- and by that, I mean

13  the fund is going to get exhausted to all of the class

14  members, putting aside the dedicated *cy pres*, if there is one,

15  attorney fees, and notice costs, that's not really a concern,

16  the limitation of the number of claims is not a concern

17  because there isn't going to be any money left on the table.

18         I don't have any concerns with the notice.  I think

19  it was admirable.  The notice was beyond the minimum required.

20  I think the notice was admirable, especially going back a

21  second time with the reminder notice.

22         I think the job that was done in terms of reaching

23  out was probably as good as it was going to get, the direct

24  notice and then the notice by publication.  I think the

25  correct magazines were hit.

1        I don't have a concern with the residual *cy pres* for

2  the reasons that we discussed, which is it's just -- that

3  kicks in only where it no longer makes economic sense to keep

4  redistributing the money left over from the uncashed checks.

5  And at that point, it can either revert, which the Seventh

6  Circuit doesn't like, or it goes to a *cy pres*; and it may as

7  well go to a *cy pres*.

8        The -- I'm not concerned about the clear sailing

9  provision *per se* because this isn't a situation where there's

10  going to be a reversion and because I'm looking very closely

11  on my own at the attorney fees, as will become clear in a

12  moment.

13        The two concerns that I do have pertain to the

14  dedicated *cy pres* and to the attorney fees.  I don't want to

15  do something that's going to cause the entire settlement to

16  unravel, in other words, that's going to cause Chase to bail.

17  At the same time, I just can't see leaving the dedicated

18  *cy pres* as it is.

19        So, I'm wondering if there was any guidance that I

20  can get from Chase at this point on -- I don't want to

21  cause -- I don't want to bust the settlement, the entire

22  settlement.  Is there any further guidance you can give?

23        MS. STRICKLAND:  I do not anticipate that we would

24  bust the settlement, and my suspicion is that your Honor is as

25  sensitive as we are to not having the Seventh Circuit disagree

1   with the reallocation.  And so again, we would defer to your
2   Honor on the reallocation question.

3          THE COURT:  All right.  And the next issue is
4   attorney fees.  I am going to want to take a look at the hours
5   that were put in and the lodestar as one factor among many.  I
6   know that there are many cases holding that the lodestar cross
7   check is discouraged, and the cases that hold that tend to
8   cite the *Synthroid II* decision from the Seventh Circuit from a
9   number of years ago.

10         The more recent Seventh Circuit decisions, though,
11  caution against an over-reading of the *Synthroid* decisions,
12  the *Synthroid* opinions, and allow a role, maybe even an
13  exclusive role, for lodestar.  And if it allows an exclusive
14  role for lodestar, it certainly -- those decisions certainly
15  allow for at least a consideration of the lodestar.

16         And I'm not -- I don't want to cause undue alarm on
17  the north side of the courtroom.  I'm not considering an
18  exclusively lodestar recovery for plaintiffs' counsel.  But it
19  is something I -- that is part of the mix, in my view, and
20  something I'm going to want to take a look at.  And I can't --
21  because that's going to be a piece of the puzzle, I can't give
22  you any numbers at this point.

23         So, how long do you think it would take to get that
24  information to the Court?

25         MS. TERRELL:  Your Honor, there are a lot of firms,

1    and we'll want to compile it in a way that it's easy for you
2    to handle.  I'd like to have at least 10 days.  Is that
3    doable?  Yeah.  Two weeks?

4         MR. FRIEDMAN:  Maybe a little bit more, maybe two
5    weeks.

6         MS. TERRELL:  Yeah, two weeks.

7         THE COURT:  That's fine.  So, why don't -- let's get
8    that to the Court by November 5th, it would be, I think.  And
9    I don't believe I need anything else.

10        MS. TERRELL:  What form would you like it in?

11        THE COURT:  Is it -- ideally, it would be filed, it
12   would be of record in case some other court needs to take a
13   look at it.

14        MS. TERRELL:  Right.  So, I think the question is
15   sort of how much detail does your Honor want to see?  Because
16   often, we've just done -- we can just do categorical amounts,
17   here's the firm, here's the amount, or you can go all the way
18   down to, you know, daily entries.  Obviously, we have that.

19        I guess we would suggest that just providing the
20   amount of lodestar as a starting point is what we would
21   suggest, but we want to make sure we give your Honor the
22   information that you need.

