UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JONATHAN I. GEHRICH, ROBERT LUND, COREY GOLDSTEIN, PAUL STEMPLE and CARRIE COUSER, individually and on behalf of all others similarly situated, | ) ) ) | 12 C 5510 |
| | ) | |
| Plaintiffs, | ) | Judge Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| CHASE BANK USA, N.A., and JPMORGAN CHASE BANK, N.A., | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Jonathan Gehrich filed this suit in July 2012 as a putative class action against Chase Bank for alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.* Doc. 1. By July 2013, the parties were actively engaged in settlement discussions, Doc. 78, and in August 2014, they moved for preliminary approval of the settlement and conditional certification of a settlement class, Doc. 107. The court granted the motion and approved a notice program for the class. Docs. 116-117. Plaintiffs now move to certify the settlement class, Doc. 168, for attorney fees and expenses and an incentive award for the five class representatives, Doc. 186, and for final approval of the settlement, Doc. 198. The motions for class certification and incentive awards are granted, and the motions for attorney fees and settlement approval are granted in part and denied in part.

**Background**

The TCPA prohibits the use of "any automatic telephone dialing system or an artificial or prerecorded voice" to call or send text messages to cell phones for non-emergency purposes without prior express consent from the recipient of the calls or messages. 47 U.S.C. § 227. The

1

statute provides a private right of action; for each violation, a consumer may recover $500 in damages and up to $1500 if a "court finds that the defendant willfully or knowingly violated" the TCPA. 47 U.S.C. § 227(b)(3). Plaintiffs allege that Chase violated the TCPA by placing automated calls and sending automated alerts regarding account updates or debt collection to their cell phones using automatic dialing systems, without their consent and after they asked that the calls and alerts cease. Doc. 96 at ¶¶ 3, 16, 31-40. Two other putative class actions were consolidated with this one, *Goldstein v. JPMorgan Chase Bank, N.A.*, No. 2:12-cv-10252-DMG-SH (C.D. Cal. filed Nov. 30, 2012), and *Lund v. Chase Bank, N.A.*, No. 3:12-cv-2554-H-DHB (S.D. Cal. filed Oct. 19, 2012). Docs. 94, 96. This case is one of several recent TCPA-related class actions in which at least one of Plaintiffs' lawyers has appeared. *See, e.g.*, *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781 (N.D. Ill. 2015); *Wilkins v. HSBC Bank Nev.. N.A.*, 2015 WL 890566 (N.D. Ill. Feb. 27, 2015); *Martin v. Comcast Corp.*, 2015 WL 163052 (N.D. Ill. Jan. 13, 2015).

On April 25, 2013, nine months after the initial complaint was filed and before any non-discovery motion practice, the parties entered settlement negotiations. Doc. 107-5 at ¶ 14; Doc. 198 at 6. Prior to commencing negotiations, Plaintiffs had moved to compel certain discovery, Doc. 56, but with both parties moving to stay the case during settlement discussions, Docs. 71, 76, 78, Plaintiffs withdrew the motion before the court could rule on it, Doc. 78. On November 25, 2013, the parties reported that they had reached a class-wide settlement in principle, Doc. 81, and they subsequently moved for preliminary approval of the settlement, Doc. 107, which the court granted, Docs. 116-117. At the court's request, Docs. 120, 123, the parties directly addressed whether the settlement complied with the principles set forth in *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014), and

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014). Doc. 124. Prior to the final approval hearing, the parties realized that Chase possessed the records of approximately 7.1 million additional class members, and the hearing was postponed while Class Counsel provided notice to those individuals. Doc. 186-1 at 14; Doc. 186-2 at ¶¶ 2-4; Doc. 188 at ¶ 18.

Class Counsel and Garden City Group ("GCG"), a third-party administrator, provided notice through mail, email, and publication in three national magazines, ultimately reaching close to 80% of the known class members. Doc. 107-6 at ¶¶ 9-24; Doc. 186-1 at 13-15; Doc. 188 at ¶¶ 9-17, 24; Doc. 197 at 12; Doc. 202 at 8-9. The proposed Settlement Class, which has 32,297,356 members, Doc. 186-1 at 13; Doc. 186-2 at ¶ 5; Doc. 197 at 10, is defined as follows:

> All persons to whom, on or after July 1, 2008 through December 31, 2013, Chase USA and/or JPMC Bank placed a non-emergency call, SMS text message or voice alert call to a cellular telephone through the use of an automatic telephone dialing system and/or an artificial or prerecorded voice.

Doc. 117 at ¶ 3. The Settlement Class comprises two subclasses, which correspond to different TCPA violations. The Alert Call Subclass consists of:

> Persons whom, on or after July 1, 2008 through December 31, 2013 received one or more Short Message Service ("SMS") text messages or voice alert calls to a cellular telephone using an automatic telephone dialing system and/or prerecorded voice placed either directly or indirectly by Chase USA or JPMC Bank in connection with providing account information ("Automatic Alert Calls"). The Alert Call Subclass includes, without limitation, persons to whom such Automatic Alerts were placed notwithstanding that they are not Chase customers and/or not the person to whom the Automatic Alert was intended to be directed …. Alert Call Subclass Members did not also receive Collection Calls.

*Ibid*. The Alert Call Subclass has 13,927,106 members. Doc. 107-5 at ¶ 13; Doc. 186-1 at 13.

The Collection Call Subclass consists of:

> Persons whom, on or after July 1, 2008 through December 31, 2013 received one or more non-emergency telephone calls to cellular telephones placed either directly or indirectly by Chase USA or JPMC Bank using an automatic telephone dialing system and/or artificial prerecorded voice in connection with attempts to collect debts relating to Chase credit card accounts or JPMC

Bank accounts ("Collection Calls"). The Collection Call Subclass includes, without limitation, persons to whom such Collection Calls were placed notwithstanding that they are not Chase customers and/or not the person to whom the Automatic Collection Call was intended to be directed.

Doc. 117 at ¶ 3. The Collection Call Subclass has 18,370,250 members. Doc. 186-1 at 13; Doc. 186-2 at ¶ 5.

The Settlement Agreement, Doc. 107-2, requires a non-reversionary payment by Chase of $34 million, to be distributed as follows:

to pay (1) Settlement Class Member claims in the amount of $18,331,967.49; (2) a dedicated *cy pres* distribution of $1,000,000; (3) settlement administration expenses of approximately $5,152,929.51; (4) court-approved incentive awards to the five named Plaintiffs in the amount of $1,500 each ($7,500 total); and (5) court-approved attorneys' fees and costs of $9,507,603.

Doc. 198 at 6. The distribution subsumes all litigation costs. Doc. 186-1 at 8. Depending the nature of the TCPA violation for a particular class member, including the subject of the call and whether and in what capacity she was a Chase customer, Doc. 107-2 at 15 (giving examples), the Agreement provides that each Collection Call Subclass member filing a timely claim will receive between $19.40 and $77.60, and possibly more if a sufficient number of claimants fail to cash their settlement checks within the prescribed period, allowing for a second *pro rata* distribution. *Id*. at 14-15, 17; Doc. 197 at 9-11, 20; Doc. 202 at 10. The Agreement further provides that any funds remaining after the second *pro rata* distribution will go to the Electronic Frontier Fund ("EFF") as a residual *cy pres* distribution. Doc. 107-2 at 18; Doc. 197 at 11. The Agreement does not provide for any monetary distribution to Alert Call Subclass members. Doc. 107-2 at 17-18; Doc. 197 at 11. Rather, the Agreement provides for a dedicated $1 million *cy pres* distribution to the Consumer Federation of America ("CFA") to serve as consideration to extinguish their TCPA claims against Chase. Doc. 107-2 at 17-18; Doc. 197 at 11.

Settlement Class Members submitted 349,206 timely claims, representing 1.08% of the class. Doc. 202 at 9. Chase has agreed that untimely claims received by the date of the final approval order will be honored. Doc. 197 at 10. Several class members filed objections to the request for attorney fees, Docs. 121, 122, 142, 143, 145, 152, 153, 155, 158, 162, 192, 221; the dedicated *cy pres* distribution, Docs. 122, 142, 150, 153, 158, 222; and other provisions, Docs. 118, 119, 142, 152, 153, 158. 225 members opted out of the class. Doc. 202 at 9.

