UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JONATHAN I. GEHRICH, ROBERT LUND, COREY GOLDSTEIN, PAUL STEMPLE and CARRIE COUSER, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> CHASE BANK USA, N.A., and JPMORGAN CHASE BANK, N.A., <br><br> Defendants. | 12 C 5510 <br><br> Judge Feinerman |

**M**EMORANDUM **O**PINION AND **O**RDER

In July 2012, Jonathan Gehrich filed this class action against Chase Bank for alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*. Doc. 1. On March 2, 2016, the court certified the settlement class and modified and approved a proposed settlement; in so doing, the court reduced Class Counsel's requested attorney fees and substantially reallocated a proposed *cy pres* award from its designated recipient to the class. Docs. 240-241 (reported at 2016 WL 806549 (N.D. Ill. Mar. 2, 2016)). Now, Objector Tamiqueca J. Johnson D'Oyley has moved for attorney fees, expenses, and an incentive award. Doc. 242. Class Counsel opposes the motion. Doc. 252. The motion is denied.

**Background**

The relevant facts are set forth in the court's prior opinion, familiarity with which is assumed. To summarize, the TCPA prohibits the use of "any automatic telephone dialing system or an artificial or prerecorded voice" to call or send text messages to cell phones for non-emergency purposes without prior express consent from the recipient of the calls or messages. 47 U.S.C. § 227(b). For each statutory violation, a consumer may recover $500 in damages and

1

up to $1,500 if "the defendant willfully or knowingly violated" the TCPA. 47 U.S.C. § 227(b)(3). Plaintiffs alleged that Chase violated the TCPA by placing automated calls and sending automated alerts regarding account updates or debt collection to their cell phones using automatic dialing systems, without their consent, and after they asked that the calls and alerts cease. Doc. 96 at ¶¶ 3, 16, 31-40.

This suit was filed in July 2012, Doc. 1, and two other putative class actions were later consolidated with this one, *Goldstein v. JPMorgan Chase Bank, N.A.*, No. 2:12-cv-10252-DMG-SH (C.D. Cal. filed Nov. 30, 2012), and *Lund v. Chase Bank, N.A.*, No. 3:12-cv-2554-H-DHB (S.D. Cal. filed Oct. 19, 2012). Docs. 94, 96; Doc. 186-1 at 10-11. By July 2013, the parties were actively engaged in settlement discussions, Doc. 78, and in August 2014, they moved for preliminary approval of the settlement and conditional certification of a settlement class, Doc. 107. The court granted the motion and approved a notice program for the class. Docs. 116-117. At the court's request, Docs. 120, 123, the parties filed a brief directly addressing whether the proposed settlement complied with the principles set forth in *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014), and *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014). Doc. 124.

In March 2015, Plaintiffs moved to certify the settlement class, Doc. 168; in August 2015, Class Counsel moved for attorney fees and expenses and incentive awards for the five class representatives, Doc. 186; and in October 2015, Plaintiffs moved for final approval of the settlement, Doc. 198. The Settlement Class, which has 32,297,356 members, Doc. 186-1 at 13; Doc. 186-2 at ¶ 5; Doc. 197 at 10, is defined as follows:

> All persons to whom, on or after July 1, 2008 through December 31, 2013, Chase USA and/or JPMC Bank placed a non-emergency call, SMS text message or voice alert call to a cellular telephone through the use of an automatic telephone dialing system and/or an artificial or prerecorded voice.

2016 WL 806549, at *2.  The Settlement Class comprises two subclasses, which correspond to different TCPA violations.  The Alert Call Subclass consists of:

> Persons whom, on or after July 1, 2008 through December 31, 2013 received one or more Short Message Service ("SMS") text messages or voice alert calls to a cellular telephone using an automatic telephone dialing system and/or prerecorded voice placed either directly or indirectly by Chase USA or JPMC Bank in connection with providing account information ("Automatic Alert Calls").  The Alert Call Subclass includes, without limitation, persons to whom such Automatic Alerts were placed notwithstanding that they are not Chase customers and/or not the person to whom the Automatic Alert was intended to be directed ….  Alert Call Subclass Members did not also receive Collection Calls.