23        THE COURT:  If you have the detailed time records, I
24   may as well get them because they may be pertinent to the
25   analysis.  So, why don't we --

1    MS. TERRELL:  We'll work among ourselves to provide
2  information.
3    THE COURT:  Okay.  And then once that's filed, I'm
4  going to want to give the objectors an opportunity to weigh in
5  further, given this new palette of information.  So, it will
6  be November 5th would be the information being filed.  I'm
7  going to give a pretty tight deadline of November 12th for the
8  objectors to say whatever it is they want to say about the
9  lodestar.
10    And then we'll come back in on a date that I'm not
11  going to set right now, but I'm going to have Jackie reach out
12  to everybody and get a mutually-agreeable date, because I
13  don't want to inconvenience -- unduly inconvenience anybody
14  who would want to come back in.  Okay?  And that would
15  probably be towards the end of November, after -- not the week
16  of Thanksgiving, the week after Thanksgiving, or maybe the
17  week after.
18    Okay?  And given that, I'm going to give the
19  objectors until the 16th to provide any additional commentary
20  on the attorney-fee issue.
21    Is there anything else that anybody would like to
22  address?
23    MS. TERRELL:  The only thing I would ask, your Honor,
24  is whether -- now that we've heard your concerns about the
25  lodestar analysis, whether you'd be open to a very brief

1  supplement on our perspective on those legal issues.

2          THE COURT:  Sure, absolutely.  I never stop anybody

3  from filing anything.  So, if you could -- could you do that

4  by the 5th?

5          MS. TERRELL:  Yes, your Honor.  We'll do it at the

6  same time.

7          THE COURT:  Good, good.  And then whoever wants to

8  take issue with what you've said can take issue with what

9  you've said.

10         MS. TERRELL:  And just so it's on the record, we will

11  provide what we are filing with ECF directly to the objectors

12  and/or their counsel as well.

13         THE COURT:  Good.  No, there's -- your notice has

14  been exemplary throughout, so I appreciate that, and I'm sure

15  they will as well.

16         MS. STRICKLAND:  Your Honor, without imposing on the

17  Court, and I understand that you suggested deferring setting a

18  date, would it be possible to at least think about a date?

19  Because calendaring between now and the end of the year

20  becomes a little dicey.

21         THE COURT:  Okay.  That's fine.

22         MS. STRICKLAND:  If your Honor wouldn't mind.

23         THE COURT:  No, not at all.  I'm assuming nobody

24  wants to come in the week of Thanksgiving.

25         MS. STRICKLAND:  That is a safe assumption.  Thank

1   you.  But we'll do whatever your Honor wants.

2           THE COURT:  We can come in on December 2nd.  Is that

3   all right?

4           MS. STRICKLAND:  Your Honor, I can't.  This is why --

5   I actually have a hearing -- I know you won't feel sorry for

6   me, but I actually have a hearing that I must be at in

7   Honolulu on December 3rd.

8           THE COURT:  That's terrible.

9           MS. STRICKLAND:  Perhaps we can reconvene in

10  Honolulu.

11          THE COURT:  Oh, you're going to be in Honolulu on the

12  2nd?

13          MS. STRICKLAND:  I'm going to be in Honolulu, right,

14  the 2nd, 3rd, and 4th.  The 1st would work.  The 7th would

15  work.

16          THE COURT:  How about Thursday the 10th?

17          MS. TERRELL:  Your Honor, I have a mediation in

18  California I need to be at.

19          THE COURT:  Okay.  How about --

20          MS. STRICKLAND:  I'm sorry, your Honor.  What date?

21          THE COURT:  The 10th has been rejected.

22          MS. STRICKLAND:  The 10th works for us, but --

23          THE COURT:  How about the 9th?

24          MS. STRICKLAND:  So, I can't do the 9th.

25          THE COURT:  Okay.

1    MS. STRICKLAND:  The entire following week is out.

2    Does that help?  In fact, the 15th, we have a hearing here in

3    another matter.

4         THE COURT:  Oh, 15th in the afternoon?

5         MS. TERRELL:  That's fine with me, your Honor.

6         THE COURT:  Okay.  Then the 15th it is.

7         MS. STRICKLAND:  That's all right with me, your

8    Honor.

9         THE COURT:  Then the 15th it is.  Let's say

10   2:00 o'clock.

11        MS. STRICKLAND:  Thank you very much, your Honor.

12        MS. TERRELL:  Thank you, your Honor.

13        THE COURT:  Sure.  Anything else from anybody, from

14   our objectors?

15        MR. GEFFIN:  No, nothing further.  Thank you, your

16   Honor.

17        THE COURT:  Okay.  Thank you.  Safe travels to

18   everybody who's traveling.

19        MS. STRICKLAND:  Thank you very much.

20        MS. TERRELL:  Thank you, your Honor.

21    (Which were all the proceedings heard.)

22                        CERTIFICATE
      I certify that the foregoing is a correct transcript from
23   the record of proceedings in the above-entitled matter.

24   */s/Charles R. Zandi*              *January 6, 2016*
     _____    _____
25   Charles R. Zandi                   Date
     Official Court Reporter