As noted, Plaintiffs have moved for class certification, settlement approval, attorney fees, and the incentive awards for the five class representatives. Docs. 168, 186, 198. After an approval hearing on October 22, 2015, the court asked Class Counsel to file lodestar data, Doc. 212, which Class Counsel did on November 5, 2015, Doc. 219. The approval hearing continued on December 15, 2015. Doc. 228.

**Discussion**

I. **Class Certification**

A court's analysis of class certification "is not free-form, but rather has been carefully scripted by the Federal Rules of Civil Procedure." *Chi. Teachers Union, Local No. 1. v. Bd. of Educ. of City of Chi*, 797 F.3d 426, 433 (7th Cir. 2015). To be certified, a proposed class must satisfy the four requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *see Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). If Rule 23(a) is satisfied, the proposed class must fall within one of the three categories in Rule 23(b), which the Seventh Circuit has described as: "(1) a mandatory class action (either because

5

of the risk of incompatible standards for the party opposing the class or because of the risk that the class adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior." *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011); *see also Bell*, 800 F.3d at 373. Finally, the class must be "identifiable as a class," meaning that the "class definitions must be definite enough that the class can be ascertained." *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) (citing *All. to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977)); *see also Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659-61 (7th Cir. 2015).

"Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Smith v. Sprint Commc'ns Co., L.P.*, 387 F.3d 612, 614 (7th Cir. 2004) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)) (internal quotation marks omitted). "But settlement is not a cure-all: '[The] other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context.'" *Ibid*. (quoting *Amchem*, 521 U.S. at 620); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 847 (1999) (noting that "in settlement-only class actions the procedural protections built into the Rule [23] to protect the rights of absent class members during litigation are never invoked in an adversarial setting") (citing *Amchem*, 521 U.S. at 620). "Failure to meet any one of the requirements of Rule 23 precludes certification of a class." *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993) (internal quotation marks omitted).

### A.     Rule 23(a)

Rule 23(a) requires the party seeking certification to demonstrate that the members of the class are so numerous that joinder is impracticable (numerosity); that there are questions of law or fact common to the proposed class (commonality); that the class representatives' claims are typical of the claims of the class (typicality); and that the representatives and class counsel will fairly and adequately represent the interests of the class (adequacy).  Fed. R. Civ. P. 23(a)(1)-(4). Although no magic number exists for satisfying the numerosity requirement, the Seventh Circuit has held that "[e]ven if the class were limited to 40 [members] … that is a sufficiently large group to satisfy Rule 23(a) where the individual members of the class are widely scattered and their holdings are generally too small to warrant undertaking individual actions."  *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *see also Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356 n.5 (3d Cir. 2013) ("While no minimum number of plaintiffs is required to maintain a suit as a class action … generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.") (internal quotation marks omitted).  "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury" and that "[t]heir claims … depend upon a common contention … of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2551 (2011) (internal quotation marks omitted); *see also Chi. Teachers Union*, 797 F.3d at 434. Typicality is satisfied when a plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory."  *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (alterations and internal

quotation marks omitted). Adequacy involves two inquiries: "(1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).

It is undisputed that the proposed class meets the numerosity requirement, as it contains more than 32 million individuals who allegedly received phone calls and text messages from Chase in violation of the TCPA. The proposed class also satisfies commonality and typicality. Each class member suffered roughly the same alleged injury: receipt of at least one phone call or text message from Chase to her cell phone. Although class members may have received different numbers of calls and alerts, and the subjects of those calls and alerts may have differed, "Rule 23(a)(2) does not demand that every member of the class have an identical claim," and some degree of factual variation will not defeat commonality provided that common questions yielding common answers can be identified. *Spano*, 633 F.3d at 585; *see also Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992). The claims of all class members depend on the resolution of some or all of these key common questions—whether, as a matter of law, providing a cellular telephone number for verification purposes constitutes prior express consent to receive calls and alerts; whether, as a matter of law, calls regarding account updates and debt collection fall under the TCPA's emergency purpose exception, *see* 47 U.S.C. § 227(b)(1)(A); and, if not, whether, as a matter of fact, Chase placed prerecorded or automated calls and alerts to those cellular phones—and "determining the truth or falsity of the common contention[s] will resolve … issue[s] that [are] central to the validity of each claim." *Chi. Teachers Union*, 797 F.3d at 434.

Because "typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members," *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 725 (7th Cir. 2011) ("*CE Design I*"), the fact that some class members (including all of the Alert Call Subclass members, Doc. 197 at 15-16; Doc. 202 at 21) may have consented to the calls and alerts, or that some class members signed arbitration clauses extinguishing their TCPA claims, does not vitiate the typicality of the class representatives' claims. All class members allegedly received calls or text messages from Chase in violation of the TCPA, and that is enough to satisfy the typicality requirement.

Two objectors contend that adequacy is lacking. Doc. 152 at 4; Doc. 221 at 6-7. The first believes that the fact that Chase credit card holders are treated more favorably than Chase bank account customers creates intra-class conflict that renders Class Counsel inadequate. Doc. 152 at 4. The Settlement Agreement provides that each class member who held a Chase credit card during the class period receives three Award Units, while each class member who held a Chase bank account receives one Award Unit. Doc. 107-2 at 14. Class members who held both a Chase credit card and a Chase bank account receive four (but no more than four) Award Units. *Id*. at 14-15.

This challenge to adequacy fails. It is true that the same attorney cannot vigorously represent the interests of two groups whose interests are not aligned. *See Amchem*, 521 U.S. at 627 (requiring "structural assurance of fair and adequate representation for the diverse groups and individuals affected"); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 679 (7th Cir. 2009) (allowing for the possibility that "class certification should have been denied because of potential conflicts of interest among class members that will make it impossible for class counsel to

present all of them impartially"); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel.") (internal quotation marks omitted). Yet the larger awards available to Chase credit card holders is a product not of inadequate counsel, but of the stronger claims available to credit card holders as compared to Chase bank account customers, who as a condition of opening their accounts agreed to submit disputes to arbitration. Doc. 202 at 15. "[W]hen real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 589 (N.D. Ill. 2011) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997)) (internal quotations marks omitted); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 250 (3d Cir. 2001) (approving a settlement with differential payouts because "the § 10(b) damages available to the class members in this case are generally greater than the § 11 damages available, so that in this respect the § 10(b) claims are potentially stronger than the § 11 claims"); *In re PaineWebber*, 171 F.R.D. at 133 (collecting cases and scenarios). The fact that class members have claims of different strength, warranting different awards, does not require that each group be represented by different counsel. Furthermore, and as explained in greater detail below, Class Counsel have performed satisfactorily on behalf of the class and have demonstrated their competence in representing the class's interests.

As for the other prong of adequacy, a proposed class representative is inadequate if her interests are "antagonistic or conflicting" with those of the other class representatives or the absent class members, *Rosario*, 963 F.2d at 1018, or if she is subject to a defense not applicable

to the class as a whole, *see CE Design I*, 637 F.3d at 726; *Randall v. Rolls–Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011). Plaintiffs allege that they received calls and/or voice alert messages from Chase on their cell phones without providing prior consent. Doc. 96 at ¶¶ 13-30. That claim is not subject to a unique defense and is not "idiosyncratic or possibly unique," *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156-59 (1982)). A second objector to adequacy argues that the named plaintiffs have violated their fiduciary duty to the class and are therefore inadequate. Doc. 221 at 6-7. This is more properly an objection to the incentive awards, which are discussed below.

Accordingly, Gehrich has satisfied all of the requirements of Rule 23(a).

**B.      Rule 23(b)(3)**

Although a putative class may satisfy any of the three Rule 23(b) categories, "[w]hen substantial damages have been sought, the most appropriate approach is that of Rule 23(b)(3)." *Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 898 (7th Cir. 1999). A proposed class satisfies Rule 23(b)(3) if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and … a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Factors pertinent to predominance and superiority include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Ibid*. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "Predominance is satisfied when

common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016) (alterations and internal quotation marks omitted).