*Ibid*.  The Alert Call Subclass has 13,927,106 members.  Doc. 107-5 at ¶ 13; Doc. 186-1 at 13.

The Collection Call Subclass consists of:

> Persons whom, on or after July 1, 2008 through December 31, 2013 received one or more non-emergency telephone calls to cellular telephones placed either directly or indirectly by Chase USA or JPMC Bank using an automatic telephone dialing system and/or artificial prerecorded voice in connection with attempts to collect debts relating to Chase credit card accounts or JPMC Bank accounts ("Collection Calls").  The Collection Call Subclass includes, without limitation, persons to whom such Collection Calls were placed notwithstanding that they are not Chase customers and/or not the person to whom the Automatic Collection Call was intended to be directed.

2016 WL 806549, at *2.  The Collection Call Subclass has 18,370,250 members.  Doc. 186-1 at 13; Doc. 186-2 at ¶ 5.

    The proposed Settlement Agreement, Doc. 107-2, required a non-reversionary payment by Chase of $34 million, to be distributed as follows:

> to pay (1) Settlement Class Member claims in the amount of $18,331,967.49; (2) a dedicated *cy pres* distribution of $1,000,000; (3) settlement administration expenses of approximately $5,152,929.51; (4) court-approved incentive awards to the five named Plaintiffs in the amount of $1,500 each ($7,500 total); and (5) court-approved attorneys' fees and costs of $9,507,603.

Doc. 198 at 6.  The distribution subsumed all litigation costs and provided that each Collection Call Subclass member filing a timely claim would receive between $19.40 and $77.60,

depending on the nature of the TCPA violation(s) to which they were subject. Doc. 107-2 at 14-15, 17; Doc. 197 at 10-11, Doc. 202 at 10. The proposed settlement further provided that any funds remaining after the second *pro rata* distribution to the Collection Call Subclass would go to the Electronic Frontier Fund ("EFF") as a residual *cy pres* distribution. Doc. 107-2 at 18; Doc. 197 at 11. The settlement did not provide for any monetary distribution to the Alert Call Subclass. Doc. 107-2 at 17-18; Doc. 197 at 11 & n.6. Rather, a dedicated $1 million *cy pres* distribution to the Consumer Federation of America ("CFA") would serve as consideration to extinguish their TCPA claims. Doc. 107-2 at 17-18; Doc. 197 at 11. Settlement Class Members submitted 349,206 timely claims, representing 1.08% of the class. Doc. 202 at 9. 225 members opted out of the class. *Ibid*.

Several class members filed objections to the attorney fee request, Docs. 121, 122, 142, 143, 145, 152, 153, 155, 158, 162, 192, 221; the dedicated *cy pres* distribution, Docs. 122, 142, 150, 153, 158, 220, 222; and other settlement provisions, Docs. 118, 119, 122, 142, 150, 152, 153, 158, 162, 220. The court held approval hearings on October 22, 2015, Doc. 212, and December 15, 2015, Doc. 228, and modified and approved the settlement on March 2, 2016. Docs. 240-241 (reported at 2016 WL 806549 (N.D. Ill. Mar. 2, 2016)). During the final approval proceedings, D'Oyley filed a nine-page brief objecting to both the dedicated and residual *cy pres* distributions, Doc. 150; appeared (through counsel) and argued at the October 22 hearing, Doc. 212; Doc. 242-1; responded, with a five-page brief, to Chase's brief defending the dedicated *cy pres* distribution, Doc. 222; appeared telephonically at the December 15 hearing, Doc 228; and filed a proposed order sustaining her objection, Docs. 227, 227-1. The court did not adopt her proposed order.