One objector suggests that the settlement class does not meet the predominance requirement because numerous individuals who qualify as class members were happy to receive the calls and alerts from Chase. Doc. 118. The objector incorrectly equates appreciating Chase's calls with the legally significant issue of whether recipients provided prior express consent to receive the calls. The TCPA does not carve an exception for unlawful calls that are welcomed by the recipient. The common questions listed above are the main questions in this case, they can be resolved on a class-wide basis without any individual variation, and they predominate over any individual issues. The proposed class satisfies Rule 23(b)(3).

### C. Ascertainability

As noted, a class definition "must be definite enough that the class can be ascertained." *Oshana*, 472 F.3d at 513; *see also Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 495-97 (7th Cir. 2012); 7A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1760 (3d ed. 2005) ("[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."). "Class definitions have failed this requirement when they were too vague or subjective, or when class membership was defined in terms of success on the merits (so-called 'fail-safe' classes)." *Mullins*, 795 F.3d at 657. No objector challenges ascertainability, and indeed no one could, because class membership is as objective as it comes: all persons to whom, between July 1, 2008 and December 31, 2013, Chase placed a non-emergency call, SMS text message, or voice alert call to a cellular telephone through the use of

12

an automated telephone dialing system and/or an artificial or prerecorded voice. Doc. 117 at ¶ 3. Given the Seventh Circuit's disavowal of the heightened ascertainability requirement adopted by some other circuits, *see Mullins*, 795 F.3d at 658, the class here is easily ascertainable.

The two subclasses are similarly objectively defined and easily ascertainable. The Alert Call Subclass consists of those who during the class period received text messages or voice alert calls from Chase related to providing account information. Doc. 117 at ¶ 3. The Collection Call Subclass comprises those who during the same period received non-emergency calls from Chase related to the collection of debts incurred on Chase credit cards or bank accounts. *Ibid*.

In sum, because the proposed class satisfies Rules 23(a) and 23(b)(3) and is ascertainable, certification is appropriate.

## II.      Settlement Approval

A court may approve a settlement that would bind class members only if, after proper notice and a public hearing, the court determines that the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Although a district court "consider[s] the fact in the light most favorable to settlement," *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (internal quotation marks omitted), "the law quite rightly requires more than a judicial rubber stamp when the lawsuit that the parties have agreed to settle is a class action." *Redman*, 768 F.3d at 629 (internal quotation marks omitted); *see also Eubank*, 753 F.3d at 720. Indeed, the Seventh Circuit has "described the district judge as a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Pearson*, 772 F.3d at 780 (internal quotation marks omitted). It follows that "the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the

13

class members." *Redman*, 768 F.3d at 629.  In so doing, the court must be vigilant for evidence of collusion between the defendants, the class representatives, and Class Counsel.  *See CE Design, Ltd. v. King Supply Co.*, 791 F.3d 722, 725 (7th Cir. 2015) ("*CE Design II*"); *Eubank*, 753 F.3d at 721.

### A.     Fairness, Reasonableness, and Adequacy

To evaluate the settlement's fairness, the court must consider "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal quotation marks omitted).  Applying these factors from *Synfuel*, and after assessing the settlement for the possibility of collusion, *Eubank*, 753 F.3d at 721, the court concludes that the settlement is "fair, reasonable, and adequate" and therefore that it satisfies Rule 23(e)(3).

### 1.     Settlement Amount

"The most important factor" in determining whether a proposed settlement satisfies Rule 23 is the "strength of plaintiffs' case on the merits balanced against the amount offered in the settlement." *Synfuel,* 463 F.3d at 653 (citations omitted).  Specifically, the court must "estimate the likely outcome of a trial" to determine the adequacy of a settlement. *Eubank*, 753 F.3d at 727.  As it stands, the Settlement Agreement requires Chase to pay $34 million into the settlement fund, from which (after deducting attorney fees, costs, administrative expenses, proposed *cy pres* distributions, and incentive awards) all eligible Collection Call Subclass members who made a claim by the date of this order will receive their *pro rata* share.  Doc. 107-

2 at 10. The theoretical recovery per Collection Call Subclass member is about $1.00. The actual recovery per *claimant* is approximately $52.50. As some objectors note, Doc. 152 at 3-4; Doc. 145 at 1; Doc. 158 at 1; Doc. 162 at 1-2, that recovery is well below the $500 statutory recovery available for each call or text. *See* 47 U.S.C. § 227(5)(B)-(C). However, the recovery falls well within the range of recoveries in other recent TCPA class actions. *See Ott v. Mortg. Investors Corp. of Ohio, Inc.*, 2016 WL 54678, at *1 (D. Or. Jan. 5, 2016) ($140.86); *Kolinek v. Walgreen Co.*, 31 F.R.D. 483, 2015 WL 7450759, at *7 (N.D. Ill. Nov. 23, 2015) ($30); *Wilkins*, 2015 WL 890566, at *5 ($93.22); *In re Capital One*, 80 F. Supp. 3d at 789 ($34.60); *Rose v. Bank of Am. Corp.*, 2014 WL 4273358, at *10 (N.D. Cal. Aug. 29, 2014) ($20 to $40).

The essential point here is that the court should not "reject[]" a settlement "solely because it does not provide a complete victory to plaintiffs," for "the essence of settlement is compromise." *Isby*, 75 F.3d at 1200 (internal quotation marks omitted). An acceptable settlement is properly "a bilateral exchange … where both sides gain as well as lose something." *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1135 (7th Cir. 1979) (internal quotation marks omitted). Individual class members receive less than the maximum value of their TCPA claims, but they receive a payout without having suffered anything beyond a few unwanted calls or texts, they receive it (reasonably) quickly, and they receive it without the time, expense, and uncertainty of litigation. Chase, for its part, buys peace and mitigates risk. However improbable it may be, complete victory for Plaintiffs at $500 or $1,500 per class member could bankrupt Chase. Even assuming (conservatively and unrealistically) only one violation per class member, if Plaintiffs won a complete victory, Chase would owe $16.1 billion, and $48.4 billion if the jury found that Chase's violations were knowing or willful. A $52.50

recovery in the hand is better than a $500 or $1,500 recovery that must be chased through the bankruptcy courts.

Further, the $52.50 recovery per claimant is paid in cash, unlike the coupon-based settlements recently disapproved by the Seventh Circuit. *See Redman*, 768 F.3d at 634; *Eubank*, 753 F.3d at 725. In that sense, "the benefits of the settlement ha[ve] been traced with some accuracy, and costs [have been] shifted with some exactitude to those benefiting." *Pearson*, 772 F.3d at 782 (quoting *Boeing Co. v. Van Gemert*, 442 U.S. 472, 480-81 (1980)) (internal quotation marks omitted). And once deposited into the settlement fund, these benefits will not revert to Chase—any remaining funds after the two rounds of distribution will form the residual *cy pres* award to the EFF. Doc. 107-2 at 18; Doc. 124 at 7.

In addition, Plaintiffs would face significant obstacles in continuing to litigate this case. First, Chase might have been able to show that call or text message recipients had consented to their receipt or that class members had signed an arbitration clause barring their claims. Doc. 107-5 at ¶ 15; Doc. 186-1 at 9-10; Doc. 197 at 15; Doc. 219 at 14-15; Doc. 219-2 at ¶ 29. FCC regulations possibly could provide Chase with another defense. A 2008 FCC order provides that that autodialed collection calls to "wireless numbers provided by the called party in connection with an existing debt are made with the 'prior express consent' of the called party" and therefore are permissible. Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 47 C.F.R. § 64 (2008); *see also* 47 U.S.C. § 227(b)(1)(A)(iii). While it is unclear how this or other FCC orders would cut in this case, another judge in this District has held that a caller is entitled to summary judgment on a TCPA claim when the plaintiff provided a cell phone number as a contact number, as was the case for many class members here. *See Greene v. DirecTV, Inc.*, 2010 WL 4628734, at *3 (N.D. Ill. Nov. 8, 2010).