The court modified the proposed settlement to provide for distribution of the $34 million common fund as follows: (1) $21,531,656.39 to the Collection Call Subclass; (2) a dedicated *cy pres* distribution of $50,000 to the CFA; (3) settlement administration expenses of approximately $5,152,929.51; (4) court-approved incentive awards to the five class representatives in the amount of $1,500 each ($7,500 total); and (5) court-approved attorney fees and costs of $7,257,914.10. 2016 WL 806549, at *19. In so doing, the court reallocated to the Collection Call Subclass: (1) approximately $2.25 million from Class Counsel's requested attorney fees, *id*. at *14-18; and (2) $950,000 from the proposed *cy pres* distribution to the CFA, *id*. at *12-13. The court did not modify the residual *cy pres* distribution to the EFF. *Id*. at *13.

On March 2, 2016, the day the court issued the final approval order, D'Oyley moved for $285,000 or $297,000 in attorney fees, $9,216.53 in costs, and an incentive award "equal to or greater than" $1,500. Doc. 242 at ¶¶ 16, 18, 34.

## Discussion

"[O]bjectors play an essential role in judicial review of proposed settlements of class actions," as they aid the court in policing against a "deal that promotes the self-interest of both class counsel and the defendant" at the class's expense. *Pearson*, 772 F.3d at 787 (internal quotation marks omitted). Accordingly, although "[t]he law generally does not allow good Samaritans to claim a legally enforceable reward for their deeds," *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir. 2002), "[i]f their objections persuade the judge to disapprove [a proposed settlement], and as a consequence a settlement more favorable to the class is negotiated and approved, the objectors will receive a cash award that can be substantial," *Eubank*, 753 F.3d at 720. *See In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 748 (7th Cir. 2011) (awarding more than $4 million in attorney fees to an objector who had obtained a

5

dramatic increase in the size of the proposed settlement); *Reynolds*, 288 F.3d at 288 ("[W]hen professionals render valuable albeit not bargained-for services in circumstances in which high transaction costs prevent negotiation and voluntary agreement, the law does allow them to claim a reasonable professional fee from the recipient of their services. That is the situation of objectors to a class action settlement.") (citations omitted). "But the principles of restitution that authorize such a result also require that the objectors produce an improvement in the settlement worth more than the fee they are seeking; otherwise, they have rendered no benefit to the class." *Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 688 (7th Cir. 2008) (internal quotation marks omitted). In other words, attorney fee awards for objectors are not participation trophies; rather, only "lawyers who contribute materially to the proceedings … obtain a fee." *Id.* at 687-88.

D'Oyley premises her fee request on the court's reallocation of $950,000 from the proposed dedicated $1 million *cy pres* distribution to the Collection Call Subclass. Doc. 242 at ¶¶ 16, 29 ("But for Objector D'Oyley's counsel's willingness to take on this matter, the Dedicated *Cy Pres* Distribution would not have been reallocated for the benefit of the Collection Call Subclass."). D'Oyley's brief objected to that *cy pres* award, Doc. 150 at 2-6, and her counsel presented the argument in the October 22, 2015 approval hearing, Doc. 242-1 at 5-10. To support her fee request, D'Oyley notes that her counsel reviewed the settlement agreement, conducted legal research and drafted the brief asserting the objection, responded to the parties' responses to the objection, attended one hearing, and participated in the other by telephone, spending 155.1 hours. Doc. 242 at ¶ 15; Doc. 242-3 at 10; Doc. 243-1 at 6. The requested $285,000 fee is 30 percent of $950,000, a percentage that D'Oyley terms "presumptively reasonable" under *Pearson* and other Seventh Circuit precedent. Doc. 242 at ¶¶ 26-28.

The court is mindful of the important role that objectors play in class action settlements. But D'Oyley did not contribute materially to the settlement class's recovery or to the court's decision to reallocate $950,000. The court accordingly denies her fee request.