16

Second, manageability concerns—which, as noted, are not pertinent for settlement classes, *see Smith*, 387 F.3d at 614—could have posed serious obstacles to a contested class certification. In assessing predominance, a court must analyze "the likely difficulties in managing a class action," Fed. R. Civ. P. 23(b)(3)(D), which "encompass[] the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974); *see also Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 760 (7th Cir. 2000). Predominance could fail where liability determinations are individual and fact-intensive, *see Kartman v. State Farm Mut. Auto Ins. Co.*, 634 F.3d 883, 891 (7th Cir. 2011), and also where "affirmative defenses will require a person-by-person evaluation of conduct to determine whether a defense precludes individual recovery." *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, __ F. Supp. 3d __, 2016 WL 305380, at *12 (N.D. Ill. Jan. 26, 2016) (quoting *Clark v. Experian Info., Inc.*, 233 F.R.D. 508, 512 (N.D. Ill. 2005), *aff'd*, 256 F. App'x 818 (7th Cir. 2007)) (alteration and internal quotation marks omitted); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010) ("[W]hile it is well established that the existence of a defense potentially implicating different class members differently does not necessarily defeat class certification, it is equally well established that courts must consider potential defenses in assessing the predominance requirement.") (emphasis and internal citations omitted).

In discovery motion practice, Chase "assert[ed] [that] no calling data existed for a majority of the class" and "maintained that it did not have complete name and address information for individuals to whom it placed calls and texts." Doc. 219 at 14. Chase also asserted that "[i]dentification of the small population of th[e] calls for which defendants cannot product evidence of consent would involve a highly individualized inquiry that would preclude

class certification." Doc. 197 at 15. Identifying class members, and the precise timing and nature of their consent (if any), would have required Chase to locate documents and analyze call recordings for nearly all of the 32 million class members, and some courts have concluded that similar circumstances warranted the denial of class certification for failure to comport with Rule 23(b)(3). *See Gene & Gene LLC v. BioPay, LLC*, 541 F.3d 318, 326-29 (5th Cir. 2008) (holding that the district court abused its discretion in certifying a class because "myriad mini-trials" to determine each class member's consent or lack thereof could not "be avoided"); *Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, 527-29 (E.D. Wis. 2014) (denying certification where it would be "possible—indeed likely—that determining whether members of the class provided prior express consent would involve individualized inquiry"); *Jamison v. First Credit Servs., Inc.,* 290 F.R.D. 92, 107 (N.D. Ill. 2013) (denying certification of TCPA claims where the "parties would need to scour [the defendant's] records" to determine consent).

Third, possible developments in the law posed a risk of harming or even eliminating Plaintiffs' claims. The Supreme Court recently heard argument in *Spokeo, Inc. v. Robins*, No. 13-1339 (U.S. argued Nov. 2, 2015), which presents the question whether statutory damage class actions where class members have suffered no concrete harm violate Article III standing requirements. Doc. 197 at 15; Doc. 219 at 14. Absent a settlement, an affirmative answer might have rendered meritless Plaintiffs' claims, given that they were subject only to unwanted phone calls and alerts. In addition, several industry groups have appealed a 2015 FCC declaratory ruling and order clarifying the meaning of "prior express consent" in the TCPA and the situations in which a caller is (and is not) liable. *See* TCPA Omnibus Declaratory Ruling and Order, 30 F.C.C.R. 7961 (2015); *ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir. filed Sept. 21, 2015). If the appeal succeeds, the class's claims could have suffered. Doc. 197 at 15; Doc. 219 at 14.

18

In light of Chase's potential defenses, the legal uncertainty concerning the application of the TCPA, and the time and expense inherent to litigation, proceeding to trial, and obtaining relief posed risks to Plaintiffs, and a possibility existed that they would have recovered nothing. Given this, the settlement provides fair actual cash value.

### 2. Complexity, Length, and Expense of Litigation

Next, the court must consider the likely complexity, length, and expense of continued litigation. *See Synfuel,* 463 F.3d at 653. This factor strongly favors approval. Although the parties have conducted limited discovery for the purpose of evaluating settlement, Doc. 107-2 at 24-25; Doc. 140-1 at ¶ 19; Doc. 186-1 at 11-12, they would need to engage in significant additional discovery of Chase's call and text message records if the litigation were to proceed. This would likely require the parties to retain experts, analyze an enormous quantity of data, and engage in substantial motion practice, which could have resulted in reducing or negating, and certainly would have delayed, any judgment in favor of Plaintiffs, even putting aside the near certainty of appeal.

### 3. Opposition

With respect to "the opposition to settlement among affected parties," *Synfuel,* 463 F.3d at 653, only 225 class members have opted out of the settlement, Doc. 202 at 9, representing approximately 0.000697% of the class. Of the 32.3 million class members, only eighteen filed timely objections to the Settlement Agreement, and the vast majority of those take issue with the proposed attorney fees and *cy pres* distributions (which are discussed below) rather than the value of the settlement. This extremely low percentage of opposition favors a finding that the settlement is fair, reasonable, and adequate. *See Kolinek*, 2015 WL 7450759, at *9 (holding that a 0.0002209% opt-out rate supports the settlement); *In re Capital One*, 80 F. Supp. 3d at

792 (same, for 0.0032%); *In re Sw. Airlines Voucher Litig.*, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) (same, for less than 0.01%), *aff'd and modified on other grounds*, 799 F.3d 701 (7th Cir. 2015); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 965 (N.D. Ill. 2011) (same).

### 4.      Opinion of Competent Counsel

Regarding the opinion of competent counsel, *see Synfuel,* 463 F.3d at 653, Class Counsel are experienced TCPA litigators and strongly support the settlement. Even though Class Counsel may be considered biased because they stand to benefit from approval, *see Redman*, 768 F.3d at 629; *Eubank*, 753 F.3d at 720, this factor (whatever its weight) favors approval.

### 5.      Stage of Proceedings

The final *Synfuel* factor is the stage of the proceedings and the amount of discovery completed at the time of the settlement. *See Synfuel,* 463 F.3d at 653. Due to the early stage at which settlement negotiations commenced, the parties have not engaged in substantial motion practice or discovery, but they did exchange "confirmatory discovery" over the course of settlement discussions. Doc. 107-2 at 24-25; Doc. 140-1 at ¶ 19; Doc. 186-1 at 11-12. Although this settlement-directed discovery is not identical to the full merits discovery that would enable counsel to better "evaluate the merits of plaintiffs' claims," *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998), extensive formal discovery would entail substantial cost and might not have placed the parties in a materially better position than they are now to determine an appropriate settlement value. As a result, the parties have completed a sufficient amount of discovery to be able to place value on their respective positions in this case.

### 6. Absence of Collusion

The Seventh Circuit recently has emphasized the importance of district judges' vigilance regarding collusion in class action settlements. *See Pearson*, 772 F.3d at 778; *Redman*, 768 F.3d at 637; *Eubank*, 753 F.3d at 721. In class action suits, named plaintiffs typically exercise little control over class counsel, and the class has little or no ability to hold accountable either the named plaintiffs or class counsel. *See Eubank*, 753 F.3d at 719. Class counsel and defendants sometimes exploit these dynamics to generate a settlement that extinguishes the claims against the defendant and enriches class counsel and the class representatives with large awards, but does not provide commensurate or adequate benefit for the class. *See Redman*, 768 F.3d at 629; *Eubank*, 753 F.3d at 720.

The record provides no tenable basis to conclude that the proposed settlement is the result of collusion between or among Chase, the class representatives, and/or Class Counsel. As some objectors correctly note, Doc. 153 at 9; Doc. 155 at 11-12, the settlement includes a "clear-sailing" provision, "a clause in which the defendant agrees not to contest class counsel's request for attorneys' fees." *Redman*, 768 F.3d at 637; *see* Doc. 107-2 at 21 (the clear-sailing provision). "Because it's in the defendant's interest to contest that request in order to reduce the overall cost of the settlement, the defendant won't agree to a clear-sailing clause without compensation— namely a reduction in the part of the settlement that goes to the class members, as that is the only reduction class counsel is likely to consider." *Ibid*. Yet because the Settlement Agreement here is non-reversionary, any reduction in the proposed attorney fees will go directly to the class, not return to Chase. Chase will have paid $34 million regardless, and because the court closely scrutinizes the requested attorney fees below, the risk of harm to the class from the clear-sailing clause is vanishingly minimal.

### B.    Overruled Objections to the Settlement

Objections to the settlement concerning matters other than attorney fees and the *cy pres* distributions are considered here.