The reason that D'Oyley did not contribute materially to the settlement class's recovery is that the court did not in fact sustain her objections. In reallocating $950,000 of the proposed dedicated *cy pres* distribution, the court did not rely on D'Oyley's legal arguments or the precedent she cited. In her objection briefs and at the fairness hearing, D'Oyley objected to the dedicated *cy pres* award on the ground that "unclaimed class action settlement funds must be distributed to class members who submit a claim form until those class members are made whole." Doc. 150 at 3; *see also* Doc. 222 at 2; Doc. 242-1 at 7. That argument runs contrary to Seventh Circuit precedent, which provides that a *cy pres* award may comprise "money that can't feasibly be awarded to the … class members," regardless of whether or not the class members are made whole. *Pearson*, 772 F.3d at 784; *see also Hughes v. Kore of Ind. Enters., Inc.*, 731 F.3d 672, 675 (7th Cir. 2013) ("[A] *cy pres* decree awards to a charity the money that would otherwise go to the members of the class as damages, if distribution to the class members is infeasible.").

The court's reallocation of $950,000 rested not on D'Oyley's arguments, but on an entirely different ground—that the claims of Alert Call Subclass members, the intended beneficiaries of the dedicated *cy pres*, lacked merit, and so $1 million was too significant an amount to divert from the Collection Call Subclass. 2016 WL 806549, at *12 ("What is problematic … is the size of the dedicated *cy pres* award, which at $1 million amounts to about 5% of the amount reserved for payments to class members. Because the Alert Call Subclass's claims likely have no value, this is much too high, for it would reduce the total value of the

settlement fund to the Collection Call Subclass members, who actually have potentially meritorious claims."). D'Oyley's objection brief nowhere argued, or even allowed for the possibility, that the *cy pres* distribution should be reduced because the Alert Call Subclass claims had no value. D'Oyley's response to Chase's defense of the *cy pres* award mentioned the possibility in passing, Doc. 222 at 4, but that response was filed only *after* the October 22, 2015 approval hearing, at which, as discussed below, the court had made its position clear. D'Oyley's objection thus did not benefit the class.

D'Oyley retorts that at the October 22 hearing, the court indicated that she had "already won" on the issue of the *cy pres* reallocation. Doc. 242 at ¶ 9; Doc. 242-1 at 31; Doc. 261 at 3. This argument misrepresents the context of the court's comment. After D'Oyley (through counsel) presented her objection to the proposed dedicated *cy pres* award, Doc. 242-1 at 5-10, 17-19, the parties' counsel defended that award, *id*. at 19-30. In the course of that discussion, the court noted on several occasions that it was inclined to reallocate the bulk of the dedicated *cy pres* distribution because Alert Call Subclass members did not have meritorious claims. *Id*. at 21 ("So, on the dedicated [*cy pres*], both sides seem to agree that the alert call subclass has no viable claim because there's consent [to receiving the allegedly unlawful calls and alerts]. Why should we give a million dollars to these people – or why should we use these people as a vehicle for the plaintiffs' lawyers to give a million dollars to the Consumer Federation of America?"); *id*. at 22 ("The first problem [with the dedicated *cy pres*] is that these people shouldn't be getting any money at all."); *id*. at 27 ("But Chase is willing – to buy global peace, Chase is willing to pay $34 million. Why allocate 3 percent of that to people who you – even you believe have no claim? … 13 million times zero is still zero."); *id*. at 29 ("And again, just to be clear, everybody agrees that this is the release of claims that have no value, and all they have is a deadweight loss

cost on Chase for having to litigate it."). The court also posed the following hypothetical to Class Counsel and defense counsel:

> If I were to reallocate $950,000 or $990,000 or $995,000 from the alert subclass … If I were to reallocate money from the alert subclass to the other subclasses on the ground that if it were up to me the alert subclass would get zero, but I understand that a component of the settlement is that Chase buys peace with respect to the alert subclass and there has to be … something given to them, would that decision be vulnerable on any factual or legal ground, vulnerable to challenge on any factual or legal ground?

*Id.* at 28.

After the parties' counsel addressed the issue, the court solicited D'Oyley's views. Rather than commenting on the court's suggested reallocation, D'Oyley began once again to challenge the purpose of a *cy pres* award, to which the court responded:

> Okay. You've already – I wouldn't – if I were you, I wouldn't focus on things that you've already won because the only thing that can happen is things could get worse for you. I would focus on the question of the reallocation.