First, some objectors argue that, in light of the available statutory damages, the awards to each class member are inadequate to release their TCPA and related claims against Chase.  Doc. 145 at 1; Doc. 152 at 3-4; Doc. 158 at 1; Doc. 162 at 1-2.  As discussed above, a class-wide recovery in line with the statutory awards is both exceedingly unlikely and, if it did come to pass, could possibly bankrupt Chase.  Likewise, the strength of Plaintiffs' case in light of Chase's defense does not warrant a settlement close to the statutory award.  Regarding the release, "[a] federal court may release not only those claims alleged in the complaint but also a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might have not been presentable in the class action." *Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 273-74 (7th Cir. 1998) (internal quotation marks and alteration omitted); *see also id*. at 274 ("It is not at all uncommon for settlements to include a global release of all claims past, present, and future, that the parties might have brought against each other.").  The individual awards here are adequate in light of the strength of Plaintiffs' claims, and the release of all claims related to automatic telephone dialing systems or callers using an artificial or prerecorded voice, Doc. 107-2 at 18-21, is not overbroad.

Second, three class members object to the settlement on the ground that the number of calls that each class member received does not affect that member's recovery; in other words, the characteristics that determine each class member's actual payout do not include call volume or number of phone numbers affected.  Doc. 122 at 2; Doc. 145 at 1; Doc. 152 at 3-4.  It is true that the TCPA provides for statutory damages per violation, so one individual may have many

22

claims.  *See* 47 U.S.C. § 227(b)(3)(B).  Yet conducting individual inquiries into the number of violations for each class member either would be administratively unmanageable or, if it were not, would deplete the settlement fund through vastly increased administrative expenses, reducing the amount available to claimants and increasing the delay in receiving their awards. *See In re Capital One*, 80 F. Supp. 3d at 793.  In addition, because the two *pro rata* distributions will exhaust the settlement fund, this aspect of the settlement is far less of a concern than it would have been had any leftover funds reverted to Chase.

Third, some objectors take issue with the notice and claims process.  Doc. 155 at 8-10; Doc. 162 at 2; Doc. 220 at 1-2.  For Rule 23(b)(3) classes, class counsel must provide the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  When class members can be identified through reasonable effort, they are entitled to individual notice.  *See Mullins*, 795 F.3d at 665; *Hughes*, 731 F.3d at 676-77.  "When that is not possible, courts may use alternative means such as notice through third parties, paid advertising, and/or positing in places frequented by class members, all without offending due process."  *Mullins*, 795 F.3d at 665.  Courts evaluate claims processes to ensure that they are fair and reasonable and not so burdensome as to discourage class members from submitting claims.  *See Schulte*, 805 F. Supp. 2d at 590-91.

Here, the notice provided went well beyond what was required.  It was well-tailored to reach the maximum number of class members both in terms of outlet (through direct mail and email, and then publication in national magazines) and persistence (contacting class members a second time as a reminder).  Doc. 107-2 at 12-14; Doc. 124 at 6, 8-9; Doc. 202 at 7-9.  The claim forms were straightforward, satisfied the Federal Judicial Center's guidelines, and required class

members only to check a box and sign their names to file a claim. Doc. 124 at 6, 8-9; Doc. 198-2; Doc. 202 at 26-28. Although one objector contends that the initial oversight on Chase's part that resulted in the need to delay the final approval hearing and notify the 7.1 million new class members demonstrates a cavalier attitude toward notice on the part of Class Counsel, Doc. 220 at 2, in the court's view Class Counsel's approach to this incident—propounding interrogatories, taking depositions, and ensuring notification of the newly discovered class members and renotification of the others, Doc. 186-2 at ¶¶ 2-6—underscored the conscientiousness with which they approached the task of notice.

Two objectors argue that notice was inadequate because settlement website's address (http://www.gehrichtcpasettlement.com) did not contain the word "Chase," because the complaint and final approval notice were not posted on the website at the time of notice, and because the deadlines for responding were not clear. Doc. 155 at 9-10. These objections lack merit. All notices to class members included the website address; moreover, Google searches for "Chase TCPA Settlement" and "Chase Settlement" both return the settlement website as the first result. *See* "Chase Settlement," *Google* (Jan. 26, 2016), https://perma.cc/3FPJ-5MN9?type=image; "Chase TCPA Settlement," *Google* (Jan. 26, 2016), https://perma.cc/VA6X-6NQ2?type=image; Doc. 197 at 12, 24; Doc. 202 at 27. The class notice included in bold font the relevant deadlines for submitting a claim and opting out of the class or objecting to the settlement, and explained the claims that the settlement would release. Doc. 197 at 12, 25-26; Doc. 202 at 27-28. Ideally, the complaint and approval notice would have been posted on the settlement website earlier (although the complaint was posted in February 2015, Doc. 197 at 27), but this is not a requirement under Rule 23. Given the amount of other information available to

potential claimants, this does not render notice inadequate, and inquisitive class members surely could have requested a copy of those papers if they truly were interested.

Fourth, some objectors argue that Chase should have provided debt relief in addition or as an alternative to settlement payments. Doc. 142 at 1-2; Doc. 153 at 6, 8. Debt relief is not related to Chase's alleged TCPA violations, and thus understandably is not offered as part of the settlement.

### C.    The *Cy Pres* Distributions

The dedicated *cy pres* award drew several objections. Doc. 122 at 2; Doc. 142 at 1; Doc. 150 at 2-6; Doc. 153 at 3-4; Doc. 158 at 2.   "*Cy pres* (properly *cy près comme possible*, an Anglo-French term meaning 'as near as possible') is the name of the doctrine that permits a benefit to be given other than to the intended beneficiary or for the intended purpose because changed circumstances make it impossible to carry out the benefactor's intent." *Pearson*, 772 F.3d at 784; *see also Hughes v. Kore of Ind. Enters., Inc.*, 731 F.3d 672, 675-76 (7th Cir. 2013). In class actions, "such a decree awards to a charity the money that would otherwise go to the members of the class as damages, if distribution to the class members is infeasible." *Hughes*, 731 F.3d at 675. A *cy pres* award can "amplify the effect of the [otherwise] modest damages in protecting consumers. A foundation that receives $10,000 can use the money to do something to minimize violations of the [statute] at issue; as a practical matter, class members each given $3.57 cannot." *Id*. at 676.

In lieu of miniscule cash awards to the nearly fourteen million members of the Alert Call Subclass, the Settlement Agreement requires Chase to make a $1 million donation to the CFA as consideration for the release of the subclass's claims. Doc. 107-2 at 17-18. (Chase will also include opt-out instructions for the alerts in question. *Id*. at 18.) Because the recovery per

subclass member would amount to about $0.07, far less than the cost of postage, distribution to class members would be infeasible, making *cy pres* the preferred alternative. The Settlement Agreement treats the Alert Call Subclass less generously than the Collection Call Subclass for a simple reason: the vast majority of Alert Call Subclass members provided their cell phone numbers to Chase, requested that Chase send the automatic alerts, and then affirmatively confirmed that they opted into the alerts upon receipt of a text message from Chase. Doc. 197 at 15, 28; Doc. 202 at 21. Alert Call Subclass members provided prior express consent to the alerts, so they almost certainly have no viable TCPA claim. *See* 47 U.S.C. § 227(b); *Payton v. Kale Realty, LLC*, 2016 WL 703869, at *10 (N.D. Ill. Feb. 22, 2016) ("In this case, plaintiffs admit that the emails sent from Payton to Kale for the purpose of merging their respective real estate businesses contained Payton's cellular telephone number and other contact information. … Because the court finds there is no genuine issue of material fact as to whether Payton provided prior express consent to receive the text message at issue in this case, defendant Kale is entitled to judgment as a matter of law as to Payton."); *Greene*, 2010 WL 4628734, at *3 ("Based on the undisputed facts, we conclude that Greene expressly consented to the fraud alert phone call by releasing her cell phone number as the one at which she wished to be reached. The TCPA does not prohibit automated calls that are made with the express consent of the individual telephoned. Accordingly, we award summary judgment to Defendants."); *see also Soppet v. Enhanced Recovery Co., L.L.C.*, 679 F.3d 637, 639-41 (7th Cir. 2012) (examining consent to determine whether the plaintiffs' TCPA claim was viable).