*Id.* at 31. When understood in context, the court's comment was not that D'Oyley's *argument* had prevailed on the *cy pres* issue; rather, it confirmed that because the court had signaled that it intended to reallocate the bulk of the proposed dedicated *cy pres* distribution on the ground that the Alert Call Subclass members' claims lacked merit, D'Oyley should focus on whether the *amount* of the reallocation was permissible instead of lingering on her (incorrect) argument about *cy pres* awards generally.

It bears mention that D'Oyley devoted approximately half of her objection brief and oral argument to the meritless contention that the residual *cy pres* award was improper because it "artificially capp[ed] the claims of the Collection Call Subclass." Doc. 150 at 6. As discussed in the settlement approval order, 2016 WL 806549, at *13, this argument stemmed from a rather obvious misunderstanding of the Settlement Agreement, which provided for the residual *cy pres* distribution to be made only after two *pro rata* distributions to claimants, and then only from

9

funds for which the cost of distribution would exceed each claimant's award from a theoretical third *pro rata* distribution. Doc. 107-2 at 17-18; Doc. 197 at 11, 30-31; Doc. 202 at 25. Although the court does not *penalize* D'Oyley for making this argument—that is, if D'Oyley had truly prevailed on the dedicated *cy pres* issue, the court would not have denied her motion simply because her other argument was meritless—the court was compelled to expend time and energy addressing an argument that D'Oyley should not have made and that did not benefit the class.

The court further notes that D'Oyley submitted two short briefs, attended and argued at one hearing, and appeared telephonically at another. Her counsel did not participate in motion practice or settlement negotiations, and their work did not precipitate changes in the size of the common fund, the scope of class members' claims releases, or any other terms of the settlement. As Class Counsel correctly notes, Doc. 252 at 5-6, the present circumstances are a far cry from the two cases cited by D'Oyley, Doc. 242 at ¶ 19. In *American International Group, Inc. v. ACE INA Holdings, Inc.*, 2012 WL 651727 (N.D. Ill. 2012), the objectors who were awarded fees litigated the case on behalf of the class, defeated a motion to dismiss, and engaged in extensive discovery. *Id*. at *18. Likewise, the objectors awarded fees in *Great Neck Capital Appreciation Investment Partnership, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400 (E.D. Wis. 2002), negotiated a revised release that preserved some of the class members' related claims, which required extensive conferral with the settling parties. *Id*. at 413. Both of those objector interventions were extensive, consequential, and beneficial to the class. D'Oyley's work in this case was none of those things, and, accordingly, she is not entitled to attorney fees and costs.

The motion for an incentive award is also denied. As an initial matter, and as noted above, objectors are entitled to awards only "if their objections persuade the judge to disapprove [a proposed settlement], and as a consequence a settlement more favorable to the class is

negotiated and approved." *Eubank*, 753 F.3d at 720. Because D'Oyley's objection was not sustained, she did not benefit the class and thus is not entitled to an award.

Moreover, the Seventh Circuit has held that "if at least one [objector] would have stepped forward without the lure of an 'incentive award,' there is no need for additional compensation." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 723 (7th Cir. 2001). This principle prevents professional objectors from plucking low-hanging fruit and then demanding payment for their services. Here, four other objectors—none of whom have moved for fees or incentive awards—independently objected to the dedicated *cy pres* distribution. Docs. 122, 142, 153, 158. It therefore "is evident that the prospect of recovery created enough incentive for" objectors to the dedicated *cy pres* "to step up even without an additional award for doing so." *Synthroid*, 264 F.3d at 723; *see also In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 571-72 (7th Cir. 1992) ("The judge's ground for refusing [the named plaintiff] a fee was that … if the named plaintiff had dropped out because he couldn't hope to be compensated for his modest efforts there were plenty of others willing to take his place without demanding compensation. The implicit reasoning is that the market would have produced a named plaintiff willing to charge a price of zero, and we think there is enough basis for this conjecture, given the state of the record, to let it stand."). Accordingly, D'Oyley's request for an incentive award is denied as well.

## Conclusion

For the foregoing reasons, D'Oyley's motion for attorney fees, expenses, and an incentive award is denied.

May 27, 2016

United States District Judge