So the Alert Call Subclass may be fourteen-million strong, but fourteen million times zero is still zero, and that very likely is the collective value of the subclass's claims. Yet because the cost to Chase of defending these claims was greater than zero, Chase understandably felt

compelled to extinguish them. This in itself is not a problem. "[E]ven if the settlement is merely a nuisance settlement, such settlements are permitted; defendants can be trusted to make such settlements only if it is in their best interest to do so." *Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 686 (7th Cir. 2008) ("*Mirfasihi II*"). What is problematic, however, is the size of the dedicated *cy pres* award, which at $1 million amounts to about 5% of the amount reserved for payments to class members. Because the Alert Call Subclass's claims likely have no value, this is much too high, for it would reduce the total value of the settlement fund to the Collection Call Subclass members, who actually have potentially meritorious claims.

At the final approval hearing, Chase defended the size of the *cy pres* distribution by claiming that it was separately negotiated from the rest of the Settlement Agreement and so did not in fact reduce the pot available to the Collection Call Subclass. This may accurately describe how settlement discussions unfolded, but as an argument it fails to persuade. Money is fungible. Chase is willing to pay $34 million to settle the claims of all class members. Within large bounds, the allocation between the two subclasses is immaterial to Chase.

Accordingly, given the likely non-zero value of the Alert Call Subclass's claims, the court reduces the dedicated *cy pres* award to the CFA to $50,000. This award is fair, reasonable, and adequate. The remaining $950,000 is added to the settlement fund for allocation to the Collection Call Subclass. This redistribution renders moot one of the objections to the dedicated *cy pres*. Doc. 150 at 2-6.

Other objectors either take issue with the entire concept of *cy pres*, Doc. 142 at 1, or with the CFA as a recipient, Doc. 122 at 2; Doc. 142 at 1; Doc. 153 at 3-4; Doc. 158 at 2. These objections lack merit. The Seventh Circuit has approved the use of *cy pres* awards in circumstances where, as here, the cost distributing money to the class members exceeds the value

27

of the distribution. *See SEC v. Custable*, 796 F.3d 653, 656 (7th Cir. 2015); *Hughes*, 731 F.3d at 675-76 (holding that, if distributing settlement funds is infeasible, it may be appropriate to distribute the funds to ensure that the defendant does not "walk[] away from the litigation scot-free because of the infeasibility of distributing the proceeds of the settlement"). And the CFA's work is relevant to the subject matter of this suit; it is a national research and advocacy organization that has done targeted work educating consumers about their rights under the TCPA. Doc. 198-1 at 9; Doc. 202 at 23. This "coincide[s] with, or at least overlap[s], the interest of the class," making it an appropriate *cy pres* recipient. *Hughes*, 731 F.3d at 676.

The residual *cy pres* award after the second *pro rata* distribution to the Collection Call Subclass is the subject of three objections. Doc. 122 at 2; Doc. 150 at 6-8; Doc. 153 at 4-5. One objection seems to stem from a misunderstanding of the Settlement Agreement, as the objector claims that the residual *cy pres* distribution caps the amount that Collection Call Subclass members can receive. Doc. 150 at 6. That is incorrect. The relevant section in the Settlement Agreement states:

> Any Remaining Funds which remain unpaid [after the second *pro rata* distribution] 365 days following the Effective Date shall be paid as *cy pres* to the Electronic Frontier Foundation.

Doc. 107-2 at 18. In other words, the residual *cy pres* distribution will be made only after the two *pro rata* distributions to claimants, and thus only from funds for which the cost of distribution would exceed each claimant's award from a theoretical third *pro rata* distribution. *Id*. at 17-18; Doc. 197 at 11, 30-31; Doc. 202 at 25. This does not cap class members' awards. The residual *cy pres* distribution abides by the Seventh Circuit's instruction that "[m]oney not claimed by class members should be used for the class's benefit to the extent that is feasible." *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 689 (7th Cir. 2013); *see also Custable*, 796 F.3d at 656; *Hughes*, 731 F.3d at 675-76.

The other objection to the residual *cy pres* distribution argue that the EFF "frivolously spends income" on itself and its staff members, Doc. 122 at 2, and has a mission too remote from the subject of this litigation, Doc. 153 at 4-5. As Class Counsel observe, however, the "EFF's mission is, in part, to protect consumers from invasions of privacy resulting from the use of new technologies such as cellular telephones." Doc. 202 at 26. Regarding the group's expenditures, the objector himself indicates that the vast majority of the EFF's annual spending is on salary and benefits for its staff, Doc. 122 at 2, who work to further the EFF's mission. There is nothing inappropriate about that.

### D.    Attorney Fees

Several objectors take issue with Class Counsel's attorney fee request. Docs. 121, 122, 142, 143, 145, 152, 153, 155, 158, 162, 192, 221. "In a certified class action, the court may award reasonable attorney's fees … that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Because Chase is paying a specific sum in exchange for release of liability to all plaintiffs, equitable principles permit the court to "determine[] the amount of attorney's fees that plaintiffs' counsel may recover" from the fund "based on the notion that not one plaintiff, but all those who have benefitted from litigation should share its costs." *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 563 (7th Cir. 1994) (internal quotation marks omitted).

"[A]ttorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services." *Silverman v. Motorola Sols., Inc.,* 739 F.3d 956, 957 (7th Cir. 2013). As part of this inquiry, and as noted above, "the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation

will be received by the class members." *Redman*, 768 F.3d at 629. "[T]he central consideration is what class counsel achieved for the members of the class rather than how much effort class counsel invested in the litigation." *Id*. at 634. Although the probability of success at the outset of the litigation is relevant, *see Florin*, 34 F.3d at 565, the "control of the class over its lawyers usually is attenuated, often to the point of nonexistence." *Eubank*, 753 F.3d at 719.

The Seventh Circuit has held that district courts "must set a fee by approximating the terms that would have been agreed to *ex ante,* had negotiations occurred." *Americana Art China Co., Inc. v. Foxfire Printing & Packaging, Inc.,* 743 F.3d 243, 246-47 (7th Cir. 2014) (internal quotation marks omitted); *see also In re Synthroid Mktg. Litig.,* 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*") ("[C]ourts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."). "Such estimation is inherently conjectural," *In re Trans Union Corp. Privacy Litig.,* 629 F.3d 741, 744 (7th Cir. 2011), and the Seventh Circuit does not prescribe a preferred method of calculation, so "in common fund cases, the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court." *Americana Art*, 743 F.3d 247. "The simple and obvious way for the judge to correct an excessive attorney's fee for a class action lawyer is to increase the share of the settlement received by the class, at the expense of class counsel." *Pearson*, 772 F.3d at 786 (internal quotation marks omitted).

Class Counsel request a fee award of $9,507,603. Of the $34 million common fund, and accounting for the dedicated *cy pres*, administrative expenses, and incentive awards, class members would receive $19,281,967.49. Doc. 198 at 6. Because "the ratio that is relevant to assessing the reasonableness of the attorneys' fees that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received," *Redman*, 768 F.3d at 630; *see also*

*Pearson*, 772 F.3d at 781, the requested award is 33.02% of the net settlement fund. (At the time

of the fee request, with the dedicated *cy pres* at $1 million, the requested award was 34.15% of

the net settlement fund.) Class Counsel argue that the "requested fee is within the market price

for contingent legal fees in complex litigation, and is reasonable and appropriate given the

attorneys' fees awarded in similar cases, the risks presented by this case, the quality and work

performed by Class Counsel, the high stakes presented, and the result achieved." Doc. 186-1 at

8. Class Counsel also contend that the "customary contingency agreement in [the Seventh]

Circuit is 33% to 40% of the total recovery." *Id.* at 20.

"[I]n consumer class actions … the presumption should we suggest be that attorneys' fees

awarded to class counsel should not exceed a third or at most a half of the total amount of money

going to class members and their counsel," *Pearson*, 772 F.3d at 782, a range in which the

requested fees fall. The class representatives' fee agreements with Class Counsel require them to

pay between 33.3% and 50% of the after-cost value of any judgment or settlement obtained.

Doc. 140-3 at ¶ 9; Doc. 140-4 at ¶ 11; Doc. 140-7 at ¶ 13; Doc. 186-1 at 12, 20. These

agreements, however, are owed "little weight," given that "named plaintiffs are usually cat's

paws of the class lawyers," *In re Trans Union*, 629 F.3d at 745, and do not have "a sufficient

stake to drive a hard—or any—bargain with the lawyer[s]," *In re Cont'l Ill. Sec. Litig.*, 962 F.2d

566, 572 (7th Cir. 1992).

Although Class Counsel cite several cases approving percentages similar to the

percentage they request here, they fail to recognize that as the dollar value of the common fund

increases, the percentage of the settlement awarded as attorney fees generally decreases. As the

Seventh Circuit recently described this sliding-scale approach:

> [N]egotiated fee agreements regularly provide for a recovery that increases at
> a decreasing rate. …

31

> Many costs of litigation do not depend on the outcome; it is almost as expensive to conduct discovery in a $100 million case as in a $200 million case. Much of the expense must be devoted to determining liability, which does not depend on the amount of damages …. There may be some marginal costs of bumping the recovery from $100 million to $200 million, but as a percentage of the incremental recovery these costs are bound to be low. It is accordingly hard to justify awarding counsel as much of the second hundred million as of the first. The justification for diminishing marginal rates applies to $50 million and $500 million cases too, not just to $200 million cases …
>
> Awarding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin (yet still preserving some incentive for lawyers to strive for these higher awards).

*Silverman*, 739 F.3d at 959. Empirical studies on attorney fees in class actions confirm that the percentage of the total settlement allocated to fees tends to decrease as the total size of the settlement increases. *See id*. at 958; Theodore Eisenberg & Geoffrey P. Miller, "Attorney Fees and Expenses in Class Action Settlements: 1993-2008," 7 *J. Empirical Legal Stud.* 248, 265 (2010) (finding that between 1993 and 2008, in settlements between $2.8 million and $5.3 million, the median attorney fee (inclusive of administrative costs) was 25% and the mean was 26.4%, while in settlements between $22.8 million and $38.3 million, the median attorney fee was 24.9% and the mean was 22.1%); Brian T. Fitzpatrick, "An Empirical Study of Class Action Settlements and Their Fee Awards," 7 *J. Empirical Legal Stud.* 811, 839 (2010) (finding that for settlements ranging from $30 million to $72.5 million, the median attorney fee was 24.9% and the mean was 22.3%); Theodore Eisenberg & Geoffrey P. Miller, "Attorney Fees in Class Action Settlements: An Empirical Study," 1 *J. Empirical Legal Stud.* 27, 28 (2004) ("A scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases.").

Class Counsel argue that the Fitzpatrick study is unhelpful because it uses a ratio different from the range of ratios approved in *Redman*, and that the study actually supports their

fee request because it finds that the mean and median for Seventh Circuit cases (of all sizes) were 27.4% and 29%, respectively, and that over 40% of all Seventh Circuit cases resulted in fee awards at or above 30% of the fund. Doc. 202 at 32; Doc. 219 at 13 (citing Fitzpatrick, *supra*, at 812, 836). Both arguments miss the point, as the Seventh Circuit itself cited the Fitzpatrick study to support the proposition that as fund size increases, attorney fee percentages decrease. *See Silverman*, 739 F.3d at 958. (Class Counsel submitted a declaration by Professor Fitzpatrick, Doc. 219-1, but only to argue that the percentage-of-the-fund method is more appropriate than the lodestar method, not that their requested percentage is appropriate. Doc. 219 at 6-7, 11-12.)

The representative attorney fee percentages cited by Class Counsel further support use of a sliding scale. Citing 22 instances in which courts awarded attorney fees of at least one-third of the total settlement amount, Class Counsel contend that those examples (some from this District, some not; some TCPA cases, some not) demonstrate that "the requested fee is at the market price, and therefore reasonable." Doc. 186-1 at 18-20; Doc. 219 at 9-10. Nearly all of those cases, however, had settlement totals far below the $34 million common fund in this case, and many of them had totals below $5 million. *See*, *e.g.*, *Zolkos v. Scriptfleet, Inc.*, 2015 WL 4275540, at *3 (N.D. Ill. July 13, 2015) ($3.35 million); *McCue v. MB Fin., Inc.*, 2015 WL 4522564, at *3 (N.D. Ill. July 23, 2015) ($789,500); *Prena v. BMO Fin. Corp.*, 2015 WL 2344949, at *1 (N.D. Ill. May 15, 2015) ($3.9 million); *Martin v. Dun & Bradstreet, Inc.*, 2014 WL 9913504, at *3 (N.D. Ill. Jan. 16, 2014) ($4.5 million). The higher fee percentages in those cases make sense under the sliding-scale approach given the relatively lower settlement amounts.

For these reasons, and given the size of the common fund in this case, the court adopts the general approach in *In re Synthroid Mktg. Litig.*, 325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*"), where the Seventh Circuit awarded as attorney fees 30% of the first $10 million of the

settlement, 25% of the second $10 million, 22% of the next $26 million, and 15% of the amounts from $46 million to the total amount of $88 million. *Id*. at 980; *see also Silverman*, 739 F.3d at 959 ("Our concern is less with the absolute level of fees than with the structure of the award. The articles we have cited reinforce the observation in the *Synthroid* opinions that negotiated fee agreements regularly provide for a recovery that increases at a decreasing rate."); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 1399367, at *5 (N.D. Ill. Mar. 23, 2015) (applying the *Synthroid II* approach); *Wilkins*, 2015 WL 890566, at *10-11 (same); *In re Capital One*, 80 F. Supp. 3d at 804 (same). This sliding-scale approach reflects that the "market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *Synthroid I*, 264 F.3d at 721. In implementing this approach, the court examines the pertinent factors from an *ex ante* perspective, as if the class members and Class Counsel were negotiating a fee at the outset. *See Americana Art China*, 743 F.3d at 246-47; *Synthroid I*, 264 F.3d at 721.

This case did pose some risks of nonpayment. As noted, Chase had several potentially meritorious defenses relating to prior express consent and arbitration clauses, Doc. 107-5 at ¶ 15; Doc. 186-1 at 9-10; Doc. 197 at 15; Doc. 219 at 15; claimed not to have call or identifying data for many of the class members, which could have posed manageability obstacles to class certification, Doc. 140-1 at ¶ 28; Doc. 197 at 15; Doc. 219 at 14; and may have benefitted from potential changes in the law regarding the TCPA and no-injury class actions, Doc. 197 at 15; Doc. 219 at 14. Yet while the risks of nonpayment were real, they were not so great that they would have justified a fixed-percentage contingent fee for Class Counsel at the commencement of the case.

34

Although Class Counsel have performed high quality work, this case settled contemporaneously with or after several recent cases in this District and elsewhere that had established a template for TCPA litigation against large financial institutions, vastly reducing the uncertainty and risk for Class Counsel. *See Wilkins* 2015 WL 890566; *In re Capital One*, 80 F. Supp. 3d 781. Class Counsel's contention that they "have devoted substantial resources to the prosecution of this case with no guarantee that they would be compensated for their time or reimbursed for their expenses," Doc. 186-1 at 9, similarly fails to persuade. That is in the very nature of plaintiff's contingency work, not of this case in particular.

Nor would Class Counsel likely have expected the case to be more difficult to resolve *ex ante*. In light of the aforementioned raft of TCPA settlements, some of which Class Counsel litigated themselves, *see In re Capital One*, 80 F. Supp. 3d 781, it likely was clear very early that settlement was likely—a notion supported by the fact that the parties entered settlement discussions after only nine months and before any significant motion practice. Although the settlement was large because of the size of Chase's potential TCPA liability, any risks to Class Counsel could and should have been addressed through a sliding-scale attorney fee percentage that declined with increases in the total recovery.

For these reasons, the court finds that fully informed and modestly sophisticated plaintiffs would have bargained for a sliding-scale contingency fee. As the Seventh Circuit has noted, a sliding-scale approach properly incents counsel. *See Silverman*, 739 F.3d at 959 ("Awarding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin (yet still preserving some incentive for lawyers to strive for these higher awards)."). Using the *Synthroid II* structure as a general model, the

court awards Class Counsel attorney fees as follows: 30% of the first $10 million of the settlement, 25% of the second $10 million, and 20% of the remaining amounts from $20 to $28.79 million (subtracting the $50,000 *cy pres* distribution, the $7,500 in incentive awards, and the $5,152,929.51 in administrative costs from the total $34 million fund). This results in an overall attorney fee award of $7,257914.10, or 21.35% of the common fund of $34 million, and 25.21% of the sum of the attorney fees and class recovery of $28,789,570.49.

The 20% that the court awards for the settlement amounts from $20 through $28.79 million is slightly less than the 22% awarded for the highest recovery band in *Synthroid II*, but given the relatively low risks in the case, the reduction is appropriate. The case's difficulty and Class Counsel's time expended does not warrant a percentage higher than 20% for that band of recovery. Indeed, although the court does not adopt the lodestar method in calculating the attorney fees and overrules those objections urging that method, Doc. 122 at 1; Doc. 162 at 2; Doc. 221 at 1-6, the lodestar data are instructive. Class Counsel billed 2,323 hours on this litigation at a (not insubstantial) blended rate of $554 per hour, resulting in a lodestar of $1.287 million. Doc. 219 at 6, 7. Class Counsel's fee request of $9.507 million would have resulted in a blended rate of $4,092 per hour, a nearly 740% increase over the lodestar and blended rate. That is far too much for this case. Even the reduced fee awarded here amounts to a 564% increase over the lodestar and blended rate.

The evolution of Class Counsel's fee request through the course of the settlement approval process confirms the request's lack of a principled mooring. In their initial request, Class Counsel sought $11 million, which was contemplated by the Settlement Agreement. Doc. 107-2 at 21; Doc. 140 at 8. After evaluating the Seventh Circuit's recent decisions in *Redman* and *Pearson*, Class Counsel reduced their request to $9.507 million, representing 33.34% of the

settlement fund after deducting the dedicated *cy pres* distribution and what was then thought to be the notice and administration expenses. Doc. 186-1 at 8. Between the date of that request and the final approval hearing, however, the notice and administration expenses increased, reducing the funds available to the class. *Compare* Doc. 186-1 at 8 (reporting administrative and notice expenses of $4,477,191) *with* Doc. 198 at 9 (reporting adjusted administrative and notice expenses of $5,152,929.51). But instead of proportionally reducing the fee request to keep the ratio at a constant percentage (33.34%), Class Counsel held fast to $9.507 million, which raised the ratio to 34.15%. Doc. 198 at 18-19. There is no conceivably legitimate reason why Class Counsel did not reduce their fee request at this point to 33.34% of the then-reduced pool, and their failure to do so undermines any argument that $9.507 million results from a principled methodology. Class Counsel should consider themselves fortunate that the court did not dock their attorney fees to punish their wholly unprincipled approach in this particular respect and to discourage future counsel from falling short in the same way.

Class Counsel make several arguments to support a straight percentage approach, all of which are unpersuasive. First, Class Counsel contend that "[l]itigating TCPA cases like this one requires persistent diligence throughout the entire course of the litigation." Doc. 219 at 14. As discussed above, the fact that Class Counsel have litigated nearly identical cases recently and contemporaneously suggests that it had several templates to follow, and the quick entry by both parties into settlement negotiations eliminated the need to further contest any issue vigorously before the court. More importantly, does not all litigation require persistent diligence? As "officers of the court … 'lawyers have obligations to their calling,'" *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) (quoting *Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*, 490 U.S. 296, 310 (1989) (Kennedy, J., concurring)), including "to exercise in [legal] proceedings a reasonable

37

degree of care, prudence, diligence, and skill." *Nat'l Sav. Bank of D.C. v. Ward*, 100 U.S. 195, 199 (1879). Suffice to say that a lack of persistent diligence in any matter would not comport with an attorney's ethical obligations, and accordingly the exercise of persistent diligence is not a ground for an outsized fee award.

Second, Class Counsel cite Chase's potential consent- and arbitration-based defenses as "substantial barriers." Doc. 219 at 15. At a contested class certification hearing or trial, those barriers may indeed have proven substantial, perhaps even insurmountable, but given the enormous size of Chase's potential liability, Class Counsel had to be reasonably certain that the case likely would settle.

Third, Class Counsel attempt to situate their $9.507 million fee request between two sliding-scale approaches drawn from in *In re Capital One*, 80 F. Supp. 3d at 806-07. Doc. 219 at 16-17. In the first approach, which *Capital One* applied, the court used the same 30%-25%-20% sliding scale used here, but added a 6% "risk premium" to the first $10 million of the settlement, so that counsel received 36% ($3.6 million) of that band. *In re Capital One*, 80 F. Supp. 3d at 805-07. Class Counsel here argue that "no reason exists to limit the risk premium to the first $10,000,000 recovered since Class Counsel would have been required to exert time and expense to extract every last penny on behalf of the class," and therefore that the 6% risk premium should apply at each level of the sliding scale. Doc. 219 at 16. This argument misses the point of the sliding-scale approach, which is that after a certain point the costs incurred in increasing a recovery are low relative to the actual increase in the recovery. *See Silverman*, 739 F.3d at 959. The issue is not how hard the lawyers did or did not work; rather, it is how hard they did or did not work for each dollar of recovery, and that does indeed differ between the first large chunk and the rest of the settlement.

38

In sum, the court grants an attorney fee award of $7,257,914.10. The $2,249,688.90 difference between the requested fee and the awarded fee is returned to the common fund, of which $21,531,656.39 is now earmarked for distribution to the Collection Call Subclass.

### E. Class Representative Incentive Awards

Plaintiffs move for approval of incentive awards of $1,500 to each of the five class representatives to reward them for their participation as named plaintiffs in this suit. Doc. 186. Incentive "awards are justified when necessary to induce individuals to become named representatives." *Synthroid I*, 264 F.3d at 722; *see also Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 875 (7th Cir. 2012). In deciding whether an incentive award is proper and, if so, in what amount, "relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir. 1998).

This case did not proceed past the earliest phases of formal discovery before it settled. Still, Gehrich, Robert Lund, Corey Goldstein, Paul Stemple, and Carrie Couser attached their names to this litigation and participated in pre-filing investigation and informal and formal discovery. Although one objector argues that the named plaintiffs' acquiescence to excessive attorney fees breached their fiduciary duty to the class, Doc. 221 at 6-7, the class representatives cannot be expected to have scrutinized the attorney fees as closely as a court has, and the contingency fee agreements into which the named plaintiffs entered, Doc. 140-3 at ¶ 9; Doc. 140-4 at ¶ 11; Doc. 140-7 at ¶ 13, were not excessive in a way that would have been apparent to non-lawyers. That Gehrich worked as an unpaid intern at one of Class Counsel's firms prior to August 2012, Doc. 124-1 at 1, does not present a conflict of interest of the sort against which the

Seventh Circuit has warned. *See Eubank*, 753 F.3d at 723-24 ("[I]t was improper for lead class counsel to be the son-in-law of the lead class representative. Class representatives are … fiduciaries of the class members, and fiduciaries are not allowed to have conflicts of interest without the informed consent of their beneficiaries.").

Finally, the $1,500 service awards requested here are truly nominal. Courts in this District have recently and routinely granted $5,000 incentive awards to named plaintiffs in TCPA cases. *See, e.g.*, *Kolinek*, 2015 WL 7450759, at *17; *In re Capital One*, 80 F.Supp.3d at 809. The court therefore grants Plaintiffs' motion for the incentive awards.

## Conclusion

For the foregoing reasons, the motions for class certification and incentive awards are granted, while the motions for final approval of the settlement and for attorney fees are granted in part and denied in part. The court modifies the settlement such that the distribution of the $34 million common fund is as follows: (1) Collection Call Subclass Member claims in the amount of $21,531,656.39; (2) a dedicated *cy pres* distribution of $50,000 to the Consumer Federation of America; (3) settlement administration expenses of approximately $5,152,929.51; (4) court-approved incentive awards to the five class representatives in the amount of $1,500 each ($7,500 total); and (5) court-approved attorney fees and costs of $7,257,914.10.

March 2, 2016

_____
United States District Judge